# UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In Re: | ) | Case No. 16-01825-als11 |
| | ) | |
| **WELLMAN DYNAMICS CORP.** | ) | Chapter 11 |
| | ) | |
| Debtor and Debtor in Possession. | ) | Honorable Anita L. Shodeen |
| | ) | |
| 1746 Commerce Rd. | ) | **DEBTOR'S MOTION FOR ORDERS** |
| Creston, IA  50801 | ) | **(I) AUTHORIZING SALE OF ASSETS** |
| | ) | **FREE AND CLEAR OF LIENS,** |
| | ) | **CLAIMS, INTERESTS AND** |
| EIN:  36-3198501 | ) | **ENCUMBRANCES** |
| | ) | **TO STALKING HORSE OR OTHER** |
| | ) | **HIGHER AND BETTER BIDDER,** |
| | ) | **(II) AUTHORIZING ASSUMPTION** |
| | ) | **AND ASSIGNMENT OR REJECTION** |
| | ) | **OF LEASES AND EXECUTORY** |
| | ) | **CONTRACTS; (III) APPROVING BID** |
| | ) | **PROCEDURES FOR SALE, AND** |
| | ) | **(IV)  SCHEDULING HEARING ON** |
| | ) | **APPROVAL OF SALE** |
| | ) | |
| | ) | No Hearing Set |
| | ) | |
| | ) | |

COMES NOW, Wellman Dynamics Corp. ("Debtor" or "WDC"), debtor and debtor in possession herein, by and through its duly-employed general reorganization counsel, Jeffrey D. Goetz, Esq. and Thomas J. Joensen, Esq., of the law firm of Bradshaw, Fowler, Proctor & Fairgrave, and respectfully files this Motion for Orders (I) Authorizing Sale of Assets Free and Clear of Liens, Claims, Interests and Encumbrances to Stalking Horse or Other Higher and Better Bidder, (II) Approving Bid Procedures for Sale, and (III) Scheduling Hearing on Approval of Sale, and would show this Honorable Court as follows:

## BACKGROUND

1.      On September 13, 2016 (the "Petition Date"), WDC, Fansteel, Inc. ("Fansteel"), and

Wellman Dynamics Machining & Assembly, Inc. ("WDMA") filed voluntary petitions under

chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") (Fansteel Docket Item 1).

Debtors filed motions to jointly administer the cases pursuant to Bankruptcy Rule 1015(b), and the

Court entered an Order authorizing joint administration on October 17, 2016 (Fansteel Docket Item

207).  The Court subsequently entered an Order on May 24, 2017 vacating its prior Order granting

joint administration and discontinuing the joint administration of the Debtors' cases under the lead

case of Fansteel (WDC Docket Item 170).

2.      Debtor continues to operate its businesses and manage its property as debtor-

in-possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

3.      No trustee or examiner has been appointed in this case.

4.      On September 23, 2016, the Office of the United States Trustee (the "Trustee")

filed a Notice of Appointment of Committee of Unsecured Creditors (the "Committee") in the

Fansteel case (Fansteel Docket Item 67).   The Notice was not filed in either the WDC or WDMA

cases and the Notice filed in Fansteel did not explicitly reference or incorporate either WDC or

WDMA.  On March 22, 2017, the United States Trustee filed in the Fansteel case an amendment

to the Committee appointment essentially disbanding the Committee and simultaneously

reconstituting the Committee as a blended Committee for the chapter 11 cases of WDC and

WDMA (Fansteel Docket Item 702).  On that same date, the United States Trustee also filed an

Appointment of Committee in WDC (WDC Docket Item 119) and WDMA (WDMA Docket

Item 84).  Due to the Court's May 24, 2017 Order vacating joint administration, the United

States Trustee filed a Motion in the WDC case for Appointment of Committee Nunc Pro Tunc

(WDC Docket Item 234).

## JURISDICTION

5.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334. Venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2).

## RELIEF REQUESTED

6.     By this Motion, pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code

and Rules 2002, 6004, 6006 and 9006 of the Federal Rules of Bankruptcy Procedures

(the "Bankruptcy Rules") the Debtor seeks entry of:

(a)     the "Bid Procedures Order", substantially in the form attached hereto as
Exhibit B:

(i)     authorizing and approving the "Bid Procedures," substantially in the
form attached as Exhibit 1 to the Bid Procedures Order.

(ii)     authorizing and approving the procedures for the assumption and
assignment of executory contracts and unexpired leases and the
determination of cure costs (the "Assumption and Assignment
Procedures");

(iii)     scheduling the auction for the Acquired Assets (as defined herein) to
be held within forty five (45) days after entry of the Bid Procedures
Order (the "Auction");

(iv)     scheduling a hearing with respect to the approval of the sale of the
Acquired Assets (the "Sale Hearing") and notices related thereto
within sixty (60) days of entry of the Bid Procedures Order (subject to
the Court's availability); and

(v)     approving various deadlines in connection with the foregoing.

(b)     the "Sale Order", which shall be filed with the Court at least 14 days prior
to the Sale Hearing and shall be in form and substance reasonably
acceptable to the Debtors and the Stalking Horse Bidder or other
Successful Bidder, authorizing and approving:

(i) the sale of substantially all of assets of WDC free and clear of any liens, claims, interests and encumbrances (the "Acquired Assets") to TCTM Financial FS, LLC ("TCTM" or the "Stalking Horse Bidder" and such order, the "Sale Order"), subject to higher or better offers in accordance with the Bid Procedures;

(ii) the assumption and assignment of certain executory contracts and unexpired leases of the Debtor in connection therewith; and

(iii) granting related relief.

**Need for Timely Sale Process**

7.        Despite the best efforts of the Debtor and its professionals, the Debtor has been unable to achieve its chapter 11 goals ten months into the case.  The Debtor's original strategy at the outset of the case was to a confirm a plan of reorganization that would pay out all creditors in full while allowing existing equity holders to maintain a stake in the company and, to that end, the Debtor filed three amended plans of reorganization. Ultimately, however, the Debtor was forced to withdraw its plan of reorganization in April 2017 when necessary exit financing was insufficient to meet the requirements of the proposed plans.  As a result, the Debtor was left with no clear path forward.  Moreover, in the process of pursuing the stand-alone plans, the Debtor incurred significant professional fees, much of which have not yet been paid.

8.        On May 8, 2017, the Committee filed a Disclosure Statement and Plan of Liquidation (Docket Item 161).  The Court entered a Notice of Deadlines and Hearing on the Disclosure Statement and Plan establishing the timeline and course of proceedings for the Committee's Plan (Docket Item 167).  The Committee filed a Motion to Continue Deadlines (Docket Item 173), which the Court granted (Docket Item 176).  The Committee filed a Second Motion to Continue Deadlines requesting a continuation of the deadlines without dates new deadlines were requested (Docket Item 215).   The Court entered an Order granting the

Committee's Second Motion to Continue Deadlines on June 27, 2017 (Docket Item 220). All of

the deadlines established in connection with the Committee's plans have passed without being

satisfied. In addition, counsel to the Committee stated to Your Honor in a status conference that

it could be 2018 before it is feasible to consummate their proposed plan in light of certain

potential environmental and other issues that may be associated with WDC.

9.    During the ten months of the case, the Debtor has been authorized to use cash

collateral through a series of stipulations and consent orders, the most recent of which expires

July 29, 2017. The Debtor has not sought nor obtained debtor-in-possession financing to operate

its business and fund its case. Although the Debtor continues to operate its business pursuant to

a cash collateral budget, that budget is premised on the Debtor not timely paying approved

professional fees, and delaying adequate protection payments to its secured lender. Without a

clear and expeditious path forward, and with no other outside source of financing readily

apparent, the most expeditious and value-maximizing path to emergence—that would result in

the least amount of administrative expense and deterioration in the value of its business—is an

immediate sale of substantially all its assets.

10.    The transaction contemplated in the Stalking Horse APA will jump-start a

competitive sale process and is in the best interest of the estate. TCTM is offering to provide $5

million in much needed cash (in addition to a credit bid and assumption of certain liabilities) as

part of its consideration. Moreover, in connection with TCTM's credit bid, and pursuant to a

separate motion to be filed with the Court, TCTM will provide $250,000 in debtor-in-possession

financing to fund the Debtor's case while also continuing to waive payment for adequate

protection and professional fees. TCTM is not only providing the Debtor with necessary

liquidity, but is conferring a material benefit to the estate by assisting other bidders in valuing the

Debtor's business, which may lead to higher or better offers for the Debtor's assets, all while foregoing significant payments that it is entitled to. Absent the commencement the sale process set forth herein, the Debtor will continue steaming towards administrative insolvency, liquidation, and job loss. Rather than head down this road, the Debtor chooses to pursue a course that will ultimately result in a value maximizing sale for the benefit of all parties.

### Proposed Sale Transaction

11.     Good-faith and arms-length negotiations have resulted in the Debtor executing an Asset Purchase Agreement (hereinbefore and after, the "APA" or the "Stalking Horse APA")[1] with TCTM, subject to higher and better offers and a thorough marketing process to be conducted. Attached hereto as <u>Exhibit A</u> is a true and exact copy of the Stalking Horse APA.

12.     The basic terms of the Stalking Horse APA are summarized as follows (with all capitalized terms not defined herein having those meanings set forth in the APA:[2]

| | |
|---|---|
| <u>Consideration:</u> | The consideration for the sale and transfer of the Acquired Assets is (i) the TCTM Credit Bid in an amount of $15,500,000 (the "<u>TCTM Credit Bid Amount</u>"), (ii) an amount in cash equal to $5,000,000 (the "<u>Cash Consideration</u>"), and (iii) the assumption of the Assumed Liabilities (clauses (i) through (iii) collectively, the "<u>TCTM Bid</u>"). |
| <u>Acquired Assets:</u> | Other than the Excluded Acquired Assets, all of the business, Acquired Assets, properties, contractual rights, goodwill, going concern value, rights and claims of Seller primarily related to the Business, wherever situated and of whatever kind and nature, real or personal, tangible or intangible, whether or not reflected on the books and records of Seller. |

---

[1] Capitalized terms used in the Motion but not otherwise defined shall have the meanings ascribed to them in the Stalking Horse APA.

[2] In the event of any inconsistency between the terms of the APA as set forth herein and the APA, the APA will control.

| | |
|---|---|
| Excluded Acquired Assets: | Any Acquired Assets owned by the Estate which are not Acquired Assets are deemed to be "Excluded Acquired Assets", including any specifically set forth on Schedule 1.2, as filed with the Bankruptcy Court on August 4, 2017 in a form and substance acceptable to Buyer (in its sole discretion), including rights in insurance arising in connection with property damage to the Excluded Acquired Assets. |
| Bid Protections | The Debtor and the Stalking Horse Bidder have not agreed to any bid protections, such as a break-up or termination fee. |
| Closing: | Subject to the satisfaction of the conditions set forth in the APA, the consummation of the transactions contemplated hereby (the "Closing") shall take place at a time and place as agreed to by the parties on the date that is two (2) Business Days following the satisfaction or waiver in writing of the conditions set forth in the APA (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another time or date, or both, are agreed to in writing by Seller and Buyer.  The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date." |

### **Marketing Efforts**

13.     There has been no marketing of the assets of the WDC prior to the date of filing this Motion, primarily because until mid-April the Debtors were pursuing standalone reorganization plans.  Since April, the Debtor has engaged in good-faith discussions with both TCTM and the Committee as to a path forward, culminating now with the Sale Motion before the Court.  There is, however, a robust marketing process contemplated by the Bid Procedures, to be led by an investment banking professional to be retained by Debtor pursuant to separate motion filed.  The marketing process will garner interest in the Debtor's assets by having the Stalking Horse establish a baseline bid that will serve to inform the market and facilitate the Debtor receiving the highest and best offer for its assets.

14.     In order to facilitate a robust and competitive marketing and test the marketplace to ensure the Debtor and the estate are realizing maximum value for the sale of the Debtor's

assets, the Debtor is seeking authority to engage Gordian Group (the "Investment Banker")
pursuant to an employment application that will shortly be filed with the Court.  The Investment
Banker will work with management to prepare an executive summary of the Acquired Assets and
its investment highlights to be distributed to potential buyers, both strategic and financial, that
will execute Non-Disclosure Agreements. Further, the Investment Banker plans to populate a
Virtual Data Room ("VDR") to facilitate interested parties due diligence exercises.  Debtor
already has made substantial progress in setting up a VDR in connection with preliminary
diligence provided to the Stalking Horse Bidder. Investment Banker will also work with
interested parties to supplement diligence investigations and facility tours, as necessary.

### Bid Procedures

15.        The Bid Procedures are designed to maximize value for the Debtor's estates
and will enable the Debtors to review, analyze, and compare all bids received to determine which
bid is the highest and best.  The Bidding Procedures describe, among other things, procedures for
parties to access due diligence, the manner in which bidders and bids become "qualified," the
receipt and negotiation of bids received, the conduct of the Auction (if any), the selection and
approval of the ultimately successful bidder, and the deadlines with respect to the foregoing
Bidding Procedures.  Moreover, despite TCTM conferring a material benefit on the estate by
negotiating the Stalking Horse APA, which will be shared with other bidders and inform the
market of the value of the Acquired Assets, the Debtor and TCTM have agreed that there will be
no break-up fee or other bid protections provided to TCTM in the event that TCTM is not the
Successful Bidder at the Auction.  The Debtor submits that the Bidding Procedures afford it the
opportunity to pursue a sale process that will maximize the value of its estate.

16.        The Bid Procedures will provide detailed instructions, requirements and notice to all interested parties regarding access to diligence materials, the assets to be sold, the bidding process, key dates for potential preliminary bidders, the bid submission process, determination and announcement of baseline bids, and conduct of the auction and bidding terms.

**Assumption and Assignment of Executory Contracts and Unexpired Leases**

17.        The basic terms of the APA relating to the assumption and assignment of executory contracts and unexpired leases is summarized as follows (with all capitalized terms not defined herein having those meanings set forth in the APA and with any inconsistency being resolved in favor of the APA):

(a)        Buyer agrees to assume Seller's obligations arising from and after the Closing Date under the Contracts designated by Buyer for assumption and assignment and approved by the Bankruptcy Court for assumption by Seller and assignment to Buyer ("Assumed Contracts").  If the Bid Procedures are approved by the Bankruptcy Court, the following or similar procedures will govern the assumption and assignment of the Assumed Contracts.

(b)        Not later than five (5) Business Days after the date of entry of the Bid Procedures Order, the Debtor will file with the Bankruptcy Court and serve on each non-Debtor party to a Preliminary Designated Contract a "Cure Notice" setting forth the amount of cure owed thereunder according to the Debtor's books and records.

(c)        The Cure Notice shall state (i) the Cure Amount, (ii) notify each non-Debtor party that such party's lease or Contract may be assumed and assigned to the Buyer, and (iii) state the Cure Objection Deadline (as defined below).

(d)        Any Objection shall be filed Ten (10) Business Days after the filing of the Cure Notice (the "Cure Objection Deadline").  Any objection to the Cure Amount must state with specificity what cure the non-Debtor party to the Preliminary Designated Contract believes is required with appropriate documentation in support thereof.  If no objection is timely received, the Cure Amount set forth in the Cure Notice shall be controlling notwithstanding anything to the contrary in any Preliminary Designated Contract or other document as of the date of the Cure Notice.  Any objections not resolved between the parties shall

9

be set for a hearing as fixed by the Bankruptcy Court.   Any counterparty to any Preliminary Designated Contract who does not file a Cure Objection by the Cure Objection Deadline, shall be forever barred from objecting to the Cure Amount or asserting or claiming any Cure Amount (other than the Cure Amount listed in the Cure Notice) against Seller, the Estate or Buyer.  Any counterparty to a Preliminary Designated Contract who does not file a timely objection to the assumption and assignment shall be deemed to have consented to the assumption and assignment of its Preliminary Designated Contract to Buyer and will be forever barred from objecting to such assumption and assignment on account of the Cure Amount, lack of adequate assurance or any other grounds.  Further, Buyer shall provide adequate assurance of future performance under the Preliminary Designated Contracts, as same is required by the Bankruptcy Court.

(e)     In either event, the Sale Order approving the assumption and assignment of the Preliminary Designated Contracts shall provide that upon payment of the applicable Cure Amount in accordance with the last sentence of paragraph (f), such counterparty shall not have any remaining claim against Seller or the Estate related to any default under any such Assumed Contract.  Seller makes no representation or warranty with respect to the future performance of any non-Debtor parties to the Assumed Contracts.  Seller makes no representation or warranty as to whether any Designated Contracts can be assumed and assigned under applicable Law or otherwise.

(f)     Buyer shall have three (3) Business Days prior to Closing to select which of the Preliminary Designated Contracts it will want Seller to assume and assign to Buyer (the "Final Designated Contracts") by notifying Seller, who will notify contract counterparties directly.  At Closing, Buyer will pay the Cure Amount of each Final Designated Contract up to an aggregate amount equal to $78,416.00 and Seller shall pay any Cure Amounts not paid by Buyer.

**The Proposed Transaction Is a Sound Exercise of
Business Judgment and in the Best Interests of the Estate**

18.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a Debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  *See also* Bankruptcy Rule 6004(f)(1) ("All sales not in the ordinary course of business may be by private sale or by public auction.").  This section generally permits a Debtor to sell property of the estate outside of the ordinary course of its

business where the proposed sale is a sound exercise of the Debtor's business judgment and
when such sale is proposed in good faith.  *See In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir.
1983); *In re Nicole Energy Services, Inc.*, 385 B.R. 201, 210 (S.D. Ohio 2008) ("Under the law
of this [Sixth] Circuit, the Court may approve a sale of all of a debtor's assets under § 363(b)
'when a sound business purpose dictates such action.'") (quoting *Stephens Industries, Inc. v.
McClung*, 789 F.2d 386, 390 (6th Cir. 1986)).

19.        Bankruptcy Code Section 363 governs Debtor's ability to sell property of the
estate outside of the ordinary course of business.  Although this section does not set forth a
standard for determining when it is appropriate to authorize such a sale, courts have uniformly
held that such a sale should be approved when it is justified by a sound business purpose.  *See In
re Lionel Corp.*, 722 F.2d 1063, 1070-71 (2d. Cir. 1983); *Chrysler Group LLC v. South Holland
Dodge, Inc.*, 862 F. Supp. 2d 661, 668 (E.D. Michigan 2012); *In re Dewey & LeBoeuf LLP*, No.
12–12321 (MG), 2012 WL 5386276, at *5 (Bankr. S.D. N.Y. Nov. 1, 2012); *In re Nicole Energy
Services, Inc.*, 385 B.R. 201, 230 (Bankr. S.D. Ohio 2008). The burden of establishing a rational
business justification lies with the debtor.  *Nicole Energy*, 385 B.R. at 230 (citing *Lionel*, 722
F.2d at 1070-71).  However, once the debtor makes such a showing, a presumption will attach
that the decision was made on an informed basis, in good faith and in the honest belief that the
action was in the best interest of the company.  *See, e.g., In re Brook Valley VII, Joint Venture*,
496 F.3d 892, 900 (8th Cir. 2007).

20.        In the instant case, the proposed sale of the Acquired Assets pursuant to the
Stalking Horse APA constitutes a sound exercise of Debtor's business judgment and has been
proposed in good faith.  First, an expeditious sale of the Acquired Assets will aid in minimizing
the administrative expenses of Debtor's estate, resulting in greater distribution to creditors.

Second, such sale of the assets as a going concern will ensure business operation will not be interrupted and both customer relationships and enterprise value will be preserved.  Finally, the sale represents the best opportunity for the Debtor to realize the value of the Acquired Assets on a going-concern basis.  The Debtor's business judgment is validated because of the withdrawal of the earlier standalone plans and the absence of any other feasible path forward.

21.    Debtor believes this Motion, the APA, and the transactions contemplated thereby are in the best interests of the bankruptcy estate and in the best interests of all other interested parties in this chapter 11 case. An orderly sale of the Acquired Assets is essential.  The proceeds of the sale, to the extent sold as a going concern, will be greater than if the same Acquired Assets are sold in a piecemeal liquidation because the Debtor's ongoing business will not be interrupted and on-going vendor relationships can be maintained.  Finally, an orderly sale process will also aid in minimizing the administrative expenses of Debtor's estate as the time and uncertainty of pursing a second plan process at this time, with no plan sponsor or feasible financing in sufficient amount to cover the expenses, will be more expensive to the estate and will create a less certain outcome.  Therefore, the Debtor believes this Motion, the APA and the transactions contemplated thereby are in the best interests of the bankruptcy estate and in the best interests of all other interested parties in this chapter 11 case.

22.    Debtor submits that the factors described above and to be established by the Debtor's witnesses and exhibits at the Bid Procedures and Sale Hearings, will support an expeditious sale of the Acquired Assets, and are consistent with the traditional rationale for authorizing a sale outside of a chapter 11 plan. *See also In re Boston Generating, LLC,* 440 B.R. 302, 321 (S.D.N.Y. 2010); *Lionel*, 722 F.2d at 1070.  The proposed sale process represents the best opportunity for the Debtor to realize the value of the Acquired Assets on a going-concern

basis, considering that the previously filed standalone plans failed and that there is no other

feasible path forward that will not result in increased administrative expenses.  Further, there is

no other feasible alternative.

### The APA Was Negotiated at Arm's Length and in Good Faith

23.        The APA and the transactions related thereto were negotiated, have been, and

are undertaken by Debtor and the Stalking Horse at arm's length, without collusion and in good

faith within the meaning of Bankruptcy Code § 363(m).  The Debtor has not agreed to any bid

protections, such as a break-up or termination fee, and TCTM has agreed to provide $5 million in

cash in addition to its credit bid.  In the Debtor's business judgment, this initial bid represents

fair consideration for the Acquired Assets, subject to higher or better offers.  Accordingly,

TCTM requests the Court determine that the entire sale process will be conducted in good faith

within the meaning of Bankruptcy Code § 363(m) and that Seller and Purchaser are entitled to

the protections of Bankruptcy Code § 363(m).  *See In re Brook Valley IV.,* 347 B.R. 662, 676

(B.A.P. 8th Cir. 2006).

24.        In Debtor's business judgment, the APA represents substantial value to

Debtor's estate inasmuch as it provides commercially reasonable, if not favorable terms, under

the Debtor's current circumstances, for the disposition of the Acquired Assets at a price that

represents fair and reasonable consideration having a certain value and ensuring the Bankruptcy

Estate will not be left administratively insolvent.  At the conclusion of the bid process and

auction opportunity, Debtor will have the highest and best offer to submit to this Court for

approval.

### Sale Free and Clear of Liens

25.       Bankruptcy Code § 363(f) authorizes a Debtor to use, sell or lease property of the estate outside of the ordinary course of business, free and clear of any interest in such property. The APA provides for the sale of the Acquired Assets free and clear of all interests, liens, claims and encumbrances, including existing or asserted rights of first refusal, contractual restrictions on transferability or other similar protective rights. Any such interests, liens, claims and encumbrances would attach to the proceeds of the sale of the Acquired Assets (the "Sale Proceeds") ultimately attributable to the property against or in which such interest, lien, claim or encumbrances is asserted.

26.       Under Bankruptcy Code § 363(f)(2), a sale free and clear of all interests, liens, claims and encumbrances is permissible if all parties asserting liens on or other interests in the assets consent. Debtor is providing proper notice of this Motion to the United States Trustee, Senior and Other Secured Creditors, the Official Committee of Unsecured Creditors, counter-parties to executory contracts and unexpired leases and all other parties who have filed requests for special notice, thereby giving them the opportunity to object to this Motion. Provided no secured creditors object to this Motion, Section 363(f)(2) will be satisfied. *See, e.g.*, *In re Motors Liquidation Co.*, 430 B.R. 65, 72) (in a Chapter 11 case, noting that "secured lenders" approved a transaction under § 363(b) of the Bankruptcy Code and related transactions).

27.       Under Bankruptcy Code § 363(f)(4), a sale free and clear of all interests, liens, claims and encumbrances is permissible if the interest of any entity is in *bona fide* dispute. Under Bankruptcy Code § 363(f)(5), a sale free and clear of all interests, liens, claims and encumbrances is permissible if any party asserting an interest in the assets could be compelled to accept money satisfaction of such interest in a legal or equitable proceeding.

**The Sale of Substantially All of WDC's Assets**
**Does Not Establish Any Sub Rosa Plan of Reorganization**

28.        A sale of assets may not be approved where such sale, rather than merely changing the composition of the Debtor's assets, either restructures the right of creditors or predetermines the rights of creditors under any future plan of reorganization. *See In re Braniff Airways, Inc.*, 700 F.2d 935, 939-40 (5th Cir. 1983); *In re Iridium Operating LLC*, 478 F.3d 452, 465-66 (2nd Cir. 2007); *In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1227-28 (5th Cir. 1986).

29.        In *Braniff*, the Fifth Circuit held that an agreement between the Debtor and its creditors established a *sub rosa* plan of reorganization because, among other things, the agreement: (i) required that any future plan of reorganization allocate certain assets only to employees, shareholders or unsecured creditors of the Debtor; (ii) required the secured creditors to vote a portion of their deficiency claim in favor of any future plan of reorganization approved by a majority of the unsecured creditors' committee; and (iii) provided for the release of claims by all parties against the Debtors, its secured creditors and its officers and directors. 700 F.2d at 939-40.

30.        Unlike *Braniff*, the transactions contemplated by the APA will not restructure the rights of Debtor's creditors or predetermine the rights of such creditors under any future plan of reorganization.

31.        Furthermore, Debtor has articulated sound business justifications for selling the Acquired Assets now, rather than as part of a plan.  A Bankruptcy Code § 363 sale motion should be approved if it is based on good business reasoning *In re Lionel Corp.*, 722 F.2d at 1070; *In re Equity Management Systems*, 149 B.R. 120 (Bankr. S.D. Iowa 1993) (Court considered some of the following factors: whether all parties in interest received reasonable

notice; whether the purchase price is fair and reasonable; whether there is a sound business reason for the sale; and whether the proposed sale unfairly benefits insiders or proprietary purchasers, or unfairly favors a creditor or class). All such factors have been met here.

32. The Consideration offered by TCTM (including $5 million in cash, a credit bid, and the assumption of certain liabilities) is a fair offer for these assets at this time. Furthermore, the TCTM Bid will be tested in the marketplace via the auction and bid process mandated by the Bid Procedures. The likelihood that a plan of reorganization will be confirmed very quickly is doubtful and the future value of these assets are subject to being diminished if the case does not progress promptly with a sale process. Given the current posture of the case, the Stalking Horse APA provides the most reasonable (if not only) path to avoid administrative insolvency. The value of the Acquired Assets as a going concern will continue to deteriorate if there is undue delay. Basically, Debtor is taking the conservative approach that a "bird in hand is worth two in the bush," again subject to any higher and better offers under the Bid Procedures. The Debtor needs a plan to emerge from chapter 11 and believes this sale process is the correct path because there is no other plan that is feasible before the Court at the moment or likely to be forthcoming. This is an exercise of the Debtor's business judgment, which is the correct legal standard to apply.

## The Bid Procedures Are Intended to Enhance Competitive Bidding

33. Applying Bankruptcy Code Section 363, courts accord Debtors substantial deference in formulating procedures for selling assets. *See, e.g., In re Boston Generating, LLC,* 440 B.R. 302, 329-330 (S.D.N.Y. 2010) (noting that the requirements for section 363 sales are reviewed according to the deferential "business judgment" standard); *In re Adelphia Communications Corp.,* No. 02–41729 (REG), 2003 WL 22316543, at *30 (Bankr. S.D.N.Y.

Mar. 4, 2003) (applying the "business judgment" standard presumption of validity and noting that courts are "loath to interfere with corporate decisions absent showings of bad faith, self-interest, or gross negligence"). Indeed, courts recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and are appropriate in the context of bankruptcy sales. *See*, *e.g.*, *In re Dura Automotive Sys., Inc.*, No. 06–11202, 2007 WL 7728109, at *90 (Bankr. Del. Aug. 15, 2007) (finding that "procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales").

34.      The Bid Procedures are fair and reasonable and will ensure that the bidding process and the Auction (to the extent necessary) will yield the maximum value for the Debtor's estates and creditors.  The Bid Procedures allow all parties in interest an opportunity to conduct in-depth diligence.  The Bid Procedures also provide an appropriate framework for the Debtors to review, analyze, and compare all bids received to determine which bid is in the best interests of the Debtors and their economic stakeholders.   The Bid Procedures clearly set forth the participation requirements for Qualified Bidders and bid requirements for Qualified Bids.  The Bid Procedures are supported by ample business justification as provided herein and as will be established by the Debtor's witnesses and exhibits at the Bid Procedures Hearing, are reasonable and appropriate under the circumstances of this case, and substantially conform with bid procedures approved by this Court within the past several years. *See Foods, Inc. dba Dahl's Foods*, No. 14-02689-11 (Bankr. S.D. Iowa); *Newton Manufacturing Company*, No. 15-01128-11 (Bankr. S.D. Iowa).  Accordingly, Debtor requests that the Court approve the Bid Procedures as fair and reasonable under the circumstances and authorize and direct Debtor to proceed in accordance with them.

## The Assumption and Assignment Procedures Should Be Approved

35.     Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  Upon finding that a debtor has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code.  *See Nostas Assocs. v. Costich* (*In re Klein Sleep Prods.*, *Inc.*), 78 F.3d 18, 25 (2d Cir. 1996); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.*), 4 F.3d 1095, 1099 (2d Cir. 1993).

36.     In connection with the sale transaction, the Debtor will assume and assign the Final Designated Contracts (*i.e.*, the executory contracts or unexpired leases designated by the Stalking Horse or other Successful Bidder prior to Closing from a pool of Preliminary Designated Contracts approved for assumption and assignment by the Court).   In the sale transaction, the Debtor's assumption of the Assumed Contracts will be contingent upon payment of Cure Amounts and effective only upon the Closing.  Further, section 365(k) of the Bankruptcy Code provides that assignment by the debtor to an entity of a contract or lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment." 11 U.S.C. § 365(k).  Pursuant to section 365(k), the Debtors will therefore be relieved from any liability for any breach of any Assumed Contract after an assignment to the Successful Bidder.  As such, the assumption of the Assumed Contracts constitutes an exercise of the Debtors' sound business judgment.

37.     Section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Assumed Contracts must be cured or that adequate assurance be provided that such defaults will be promptly cured.  As set forth above, the Debtor proposes to file with the

Court, and serve on each non-Debtor party to a Preliminary Designated Contract, a Cure Notice indicating the Debtors' calculation of the Cure Amounts for each such contract. Non-Debtor parties to the Preliminary Designated Contracts shall have the opportunity to lodge any objections to the proposed assumption and assignment to the Successful Bidder and, if applicable, the proposed Cure Amount.

38.        Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Azzari* (*In re Carlisle Homes, Inc.*), 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (citation omitted); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance."). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding; in the leasing context, chief determinant of adequate assurance is whether rent will be paid).

39.        At the Sale Hearing, to the extent necessary, the Debtor will be prepared to proffer testimony or present evidence to demonstrate the ability of the Successful Bidder to perform under the Preliminary Designated Contracts.  The Sale Hearing, therefore, will provide the Court and other interested parties with the opportunity to evaluate the ability of the Successful Bidder to provide adequate assurance of future performance, as required by section 365(b)(1)(C) of the Bankruptcy Code.  Accordingly, it is requested that at the conclusion of the Sale Hearing, the proposed assumption and assignment of the Preliminary Designated Contracts be approved.

40.        To facilitate the assumption and assignment of the Assumed Contracts, the Debtors further request that the Court find all anti-assignment provisions of the Preliminary Designated Contracts to be unenforceable under section 365(f) of the Bankruptcy Code.[3]

## CONCLUSION

41.        Based upon the authorities and facts detailed above, Debtor submits that the Court should approve, the Bid Procedures; and at a Sale Hearing to be held promptly after the Auction, or if no Auction is held, within seven (7) days after the Preliminary Bid Deadline, subject to the terms of the Bid Procedures, the Court should approve the sale of the Acquired Assets to the Stalking Horse or such other Successful Bidder at the Auction. Such relief is warranted because Debtor has shown and will further establish by testimonial and documentary evidence at hearing, that the transactions connected to the APA are in the best interests of

---

[3] Section 365(f)(1) provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease…"  11 U.S.C. § 365(f)(1).   Section 365(f)(3) further provides that "Notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee."  11 U.S.C. § 365(f)(3).

Debtor, its estate and creditors, and because the decision to enter into the APA was reached in the exercise of Debtor's sound business judgment, after careful deliberation of its consequences and possible alternatives.

WHEREFORE**,** the Debtor respectfully requests that the Court hear this Motion and (I) enter the Bid Procedures Order: (a) including a finding that due and adequate notice and an opportunity to be heard in accordance with all applicable law were given to all creditors and interested parties in the chapter 11 case, and any and all other affected or interested parties; (b) approving the Bid Procedures; (c) setting a Sale Hearing, subject to the Bid Procedures; and (d) approving the procedures for the assumption and assignment or rejection of leases and executory contracts; and (II) enter the Sale Order: (a) authorizing the sale of the Acquired Assets free and clear of all liens, encumbrances, claims and interests, including but not limited to mortgage liens, personal property liens, mechanics' liens, judgment liens, rights of first refusal and all other claims; (b) finding that the sale be effective immediately and that the stay provisions of Bankruptcy Rules 6004(h) and 6006(d) do not apply; (c) finding that nothing related to or arising out of the APA or the Sale Order shall cause the Stalking Horse to be deemed to be in control of Seller, or to be acting as a "responsible person" with respect to the operation and management of seller, prior to or after the Closing; and (d) providing such other relief as is just and proper under the circumstances.

Date:  July 14, 2017                                    Respectfully submitted,

                                               */s/ Jeffrey Goetz*_____
                                               Jeffrey D. Goetz, Esq., IS #9999366
                                               Bradshaw Fowler Proctor & Fairgrave, P.C.
                                               801 Grand Avenue, Suite 3700
                                               Des Moines, IA 50309-8004
                                               515/246-5817
                                               515/246-5808 FAX

goetz.jeffrey@bradshawlaw.com

General Reorganization Counsel for
Wellman Dynamics Corporation,
Debtor and Debtor-in-Possession

CERTIFICATE OF SERVICE

This document was served electronically on parties who receive electronic notice through CM/ECF as listed on CM/ECF's notice of electronic filing. */s/      Barb Warner              *

## **Exhibit A**

**Stalking Horse Asset Purchase Agreement**

ASSET PURCHASE AGREEMENT

by and between

WELLMAN DYNAMICS CORPORATION, as Seller

TCTM FINANCIAL FS LLC, as Buyer

Dated as of July 14, 2017

# TABLE OF CONTENTS

**Page**

ARTICLE 1.   PURCHASE AND SALE OF THE ACQUIRED ASSETS ....................................1

Section 1.1.       Transfer of Acquired Assets .................................................1

Section 1.2.       Excluded Assets .................................................................4

Section 1.3.       Assumed and Assigned Contracts.........................................4

Section 1.4.       Assumed Liabilities .............................................................5

Section 1.5.       Excluded Liabilities .............................................................5

Section 1.6.       Non-Assignment of Assets ..................................................7

ARTICLE 2.   CONSIDERATION ....................................................................................7

Section 2.1.       Consideration ......................................................................7

Section 2.2.       Bankruptcy Sale Matters .....................................................7

ARTICLE 3.   CLOSING AND DELIVERIES ...................................................................8

Section 3.1.       Closing ................................................................................8

Section 3.2.       Seller's Deliveries ................................................................8

Section 3.3.       Buyer's Deliveries ...............................................................9

ARTICLE 4.   REPRESENTATIONS AND WARRANTIES.................................................9

Section 4.1.       Representations and Warranties of Seller..............................9

Section 4.2.       Representations and Warranties of Buyer...........................20

Section 4.3.       Warranties Exclusive ........................................................21

Section 4.4.       Survival of Representations and Warranties.........................22

ARTICLE 5.   COVENANTS AND OTHER AGREEMENTS .............................................22

Section 5.1.       Covenants of Seller............................................................22

Section 5.2.       Covenants of Buyer...........................................................23

Section 5.3.       Conduct of the Business Pending Closing ..........................23

Section 5.4.       Bankruptcy Matters...........................................................25

Section 5.5.       Further Assurances............................................................25

Section 5.6.       Public Announcements.......................................................26

Section 5.7.       Use of Name ......................................................................26

Section 5.8.       Confidentiality ..................................................................27

Section 5.9.       Casualty and Insurance ......................................................27

Section 5.10.     Contact with Customers and Suppliers................................27

i

# TABLE OF CONTENTS

(continued)

Page

Section 5.11.    Environmental Matters...................................................................28

Section 5.12.    No Disparagement .....................................................................28

Section 5.13.    Lorimor Property ......................................................................28

Section 5.14.    Schedules to be Filed ................................................................28

Section 5.15.    TCTM Contingent Claim ..........................................................28

Section 5.16.    Use of Cash Consideration.........................................................29

ARTICLE 6.  TAXES.........................................................................................29

Section 6.1.     Taxes Related to Purchase of Assets ........................................29

Section 6.2.     Cooperation on Tax Matters .....................................................29

Section 6.3.     Allocation of Consideration and Consideration Allocation
                 Forms ....................................................................................30

ARTICLE 7.  CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES .................30

Section 7.1.     Conditions Precedent to Performance by Seller .....................30

Section 7.2.     Conditions Precedent to the Performance by Buyer ...............31

Section 7.3.     Frustration of Closing Conditions............................................33

ARTICLE 8.  TERMINATION...............................................................................33

Section 8.1.     Termination.............................................................................33

Section 8.2.     Effect of Termination ..............................................................35

Section 8.3.     Procedure Upon Termination...................................................35

ARTICLE 9.  EMPLOYEES AND EMPLOYEE BENEFITS ..................................35

Section 9.1.     Employment............................................................................35

ARTICLE 10. MISCELLANEOUS ........................................................................35

Section 10.1.    Successors and Assigns............................................................35

Section 10.2.    Governing Law; Jurisdiction....................................................36

Section 10.3.    Expenses .................................................................................36

Section 10.4.    Broker's and Finder's Fees ......................................................36

Section 10.5.    Severability .............................................................................36

Section 10.6.    Notices ....................................................................................36

Section 10.7.    Amendments; Waivers.............................................................37

Section 10.8.    Entire Agreement ....................................................................38

ii

## TABLE OF CONTENTS
(continued)

**Page**

Section 10.9.      No Third-Party Beneficiaries / Parties in Interest................................38

Section 10.10.     Headings, Interpretation, Gender.........................................................38

Section 10.11.     Injunctive Relief...................................................................................39

Section 10.12.     Counterparts .........................................................................................39

ARTICLE 11. DEFINITIONS.................................................................................................39

Section 11.1.      Certain Terms Defined.........................................................................39

EXHIBITS

Exhibit A – Form of Bill of Sale
Exhibit B – Form of Assignment and Assumption Agreement
Exhibit C – Form of Assignments of Registered Intellectual Property
Exhibit D – Form of Warranty Deed

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of July 14, 2017, is made by and between Wellman Dynamics Corporation ("WDC", the "Seller" or the "Debtor") under Case No. 16-01825-als11, and TCTM Financial FS LLC, a Delaware Limited Liability Company ("TCTM" or the "Buyer").

## *BACKGROUND INFORMATION*

A.    The Debtor commenced a voluntary bankruptcy case under chapter 11 of title of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Iowa (the "Bankruptcy Court") on September 13, 2016 (the "Petition Date").

B.    The Debtor engages in the manufacturing of highly complex precision aluminum and magnesium sand castings for the aerospace and defense industries (collectively, the "Business").

C.    Buyer desires to purchase the Acquired Assets (as defined below) from Seller, and Seller desires to sell, convey, assign and transfer to Buyer, the Acquired Assets, which are substantially all of the assets used or held for use by Seller in conducting the Business, Free and Clear of all Liens, in accordance with section 363 of the Bankruptcy Code.

D.    Seller acknowledges that it is integral to the process of facilitating an orderly sale of the Acquired Assets to proceed by selecting Buyer as the "stalking horse" bidder, subject to (i) the Bankruptcy Court's approval and (ii) any higher or better offers that may be obtained by Seller for all of the Acquired Assets.

E.    The Acquired Assets are assets of the Debtor's bankruptcy estate ("Estate"), which are to be purchased and assumed by Buyer, Free and Clear of all Liens, and pursuant to a Sale Order, all in the manner and subject to the terms and conditions set forth in this Agreement, the Sale Order, and in accordance with other applicable provisions of the Bankruptcy Code.

F.    The execution and delivery of this Agreement and Seller's ability to consummate the transactions set forth in this Agreement are subject, among other things, to the entry of the Sale Order.

NOW, THEREFORE, in consideration of the foregoing and their respective representations, warranties, covenants and agreements herein contained, and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer hereby agree as follows:

## ARTICLE 1.   PURCHASE AND SALE OF THE ACQUIRED ASSETS.

Section 1.1.    Transfer of Acquired Assets.  At the Closing, and upon the terms and conditions set forth herein and in the Sale Order, Seller shall sell, transfer, assign, convey and deliver to Buyer, and Buyer shall acquire from Seller, all of Estate's right, title and interest in, to and under the Acquired Assets, Free and Clear of all Liens. For the purposes of this

Agreement, "<u>Acquired Assets</u>" shall mean (other than the Excluded Assets) all of the business, assets, properties, contractual rights, goodwill, going concern value, rights and claims of Seller primarily related to the Business, wherever situated and of whatever kind and nature, real or personal, tangible or intangible, whether or not reflected on the books and records of Seller, including the following:

(a)    Debtor's real property known commonly as 1746 Commerce Road, Creston, Iowa 50801 (the "<u>Creston Property</u>") and Debtor's real property known commonly as 650 North Highway 169, Lorimor, Iowa 50149 (the "<u>Lorimor Property</u>"), in each case, together with all facilities, improvements, fixtures and other appurtenances thereto and rights in respect thereof and all servitudes, easements, rights-of-way, and other surface use agreements, and water use agreements to the extent used in connection with the Business;

(b)    all (i) furniture, fixtures, furnishings and leasehold improvements including any specifically set forth on <u>Schedule 1.1(b)(i)</u>; (ii) machinery, equipment, owned or leased vehicles, tools, spare parts, supplies (including all of Seller's inventory) and all other tangible personal property owned by Seller or used by Seller in the conduct of the Business and whether or not in the ordinary course of business, including artwork, desks, chairs, tables, Hardware, copiers, telephone lines and numbers, facsimile machines and other telecommunication equipment, cubicles and miscellaneous office furnishings including any specifically set forth on <u>Schedule 1.1(b)(ii)</u>; (iii) cash and cash equivalents, accounts, accounts receivable (including all intercompany receivables owed to Seller from Fansteel, Inc. and/or Wellman Dynamics Machinery & Assembly, Inc.) including any specifically set forth on <u>Schedule 1.1(b)(iii)</u>; and (iv) personal property leases primarily pertaining to or used in connection with the Business (the "<u>Personal Property Leases</u>") including any specifically set forth on <u>Schedule 1.1(b)(iv)</u>;

(c)    all deposits and prepaid charges and expenses of Seller, any deposits or prepaid charges and expenses paid in connection with the Business including any specifically set forth on <u>Schedule 1.1(c)</u>;

(d)    all Permits used by Seller in the Business including any specifically set forth on <u>Schedule 1.1(d)</u>;

(e)    all rights of Seller under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of Seller or with third parties to the extent relating to the Business or the Acquired Assets (or any portion thereof) including any specifically set forth on <u>Schedule 1.1(e)</u>;

(f)    all rights of Seller under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to services to be provided to Seller after the Closing or to the extent affecting any Acquired Assets including any specifically set forth on <u>Schedule 1.1(f)</u>;

(g)    all goodwill and other intangible assets (other than intellectual property rights as enumerated below) owned by Seller and associated with the Business, including (i)

2

customer and supplier lists and the goodwill associated therewith and (ii) any specifically set forth on Schedule 1.1(g), but excluding Causes of Action and related insurance coverages;

(h)     all Intellectual Property Rights owned or licensed by Seller and used or held for use in connection with the Business (the "Purchased Intellectual Property"), including:

(i)     all right, title and interest in and to the Marks owned (or purported to be owned) by Seller, including any specifically set forth on Schedule 1.1(h)(i), together with the goodwill of any business symbolized thereby and the right to bring any action at law or in equity for the infringement, misappropriation, dilution or other violation of such trademarks occurring prior to the Closing Date, including the right to receive all proceeds and damages therefrom;

(ii)     all right, title and interest in and to the Copyrights owned (or purported to be owned) by Seller, including any specifically set forth on Schedule 1.1(h)(ii), and the right to bring any action at law or in equity for the infringement, misappropriation or other violation of such Copyrights occurring prior to the Closing Date, including the right to receive all proceeds and damages therefrom; and

(iii)     all right, title and interest in and to the Patents owned (or purported to be owned) by Seller, including any specifically set forth on Schedule 1.1(h)(iii), and the right to bring any action at law or in equity for the infringement, misappropriation or other violation of such Patents occurring prior to the Closing Date, including the right to receive all proceeds and damages therefrom;

(i)     all interests of the Debtor in the Assumed Contracts (defined below) and all rights (including all Intellectual Property Rights) granted to Seller in the Assumed Contracts (including any Intellectual Property Licenses);

(j)     all insurance, third party property and casualty insurance proceeds arising in connection with property damage to the Acquired Assets occurring prior to the Closing Date, to the extent not expended on the repair or restoration of the Acquired Assets and all rights to third party property and casualty insurance proceeds, in each case to the extent received or receivable in respect of the Business, but excluding any insurance related to or which might cover any Causes of Action;

(k)     all right, title and interest in any decommissioning trusts regarding the Creston Property, including the decommissioning trust created to pursuant to the Decommissioning Trust Agreement entered into as of November 5, 2008, by and between WDC and Iowa State Savings Bank including any specifically set forth on Schedule 1.1(k);

(l)     all claims, rights, actions, choses in action, suits, causes of action, liens, judgments and damages that Seller may have against (i) Buyer or any of Buyer's Affiliates, (ii) any party to an Assumed Contract and (iii) any vendor, supplier, customer, Transferred Employee or other Person with a business relationship to the Business prior to the Closing and with whom Buyer continues to have a business relationship after the Closing (collectively, "Excluded Causes of Action"); and

3

(m)    all documents that are used in, held for use in or intended to be used in, or that arise primarily out of, the Business, including documents relating to Products, services, marketing, advertising, promotional materials, Purchased Intellectual Property, personnel files for Transferred Employees and all files, customer files and documents (including credit information), supplier lists, records, literature and correspondence, but excluding personnel files for Employees of Seller who are not Transferred Employees.

Section 1.2.    Excluded Assets.  Any assets owned by the Estate which are not Acquired Assets are deemed to be "Excluded Assets", including any specifically set forth on Schedule 1.2, as filed with the Bankruptcy Court on the Schedule Filing Date in a form and substance acceptable to Buyer (in its sole discretion), including rights in insurance arising in connection with property damage to the Excluded Assets.

Section 1.3.    Assumed and Assigned Contracts.  Buyer agrees to assume Seller's obligations arising from and after the Closing Date under the Contracts designated by Buyer for assumption and assignment and approved by the Bankruptcy Court for assumption by Seller and assignment to Buyer ("Assumed Contracts").  If the Bid Procedures are approved by the Bankruptcy Court, the following or similar procedures will govern the assumption and assignment of the Assumed Contracts:

(a)    No later than five (5) Business Days prior to the entry of the Bid Procedures Order, Debtor shall notify Buyer in writing of the Cure Amount to be included in each Cure Notice (as defined below) setting forth the amount of cure owed under each contract that may qualify as an Assumed Contract (a "Preliminary Designated Contract").

(b)    Not later than five (5) Business Days after the date of entry of the Bid Procedures Order, the Debtor will file with the Bankruptcy Court and serve on each non-Debtor party to a Preliminary Designated Contract a "Cure Notice" setting forth the amount of cure owed thereunder according to the Debtor's books and records.

(c)    The Cure Notice shall state (i) the Cure Amount, (ii) notify each non-Debtor party that such party's lease or Contract may be assumed and assigned to the Buyer, and (iii) state the Cure Objection Deadline (as defined below).

(d)    Any objection to the Cure Notice shall be filed ten (10) Business Days after the filing of the Cure Notice (the "Cure Objection Deadline").  Any objection to the Cure Amount must state with specificity what cure the non-Debtor party to the Preliminary Designated Contract believes is required with appropriate documentation in support thereof.  If no objection is timely received, the Cure Amount set forth in the Cure Notice shall be controlling notwithstanding anything to the contrary in any Preliminary Designated Contract or other document as of the date of the Cure Notice.  Any objections not resolved between the parties shall be set for a hearing as fixed by the Bankruptcy Court.  Any counterparty to any Preliminary Designated Contract who does not file a Cure Objection by the Cure Objection Deadline, shall be forever barred from objecting to the Cure Amount or asserting or claiming any Cure Amount (other than the Cure Amount listed in the Cure Notice) against Seller, the Estate or Buyer.  Any counterparty to a Preliminary Designated Contract who does not file a timely objection to the assumption and assignment shall be deemed to have consented to the assumption and assignment

4

of its Preliminary Designated Contract to Buyer and will be forever barred from objecting to such assumption and assignment on account of the Cure Amount, lack of adequate assurance or any other grounds.  Further, Buyer shall provide adequate assurance of future performance under the Preliminary Designated Contracts, as same is required by the Bankruptcy Court.

(e)      In either event, the Sale Order approving the assumption and assignment of the Preliminary Designated Contracts shall provide that upon payment of the applicable Cure Amount in accordance with the last sentence of this Section 1.3, such counterparty shall not have any remaining claim against Seller or the Estate related to any default under any such Assumed Contract.  Seller makes no representation or warranty with respect to the future performance of any non-Debtor parties to the Assumed Contracts.  Seller makes no representation or warranty as to whether any Designated Contracts can be assumed and assigned under applicable Law or otherwise.

(f)      Buyer shall have three (3) Business Days prior to Closing to select which of the Preliminary Designated Contracts it will want Seller to assume and assign to Buyer (the "Final Designated Contracts") by notifying Seller, who will notify contract counterparties directly.  At Closing, Buyer will pay the Cure Amount of each Final Designated Contract up to an aggregate amount equal to $78,416.00 and Seller shall pay any Cure Amounts not paid by Buyer.

Section 1.4.    Assumed Liabilities.  At the Closing, on the terms and conditions set forth in this Agreement, and subject to Section 1.5, Buyer shall only assume (i) all Liabilities of Seller arising after the Closing, which relate to or arise from the ownership and operation of Acquired Assets or arise under Assumed Contracts (except for Cure Amounts payable by Buyer pursuant to Section 1.3, which shall be paid by Buyer prior to any such assignment) or the Assumed Benefit Plans (if any); provided, however, that Buyer shall have no liability whatsoever or be deemed to have assumed any Liabilities arising prior to the Closing and which relate to or arise from Acquired Assets and Assumed Contracts (except for the Cure Amounts payable by Buyer pursuant to Section 1.3) and the Assumed Benefit Plans (if any); which shall at all times remain the responsibility of the Estate, (ii) the TCTM Contingent Claim, (iii) the Refinanced First Lien Debt and (iv) all Liabilities of Seller as set forth on Schedule 1.4, as filed with the Bankruptcy Court on the Schedule Filing Date in a form and substance acceptable to Buyer, in its sole discretion (such Liabilities described in clauses (i), (ii), (iii) and (iv), collectively, the "Assumed Liabilities").

Section 1.5.    Excluded Liabilities.  Notwithstanding anything in this Agreement to the contrary, Buyer shall not assume, and shall be deemed not to have assumed, any Liabilities of Seller or any Affiliate of Seller except as expressly provided in Section 1.4, and Seller and its Affiliates shall be solely and exclusively liable with respect to all such Liabilities, other than the Assumed Liabilities (collectively, the "Excluded Liabilities").  For the purposes of this Agreement, "Excluded Liabilities" shall include those Liabilities set forth below:

(a)      all Liabilities in respect of any and all Products sold and/or services performed by Seller on or before the Closing Date;

5

(b)      all Environmental Costs and Liabilities, to the extent arising out of or otherwise related to (i) any noncompliance with Environmental Laws (including fines, penalties, damages and remedies) associated with the ownership or operation by Seller of the Creston Property, the Lorimor Property, the Real Property Leases (or any condition thereon) or the Business on or prior to the Closing Date; (ii) the offsite transportation, storage, disposal, treatment or recycling of Hazardous Material generated by and taken offsite by or on behalf of Seller on or prior to the Closing Date; (iii) any third party claims arising on or prior to the Closing Date related to Hazardous Materials that were or are located at or that migrated or may migrate from the Creston Property, the Lorimor Property, or  the Real Property Leases; or (iv) the Excluded Assets or any other real property formerly owned, operated, leased or otherwise used by Seller;

(c)      all Liabilities arising out of, relating to or with respect to (i) the employment or performance of services, or termination of employment or services by Seller or any of its Affiliates of any individual on or before the Closing Date, (ii) workers' compensation claims against Seller that relate to the period on or before the Closing Date, irrespective of whether such claims are made prior to or after the Closing; and (iii) (A) any Employee Benefit Plan, except as set forth at Schedule 1.5(c)(i) (the "Assumed Benefit Plans"), as filed with the Bankruptcy Court on the Schedule Filing Date (or, if Buyer so elects, as filed with the Bankruptcy Court on or before the Bid Deadline) in a form and substance acceptable to Buyer, in its sole discretion or (B) any Collective Bargaining Agreements, except as set forth at Schedule 1.5(c)(ii) (the "Assumed Collective Bargaining Agreements"), as filed with the Bankruptcy Court on the Schedule Filing Date in a form and substance acceptable to Buyer, in its sole discretion; provided, that with respect to Assumed Collective Bargaining Agreements, all Liabilities arising out of, under, in connection with, or in respect of a breach by or default of Seller accruing under such Collective Bargaining Agreements with respect to any period prior to Closing shall be Excluded Liabilities;

(d)      all Liabilities for (i) Transaction Taxes (other than any Transaction Taxes payable by Buyer pursuant to Section 6.1), (ii) Taxes of Seller, (iii) Taxes that relate to the Acquired Assets or the Assumed Liabilities for taxable periods (or portions thereof) ending on or before the Closing Date, including Taxes allocable to Seller pursuant to Section 6.1 and (iv) payments under any Tax allocation, sharing or similar agreement (whether oral or written);

(e)      all Liabilities arising out of, under or in connection with Contracts that are not Assumed Contracts and, with respect to Assumed Contracts, Liabilities in respect of a breach by or default of Seller accruing under such Contracts with respect to any period prior to Closing and all Cure Amounts (other than any Cure Amounts payable by Buyer pursuant to Section 1.3);

(f)      all Liabilities arising out of, under or in connection with any Indebtedness of Seller remaining unsatisfied from and after the Closing Date;

(g)      all Liabilities in respect of any pending or threatened Legal Proceeding, or any claim arising out of, relating to or otherwise in respect of (i) the operation of the Business to the extent such Legal Proceeding or claim relates to such operation on or prior to the Closing Date (other than, as agreed in writing by Buyer in its sole discretion, certain Environmental Costs and Liabilities) or (ii) any Excluded Asset;

6

(h)    all Liabilities relating to any Excluded Employee, including, (i) any employment-related liability, (ii) any liability relating to, arising under or in connection with any Employee Plan, including any liability under COBRA, whether arising prior to, on or after the Closing Date, and (iii) any liability under WARN; and

(i)    all Liabilities relating to amounts required to be paid by Seller under this Agreement.

Section 1.6.    <u>Non-Assignment of Assets</u>.    Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer and shall not effectuate the assignment or transfer of any Acquired Asset if (i) an attempted assignment or transfer thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto or a Governmental Body (each such action, a "<u>Necessary Consent</u>"), would constitute a breach, default or violation thereof or of any Law or Order and (ii) the Bankruptcy Court has not entered an Order providing that such Necessary Consent is not required.  In such event, such assignment or transfer is subject to such Necessary Consent being obtained, and Seller shall use its reasonable best efforts to obtain the Necessary Consents with respect to any such Acquired Asset or any claim or right or any benefit arising thereunder for the assignment or transfer thereof to Buyer as Buyer may reasonably request.  For the avoidance of doubt, any asset that would be a Acquired Asset but is not assigned in accordance with this <u>Section 1.6</u> shall not be considered a "Acquired Asset" for purposes hereof, unless and until such asset is assigned to Buyer following the Closing Date upon receipt of the Necessary Consent and Bankruptcy Court approval.  If such Necessary Consent is not obtained, or if an attempted assignment or transfer thereof would be ineffective, Seller shall cooperate with Buyer in any reasonable arrangement to provide for Buyer to obtain the benefits and assume the relevant obligations thereunder in accordance with this Agreement, including subcontracting, sub-licensing, or sub-leasing to Buyer, or under which Seller would enforce for the benefit of Buyer all of its rights thereunder.

ARTICLE 2.   <u>CONSIDERATION</u>.

Section 2.1.    <u>Consideration</u>.    The consideration for the sale and transfer of the Acquired Assets is (i) the TCTM Credit Bid in an amount of $15,500,000 (the "<u>TCTM Credit Bid Amount</u>"), (ii) an amount in cash equal to $5,000,000 (the "<u>Cash Consideration</u>"), which price shall be payable and deliverable in accordance with <u>Section 3.3</u> and (iii) the assumption of the Assumed Liabilities (clauses (i) through (iii) collectively, the "<u>TCTM Bid</u>").

Section 2.2.    <u>Bankruptcy Sale Matters</u>.

(a)    The TCTM Bid is deemed to be a Qualified Bid as set forth in the Bid Procedures.

(b)    This Agreement is subject to approval by the Bankruptcy Court and the consideration by the Debtor of higher or better competing bids in respect of all or part of the Acquired Assets (whether in combination with other assets of Seller or otherwise) (each a "<u>Competing Bid</u>").  The Debtor is permitted, in accordance with the Bid Procedures, to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person

7

(in addition to Buyer) in connection with any sale or other disposition of the Acquired Assets.  In addition, the Debtor shall be permitted to respond to any inquiries or offers to purchase all or any part of the Acquired Assets and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Bid Procedures or other applicable Law, including supplying information relating to the Business and the assets of Seller to prospective purchasers.  Promptly upon receipt of any Competing Bid or proposal or indication of interest in respect thereof, the Debtor shall provide Buyer with summaries of the material terms of such bid, proposal or indication of interest.  The Debtor shall regularly update Buyer as to the status of the marketing process, including any negotiations in connection with a Competing Bid.  Seller shall promptly furnish Buyer with all information, documents and data concerning Seller that is provided to any prospective purchaser that has not previously been furnished to Buyer.

(c)    Seller and Buyer agree that, in the event that Buyer is not the winning bidder at the Auction undertaken pursuant to the Bid Procedures, Buyer shall act as the Back-up Bid as set forth in the Bid Procedures, if so named at the Auction.

ARTICLE 3.   CLOSING AND DELIVERIES.

Section 3.1.    Closing.  Subject to the satisfaction of the conditions set forth in Section 7.1 and Section 7.2 (or the waiver thereof in writing by the party entitled to waive the applicable condition), the consummation of the transactions contemplated hereby (the "Closing") shall take place at a time and place as agreed to by the parties on the date that is two (2) Business Days following the satisfaction or waiver in writing of the conditions set forth in Article 7 (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another time or date, or both, are agreed to in writing by Seller and Buyer.  The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date."

Section 3.2.    Seller's Deliveries.  At the Closing, the sale, transfer, assignment and delivery by Seller of the Acquired Assets to Buyer, as herein provided, shall be Free and Clear of all Liens and shall be effected on the Closing Date. In furtherance of the foregoing, at the Closing, Seller shall deliver, or cause to be delivered, to Buyer the following:

(a)    a certificate executed by Seller that Seller is not a foreign person within the meaning of section 1445(f)(3) of the Code, which certificate shall set forth all information required by, and otherwise be executed in accordance with, Treasury Regulation section 1.1445-2(b)(2);

(b)    a duly executed bill of sale substantially in the form attached as Exhibit A;

(c)    a duly executed assignment and assumption agreement substantially in the form attached hereto as Exhibit B;

(d)    affidavits and indemnities in customary form and delivered by Seller, as reasonably required by Buyer's title insurer to induce such insurer to issue owner's policies of title insurance for the owned real property or any portion thereof subject to no Liens and

8

containing or accompanied by such affirmative insurance and endorsements as Buyer shall reasonably request;

(e)    Officer's certificates required to be delivered pursuant to <u>Section 7.2(a)</u> and <u>Section 7.2(b)</u>;

(f)    assignments of all of the Acquired Assets that are Registered Intellectual Property owned or purported to be owned by Seller, substantially in the forms attached as Exhibit C;

(g)    a duly executed general warranty deed transferring fee simple title to the real property to Buyer, substantially in the form attached as Exhibit D; and

(h)    all other deeds, endorsements, assignments and other instruments of transfer and conveyance, as well as the electronic transfer of all files and records of Seller relating to the Acquired Assets and any other documents Buyer may reasonably require which, in each case, shall otherwise be consistent with the terms of this Agreement and shall be reasonably satisfactory in form and substance to counsel for Buyer.

Section 3.3.    <u>Buyer's Deliveries</u>.  At the Closing, Buyer shall pay to Seller, by wire transfer of immediately available funds in accordance with instructions provided by Seller (at least 3 Business Days prior to the Closing Date) the Cash Consideration.

ARTICLE 4.    <u>REPRESENTATIONS AND WARRANTIES</u>.

Section 4.1.    <u>Representations and Warranties of Seller</u>.  Seller represents and warrants to Buyer as follows:

(a)    <u>Corporate Organization</u>.  Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.  Seller is in good standing under the laws of each jurisdiction in which it owns or leases real property and each other jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except as disclosed by Seller to Buyer on <u>Schedule 4.1(a)</u> of the Disclosure Schedules or where the failure to be so qualified, authorized or in good standing would not be reasonable expected to result in a Material Adverse Effect.

(b)    <u>Authorization and Validity</u>.  Seller has all requisite power and authority to execute and deliver this Agreement and, subject to the Bankruptcy Court's entry of the Sale Order, to carry out its obligations under this Agreement and each other agreement, document, or instrument or certificate contemplated by this Agreement in connection with the consummation of the transactions contemplated by this Agreement (the "<u>Seller Documents</u>").  Subject only to any necessary authority from the Bankruptcy Court, Seller has all requisite power and authority to consummate the transactions contemplated hereby and convey and transfer the Acquired Assets, per the Sale Order, this Agreement, and the Seller Documents, Free and Clear of all Liens to Buyer. This Agreement and the Seller Documents have been duly executed by an

authorized officer of Seller and, subject to the Bankruptcy Court's entry of the Sale Order, constitutes valid and binding obligations, enforceable against the Debtor as Seller and its Estate in accordance with the terms and provisions of this Agreement, the Sale Order and the Seller Documents.

(c)    Conflicts; Consents of Third Parties.   Other than in connection with the chapter 11 case and entry of the Sale Order or except as disclosed by Seller to Buyer on Schedule 4.1(c) of the Disclosure Schedules, no consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Seller in connection with (i)  the execution and delivery of this Agreement or the Seller Documents, the compliance by Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or the taking by Seller of any other action contemplated hereby or (ii) the continuing validity and effectiveness immediately following the Closing of any Contract or Permit of Seller.

(d)    Title to Acquired Assets.   Seller owns and has good title to each of the Acquired Assets except as disclosed by Seller to Buyer on Schedule 4.1(d) of the Disclosure Schedules, and at the Closing, Seller shall convey each of the Acquired Assets Free and Clear of all Liens.

(e)    Litigation.   Except as disclosed by Seller to Buyer on Schedule 4.1(e)(i) of the Disclosure Schedules, there is no suit, action, proceeding, investigation, claim or order pending or threatened against Seller (or to the Knowledge of Seller, pending or threatened, against any of the officers, directors or key employees of Seller with respect to their business activities on behalf of Seller).  Other than the chapter 11 case or as disclosed by Seller to Buyer on Schedule 4.1(e)(ii) of the Disclosure Schedules, Seller is not subject to any Order of any Governmental Body except to the extent the same could not reasonably be expected to have a material impact on the Business and Seller.

(f)    Intellectual Property.

(i)    Schedule 4.1(f)(i)(A) of the Disclosure Schedules sets forth a list of all Patents, registered Marks, pending applications for registration of any Marks, registered Copyrights, and pending applications for registration of Copyrights, in each case included in the Purchased Intellectual Property (collectively, the "Registered Intellectual Property"), including for each item listed, the record owner, jurisdiction and issuance, registration or application number and date, as applicable of such item.  All Registered Intellectual Property is subsisting, and to the Knowledge of Seller, valid and enforceable except as disclosed by Seller to Buyer on Schedule 4.1(f)(i)(B) of the Disclosure Schedules.

(ii)    Seller is the sole and exclusive owner of all right, title, and interest in and to all of the Purchased Intellectual Property that it owns or purports to own and all Products made, used, sold or licensed by or for Seller in the Business as presently conducted and as currently proposed to be conducted except as disclosed by Seller to Buyer on Schedule 4.1(f)(ii)(A) of the Disclosure Schedules, and Seller has rights to use all other Intellectual Property Rights included in the Purchased Intellectual Property, free and clear of all Liens. Except as disclosed by Seller to Buyer on Schedule 4.1(f)(ii)(B) of the Disclosure Schedules, the

10

Purchased Intellectual Property includes all of the Intellectual Property Rights necessary to enable Seller to conduct the Business in the manner in which such Business is currently being conducted.

(iii)    Excluding licenses of commercial off-the-shelf Software, Schedule 4.1(f)(iii) of the Disclosure Schedules a list of all active Inbound Intellectual Property Licenses.

(iv)    Except as disclosed by Seller to Buyer on Schedule 4.1(f)(iv) of the Disclosure Schedules, Seller is not a party to any Contracts that are Outbound Intellectual Property Licenses other than licenses granted to customers for use in connection with the Products or services of Seller, which licenses do not permit further reproduction or manufacturing.

(v)    Except as disclosed by Seller to Buyer on Schedule 4.1(f)(v)(A) of the Disclosure Schedules, Seller has not received any notice of default under any Intellectual Property License.  Except as disclosed by Seller to Buyer on Schedule 4.1(f)(v)(B) of the Disclosure Schedules, no party to any of the Intellectual Property Licenses has exercised any termination rights with respect thereto.

(vi)    Except as disclosed by Seller to Buyer on Schedule 4.1(f)(vi)(A) of the Disclosure Schedules, no Trade Secret or any other non-public, proprietary information material to the Business as presently conducted has been authorized to be disclosed or, to the Knowledge of Seller, has been actually disclosed by Seller to any employee or any third party other than pursuant to a non-disclosure agreement restricting the disclosure and use thereof. Except as disclosed by Seller to Buyer on Schedule 4.1(f)(vi)(B) of the Disclosure Schedules, Seller has taken adequate security measures to protect the secrecy, confidentiality and value of all the Trade Secrets included in the Purchased Intellectual Property and any other confidential information, including invention disclosures, not covered by any patents owned or patent applications filed by Seller.  Except as disclosed by Seller to Buyer on Schedule 4.1(f)(vi)(C) of the Disclosure Schedules, each employee, consultant and independent contractor of Seller who has contributed to the development of any Purchased Intellectual Property, has entered into a written non-disclosure and invention assignment agreement.

(vii)    Except as disclosed by Seller to Buyer on Schedule 4.1(f)(vii) of the Disclosure Schedules, no claims for infringing, violating, misusing or misappropriating any material Purchased Intellectual Property have been made against any Person by Seller.

(viii)    Except as disclosed by Seller to Buyer on Schedule 4.1(f)(viii) of the Disclosure Schedules, there are no Orders which restrict: (a) the use of any of the Purchased Intellectual Property by Seller; or (b) the sale, transfer or assignment of the Purchased Intellectual Property as contemplated by this Agreement.

(ix)    Except as disclosed by Seller to Buyer on Schedule 4.1(f)(ix) of the Disclosure Schedules, the consummation of transactions contemplated hereby will not result in the loss or impairment of Buyer's right to own or use any of the Purchased Intellectual Property.

11

(x)        Except as disclosed by Seller to Buyer on <u>Schedule 4.1(f)(x)(A)</u> of the Disclosure Schedules, no present or former employee has any right, title, or interest, directly or indirectly, in whole or in part, in any Purchased Intellectual Property.  Except as disclosed by Seller to Buyer on <u>Schedule 4.1(f)(x)(B)</u> of the Disclosure Schedules, to the Knowledge of Seller, no employee, consultant or independent contractor of Seller is in default or breach of any material term of any employment agreement, non-disclosure agreement, assignment of invention agreement or similar agreement between such Person and Seller.

(g)        <u>Material Contracts</u>.

(i)        <u>Schedule 4.1(g)(i)</u> of the Disclosure Schedules sets forth all of the following Contracts (collectively, the "<u>Material Contracts</u>"):

a.        Contracts with any Affiliate or current or former officer, director, stockholder or Affiliate of Seller;

b.        Contracts pursuant to which any party is required to purchase or sell a stated portion of its requirements or output from or to another party;

c.        Contracts for the sale of any of the assets of Seller other than in the Ordinary Course of Business or for the grant to any Person of any preferential rights to purchase any of its assets;

d.        Contracts for joint ventures, strategic alliances or partnerships;

e.        Contracts containing covenants of Seller not to compete in any line of business or with any Person in any geographical area or covenants of any other Person not to compete with Seller in any line of business or in any geographical area;

f.        Contracts relating to the acquisition by Seller of any operating business or the capital stock of any other Person;

g.        Contracts relating to incurrence, assumption or guarantee of any Indebtedness or imposing a Lien on any of its assets;

h.        Contracts under which Seller has made advances or loans to any other Person;

i.        Contracts providing for severance, retention, change in control or similar payments;

j.        Contracts for the employment of any individual on a full-time, part-time or consulting or other basis providing annual compensation in excess of $75,000;

12

k.      Outstanding    agreements    of    guaranty,    surety    or indemnification, direct or indirect, by Seller;

l.      All Government Contracts;

m.      Contracts (or a group of related Contracts) which involve consideration of more than $350,000 annually or $1,250,000 in the aggregate or require performance by any party more than one year from the date hereof;

n.      all Inbound Intellectual Property Licenses (excluding commercial off-the-shelf Software) and all Outbound Intellectual Property Licenses;

o.      any leases, subleases, licenses, concessions or other occupancy agreements where Seller is tenant; and

p.      any other Contract material to the Business.

(ii)     Except as disclosed by Seller to Buyer on Schedule 4.1(g)(ii)(A) of the Disclosure Schedules, each of the Material Contracts is in force.  Except as disclosed by Seller to Buyer on Schedule 4.1(g)(ii)(B) of the Disclosure Schedules, no party to any of the Material Contracts has given Seller notice of any termination rights with respect thereto.  Seller has, and will transfer to Buyer at the Closing, good and valid title to the Material Contracts (which are Assumed Contracts), Free and Clear of all Liens.

(h)     Employee Benefits.

(i)     Schedule 4.1(h)(i) of the Disclosure Schedules sets forth all "employee benefit plans," as defined in section 3(3) of ERISA, including any multiemployer plans as defined in section 3(37) of ERISA or section 4001(a)(3) of ERISA (each, a "Multiemployer Plan"), and all other material employee benefit plans or arrangements (other than governmental plans and statutorily required benefit arrangements), including bonus or incentive plans, deferred compensation arrangements, equity or equity-based compensation, severance pay, salary continuation, sick leave, vacation pay, disability, hospitalization, medical, accident, disability and life insurance, worker's compensation, retiree healthcare, retiree life insurance, retirement, scholarship, legal services, cafeteria, day or dependent care, or other insurance or employee benefit programs, plans, policies or arrangements, whether written or oral, as to which Seller contributes, has an obligation to contribute to, or has any Liability, contingent or otherwise, with respect to, or otherwise provide to, any current or former employee or Service Provider (collectively, the "Employee Benefit Plans").

(ii)     Except as disclosed by Seller to Buyer on Schedule 4.1(h)(ii) of the Disclosure Schedules, no Employee Benefit Plan is maintained outside of the jurisdiction of the United States.

(iii)     Except as disclosed by Seller to Buyer on Schedule 4.1(h)(iii) of the Disclosure Schedules, with respect to each Employee Benefit Plan other than any Multiemployer Plan, Seller has made available to Buyer a copy (or, to the extent no such copy exists, an accurate description thereof) of (i) any plan documents, and any amendments thereto,

13

(ii) the most recent summary plan descriptions, if any (iii) the most recent IRS determination or opinion letter, if any, and (iv) the most recent (A) Forms 5500 and attached schedules, (B) audited financial statements, and (C) actuarial valuation reports, to the extent any of (iv)(A)-(C) exist.

(iv)     Except as disclosed by Seller to Buyer on <u>Schedule 4.1(h)(iv)</u> of the Disclosure Schedules, no Seller sponsors, maintains, contributes to or has any Liability in respect of, or has in the past six years sponsored, maintained, contributed to or had any Liability in respect of, any defined benefit pension plan (as defined in section 3(35) of ERISA), plan subject to section 412 of the Code or section 302 of ERISA or any Multiemployer Plan.

(v)     Except as disclosed by Seller to Buyer on <u>Schedule 4.1(h)(v)</u> of the Disclosure Schedules, with respect to any Assumed Benefit Plan (if any) that is a defined benefit pension plan, to the extent not resulting in a material impact on the Business, (i) Seller has not filed a notice of intent to terminate the plan or adopted any amendment to treat such plan as terminated and (ii) the Pension Benefit Guaranty Corporation has not instituted, or threatened to institute, proceedings to treat such plan as terminated.

(vi)     Except as disclosed by Seller to Buyer on <u>Schedule 4.1(h)(vi)</u> of the Disclosure Schedules, with respect to any Multiemployer Plan contributed to by Seller, no Seller has incurred any withdrawal liability under Title IV of ERISA.

(i)     <u>Real Property</u>.

(i)     Except as disclosed by Seller to Buyer on <u>Schedule 4.1(i)(i)(A)</u> of the Disclosure Schedules, Seller owns in fee simple the Creston Property and the Lorimor Property.  The Creston Property and the Lorimor Property constitute the only real properties owned in fee simple by Seller to be acquired by Buyer. <u>Schedule 4.1(i)(i)(B)</u> of the Disclosure Schedules sets forth any financing agreements that currently encumber the Creston Property or the Lorimor Property.

(ii)     Except as disclosed by Seller to Buyer on <u>Schedule 4.1(i)(ii)(A)</u> of the Disclosure Schedules, Seller has good, valid and marketable fee simple title to the Creston Property and the Lorimor Property, free and clear of all Liens. Except as disclosed by Seller to Buyer on <u>Schedule 4.1(i)(ii)(B)</u> of the Disclosure Schedules, there are no leases, subleases, licenses, concessions or other occupancy agreements, written or oral, granting any Person the right to use, occupy or operate any portion of the Creston Property or the Lorimor Property.

(iii)     Except as disclosed by Seller to Buyer on <u>Schedule 4.1(i)(iii)</u> of the Disclosure Schedules, there are no condemnation or eminent domain proceedings pending or, threatened with respect to the Creston Property or the Lorimor Property and Seller has not received written notice of any condemnation or eminent domain proceedings affecting or relating to such owned real property.

(iv)     Except as disclosed by Seller to Buyer on <u>Schedule 4.1(i)(iv)</u> of the Disclosure Schedules, all of Seller's real property, including buildings, fixtures, and

14

improvements thereon owned by Seller are in adequate operating condition and repair for which they are currently employed (normal wear and tear excepted).

(v)     Except as disclosed by Seller to Buyer on Schedule 4.1(i)(v) of the Disclosure Schedules, Seller's use and occupancy of the Creston Property and the Lorimor Property, as currently used, occupied and operated, and the conduct of business thereon, as currently conducted, complies in all material respects with all deed and other restrictions of record and applicable Laws consisting of building codes, zoning, subdivision or other land use or similar Laws.

(vi)    Seller has delivered or made available to Buyer copies of all deeds, title reports and surveys, which are in Seller's possession, for the owned property.

(vii)   Except as disclosed by Seller to Buyer on Schedule 4.1(i)(vii) of the Disclosure Schedules, neither the Creston Property nor the Lorimor Property is subject to, any option, right of first refusal or other contractual rights to purchase, acquire, sell or dispose of any owned real property.

(viii)  Except as disclosed by Seller to Buyer on Schedule 4.1(i)(viii) of the Disclosure Schedules, Seller has not entered into any leases, subleases, licenses, concessions or other occupancy agreements where Seller is tenant (collectively, "Real Property Leases").

(j)     Environmental.

(i)     Except as disclosed by Seller to Buyer on Schedule 4.1(j)(i) of the Disclosure Schedules, Seller, the Business and the Acquired Assets are in compliance in all material respects with applicable Environmental Laws (including obtaining all permits and licenses required thereunder).

(ii)    Except as disclosed by Seller to Buyer on Schedule 4.1(j)(ii) of the Disclosure Schedules, Seller has not received any written notice, report or other information regarding any material violation of Environmental Laws relating to any of the Acquired Assets or the operation of the Business or regarding the presence or potential presence of any Hazardous Substance contamination at the Creston Property or the Lorimor Property.

(iii)   Except as disclosed by Seller to Buyer on Schedule 4.1(j)(iii) of the Disclosure Schedules, no Hazardous Substances have been released at or from, or are present at, the Creston Property or the Lorimor Property in a manner or to a degree that requires reporting, investigation, assessment, remediation or abatement pursuant to applicable Environmental Laws.

(k)     Financial Statements.  Seller has delivered to Buyer copies of (i) the unaudited consolidated balance sheets of Seller as at December 31, 2016 and the related unaudited consolidated statements of income and of cash flows of Seller for the year then ended, (ii) monthly operating reports which are filed with the Bankruptcy Court and (iii) monthly financial reporting packages for each month since September 30, 2016 (such unaudited statements and the monthly financial reporting packages, including the related notes and

15

schedules thereto, are referred to herein as the "Financial Statements").  Each of the Financial Statements has been prepared in accordance with GAAP consistently applied throughout the periods presented and presents fairly in all material respects the consolidated financial position, results of operations and cash flows of Seller as at the dates and for the periods indicated.

For the purposes hereof, the unaudited consolidated balance sheet of Seller as at December 31, 2016 is referred to as the "Balance Sheet" and December 31, 2016 is referred to as the "Balance Sheet Date."

(l)     Absence of Certain Developments.  Except as expressly contemplated by this Agreement, as a direct result of the chapter 11 case or as disclosed by Seller to Buyer on Schedule 4.1(l) of the Disclosure Schedules, since the Balance Sheet Date (i) Seller has conducted the Business only in the Ordinary Course of Business and (ii) there has not been any event, change, occurrence or circumstance that has had or could reasonably be expected to have a Material Adverse Effect.

(m)     Compliance with Laws.

(i)     Except as disclosed by Seller to Buyer on Schedule 4.1(m)(i)(A) of the Disclosure Schedules, Seller is in compliance in all material respects with all Laws and Orders applicable to the Acquired Assets and the Business. Except as disclosed by Seller to Buyer on Schedule 4.1(m)(i)(B) of the Disclosure Schedules, Seller has not, for the previous three (3) years, received any written notice or other written communication from a Governmental Body alleging that the operation of the Business or Acquired Assets is not in compliance with any Law, Order or material Permit in any material respect.

(ii)     Except as disclosed by Seller to Buyer on Schedule 4.1(m)(ii)(A) of the Disclosure Schedules, Seller currently has all material Permits which are required and necessary for the operation of the Business as presently conducted. Except as disclosed by Seller to Buyer on Schedule 4.1(m)(ii)(B) of the Disclosure Schedules, all such Permits are in force and, to the Knowledge of Seller, such Permits are transferable to Buyer without causing such Permits to be revoked, canceled, suspended or modified and Seller has no notice of Legal Proceedings pending with respect to Permits required in connection with the operation of the Business.

(n)     Tangible Personal Property.

(i)     Except as disclosed by Seller to Buyer on Schedule 4.1(n)(i) of the Disclosure Schedules, Seller has good and marketable title to the Acquired Assets free and clear of all Liens.

(ii)     Schedule 4.1(n)(ii) of the Disclosure Schedules sets forth all Personal Property Leases involving annual payments in excess of $100,000 relating to personal property used by Seller in the Business or to which Seller is a party or by which the properties or assets of Seller is bound, together with all amendments, modifications or supplements thereto.

16

(iii)    Except as disclosed by Seller to Buyer on Schedule 4.1(n)(iii)(A) of the Disclosure Schedules, each of the Personal Property Leases is in force. Except as disclosed by Seller to Buyer on Schedule 4.1(n)(iii)(B) of the Disclosure Schedules, no party to any of the Personal Property Leases has given Seller notice of any termination rights with respect thereto.

(o)    Adequacy of Acquired Assets. Except as disclosed by Seller to Buyer on Schedule 4.1(o) of the Disclosure Schedules, the Acquired Assets: (a) constitute all the assets used or held for use by Seller in connection with or otherwise related to the Business, other than Excluded Assets, (b) will permit Buyer to conduct the Business substantially as it is being conducted on the date hereof, except as a result of any assets being Excluded Assets; and (c) to the Knowledge of Seller, will permit Buyer to comply as of the Closing Date in all material respects with all Laws, Permits and Orders applicable as of the Closing Date to the Business and ownership and use of the Acquired Assets.

(p)    Equity Interests.  Except as disclosed by Seller to Buyer on Schedule 4.1(p) of the Disclosure Schedules, Seller does not own, directly or indirectly, any capital stock or equity securities of any Person.

(q)    Taxes.

(i)    Except as disclosed by Seller to Buyer on Schedule 4.1(q)(i) of the Disclosure Schedules, no audit or other proceeding by any Governmental Body is pending or threatened in writing with respect to any Taxes due from or with respect to Seller or with respect to any of the Acquired Assets.

(ii)    Seller is not a foreign person within the meaning of Section 1445 of the Code.

(r)    Insurance.  Except as disclosed by Seller to Buyer on Schedule 4.1(r)(i) of the Disclosure Schedules, Seller has insurance policies in force for such amounts as are sufficient for all requirements of law and all agreements to which Seller is a party or by which it is bound. Excluding insurance policies that have expired and been replaced in the Ordinary Course of Business, Seller has not received notice of cancellation of any such insurance policy except as disclosed by Seller to Buyer on Schedule 4.1(r)(ii) of the Disclosure Schedules.  Except as disclosed by Seller to Buyer on Schedule 4.1(r)(iii) of the Disclosure Schedules, all such insurance will remain in force after Closing.

(s)    Inventories.  Except as disclosed by Seller to Buyer on Schedule 4.1(s) of the Disclosure Schedules, the inventories of Seller are saleable in the Ordinary Course of Business.

(t)    Government Contracts.  Except as disclosed by Seller to Buyer on Schedule 4.1(t) of the Disclosure Schedules, with respect to any prime contract, subcontract, basic ordering agreement, letter contract, purchase order or delivery orders of any kind, including all amendments, modifications and options thereunder or relating thereto, with any Governmental Entity or any customer for whom the ultimate customer is a governmental entity

17

(a "Government Contract"): (i) no Government Contract is currently the subject of bid or award protest proceedings; (ii) Seller has not received notice that any of the Government Contracts has been terminated for default and Seller has received no written notice terminating any of the Government Contracts for convenience or indicating an intent to terminate any of the Government Contracts for convenience; (iii) Seller has not undergone and is not undergoing any audit, review, inspection, investigation, survey or examination of records relating to the Government Contracts, other than in the ordinary course of business; and (iv) Seller has made no payment, directly or indirectly, to any Person in violation of applicable procurement laws, including laws relating to bribes, gratuities, kickbacks, lobbying expenditures, political contributions and contingent fee payments.

(u)     Affiliate Transaction.  Except as disclosed by Seller to Buyer on Schedule 4.1(u) of the Disclosure Schedules, no current director, officer, employee or Affiliate of Seller (a) owns any property, assets, interest and rights, tangible or intangible, that is an Acquired Asset, (b) is a party to any Contract with respect to any Acquired Asset or (c) is a controlling Affiliate of any customer or supplier of the Business.

(v)     Labor.

(i)     Except as disclosed by Seller to Buyer on Schedule 4.1(v)(i) of the Disclosure Schedules, Seller is not a party to any labor or collective bargaining agreement or other agreements with any labor organization or union, works council or other employee organization, and there are no labor or collective bargaining agreements which pertain to employees of Seller (collectively, "Collective Bargaining Agreements").  Seller has delivered or otherwise made available to Buyer copies of the labor or collective bargaining agreements so disclosed, together with all amendments, modifications, or supplements thereto.

(ii)     Except as disclosed by Seller to Buyer on Schedule 4.1(v)(ii)(A) of the Disclosure Schedules, no Employees are represented by any labor organization.  Except as disclosed by Seller to Buyer on Schedule 4.1(v)(ii)(B) of the Disclosure Schedules, no labor organization or group of employees of Seller has made a pending demand for recognition, and there are no representation proceedings or petitions seeking a representation proceeding presently pending to be brought or filed, with the National Labor Relations Board or other labor relations tribunal, and Seller has not received notice of any order of the National Labor Relations Board or other labor relations tribunal or any unfair labor practice decision.

(iii)     Except as disclosed by Seller to Buyer on Schedule 4.1(v)(iii) of the Disclosure Schedules, as of the date hereof, Seller has not experienced any strikes, work stoppages, slowdowns, lockouts, or arbitrations.

(iv)     Except as disclosed by Seller to Buyer on Schedule 4.1(v)(iv) of the Disclosure Schedules, there are no complaints, charges, or claims against Seller pending with any Governmental Body or based on, arising out of, in connection with or otherwise relating to the employment or termination of employment or failure to employ by Seller, of any individual.

(v)     The execution and delivery by Seller of this Agreement and the performance by Seller does not require Seller to seek or obtain any consent, engage in

18

consultation with, or issue any notice to or make any filing with (as applicable) any employee or any representatives, labor unions, works councils or similar organizations representing Seller's employees, or any Governmental Body with respect to Seller's employees (except as disclosed by Seller to Buyer on Schedule 4.1(v)(v) of the Disclosure Schedules).

(w)     Sanctions; Export Controls; Anti-Corruption and Anti-Bribery.

(i)     Except as disclosed by Seller to Buyer on Schedule 4.1(w)(i) of the Disclosure Schedules, none of Seller or its directors, officers, employees, or agents (A) is a Person with whom transactions are prohibited or limited under the economic sanctions Laws administered by the United States Department of the Treasury Office of Foreign Assets Control ("OFAC") or (B) within the last five (5) years, has committed any violation of the economic sanctions Laws administered by OFAC.

(ii)     Except as disclosed by Seller to Buyer on Schedule 4.1(w)(ii) of the Disclosure Schedules, Seller is and for the past five (5) years, has been in compliance with applicable export control Laws, including the Export Administration Regulations and the International Traffic in Arms Regulations.

(iii)     Except as disclosed by Seller to Buyer on Schedule 4.1(w)(iii) of the Disclosure Schedules, within the past five (5) years, Seller has made no voluntary disclosures to any Governmental Body under the economic sanctions Laws administered by OFAC or export control Laws and, to the Knowledge of Seller, has not been the subject of any governmental investigation or inquiry regarding the compliance of Seller with such Laws, nor been assessed any fine or penalty in regard to compliance with such Laws.

(iv)     Except as disclosed by Seller to Buyer on Schedule 4.1(w)(iv) of the Disclosure Schedules, for the past five (5) years, Seller has not been subject to a shutdown or import or export prohibition by a Governmental Body.

(v)     Except as disclosed by Seller to Buyer on Schedule 4.1(w)(v) of the Disclosure Schedules, within the last five (5) years, none of Seller or its officers, directors, employees, agents, representatives, consultants, or any other Person associated with or acting for or on behalf of Seller, has, directly or indirectly, in the case of (1) through (3) below, in order to assist Seller in obtaining or retaining business on behalf of, securing an improper advantage on behalf of, or directing business to, Seller or any other Person: (1) made, offered or promised to make or offer any payment, loan or transfer of anything of value, including any reward, advantage or benefit of any kind, to or for the benefit of any Government Official, candidate for public office, political party or political campaign, for the purpose of (i) influencing any act or decision of such Government Official, candidate, party or campaign, (ii) inducing such Government Official, candidate, party or campaign to do or omit to do any act in violation of a lawful duty, (iii) obtaining or retaining business for or with any Person, or (iv) otherwise securing any improper advantage; (2) paid, offered or promised to pay or offer any bribe, payoff, influence payment, kickback, unlawful rebate, or other similar unlawful payment of any nature; (3) made, offered or promised to make or offer any unlawful contributions, gifts, entertainment or other unlawful expenditures; (4) established or maintained any unlawful fund of corporate monies or other properties; (5) created or caused the creation of any false or inaccurate books

19

and records of Seller related to any of the foregoing; or (6) otherwise violated any provision of the Foreign Corrupt Practices Act of 1977, 15 U.S.C. §§ 78dd-1, et seq., or any other applicable anti-corruption or anti-bribery law.

(x)    <u>Disclaimer of other Representations and Warranties</u>.  Except as provided herein, Seller makes no representation or warranty, express or implied, at law or in equity, regarding the Acquired Assets (including the Assumed Contracts and the Intellectual Property Licenses), or any assets, liabilities or operations, including with respect to capacity, condition, design, fitness for any particular purpose, merchantability, operation or quality, and any such other representations or warranties are hereby expressly disclaimed.  Except as provided herein, Seller expressly disclaims any representation or warranty, express, statutory, or implied, as to: (i) the content, character, or nature of any descriptive memorandum, report, brochure, chart, or statement prepared by third parties and relating to the Debtor or the Acquired Assets; (ii) any estimates of the value of the Acquired Assets, or future revenues generated by the Acquired Assets; (iii) the condition, quality, suitability, prior use, or design of the Acquired Assets; (iv) the merchantability or fitness for a particular purpose of the Acquired Assets; (v) the rights any licensee may have under 11 U.S.C. § 365(n); or (vi) any other materials or information that may have been made available or communicated to Buyer or its Affiliates, or their employees, agents, consultants, representatives, or advisors in connection with the transactions contemplated by this Agreement or any discussion or presentation relating thereto.    BUYER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES PROVIDED HEREIN, BUYER IS PURCHASING THE ACQUIRED ASSETS ON AN "AS-IS, WHERE-IS" BASIS AND "WITH ALL FAULTS". WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, SELLER MAKES NO REPRESENTATION OR WARRANTY REGARDING ANY ASSETS OTHER THAN THE ACQUIRED ASSETS, AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY.

Section 4.2.    <u>Representations and Warranties of Buyer</u>.  Buyer hereby represents and warrants to Seller as follows:

(a)    <u>Corporate Organization</u>.    Buyer is a limited liability company duly formed, validly existing and in good standing under the laws of Delaware, and has all requisite limited liability company or corporate, as applicable, power and authority to own its properties and assets.

(b)    <u>Authorization and Validity of Agreement</u>.    Buyer has all requisite corporate or limited liability company, as applicable, power and authority to enter into this Agreement and to carry out its obligations hereunder.    The execution and delivery of this Agreement and the performance of Buyer's obligations hereunder have been duly authorized by all necessary limited liability company or corporate, as applicable, action by the board of directors (or equivalent) of Buyer, and no other limited liability company or corporate, as applicable, action on the part of Buyer is necessary to authorize such execution, delivery and performance. This Agreement has been or will be duly executed by Buyer and constitutes, or will when executed constitute, its valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial

20

reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at Law or in equity).

(c)    <u>No Conflict or Violation</u>.    Except as would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby, the execution, delivery and performance by Buyer of this Agreement does not and will not violate or conflict with any provision of the certificate of incorporation or by-laws (or equivalent documents) of Buyer and does not and will not violate any provision of Law, or any order applicable to Buyer, nor will it result in a breach of or constitute (with due notice or lapse of time or both) a default under any Contract to which Buyer is a party or by which it is bound or to which any of its properties or assets is subject.

(d)    <u>Consents and Approvals</u>.    As of the date of this Agreement, to the knowledge of Buyer, the performance of this Agreement does not and will not require the consent or approval of, or filing with, any government or any other Person except (i) as may be required to be obtained by Buyer after the Closing in order to own or operate any of the Acquired Assets; (ii) for entry of the Sale Order by the Bankruptcy Court; (iii) consent and approval of the counterparty to any Government Contract; (iv) consent of the Iowa Department of Natural Resources and any other Required Governmental Body; (v) such other consent or approval as may be determined by Buyer; or (vi) for such consents, approvals and filings, of which the failure to obtain or make would not, individually or in the aggregate, have a material adverse effect on the ability of Buyer to consummate the transactions contemplated hereby.

(e)    <u>Investigation by Buyer</u>.    Buyer has conducted its own independent review of all Orders of, and all motions, pleadings, and other submissions to, the Bankruptcy Court in connection with Bankruptcy Case.    Buyer (i) acknowledges that neither Seller nor any of its Affiliates or Related Persons, their agents, representatives, professionals and Related Persons makes or has made any representation or warranty, either express or implied, as to the accuracy or completeness of any of the information provided or made available to Buyer or its Affiliates or Related Persons, except for the representations and warranties contained in <u>Section 4.1</u> (which are subject to the limitations and restrictions contained in this Agreement); and (ii) agrees, to the fullest extent permitted by law, that none of Seller, its Affiliates or any of their respective Related Persons, their agents, representatives, professionals and Related Persons shall have any liability or responsibility whatsoever to Buyer or its Affiliates or Related Persons on any basis (including in contract or tort, under federal or state securities laws or otherwise) based upon any information provided or made available, or statements made, to Buyer or its Affiliates or Related Persons (or any omissions therefrom), including in respect of the specific representations and warranties of Seller set forth in this Agreement, except, with regard to Seller, for the representations and warranties contained in <u>Section 4.1</u> and, with respect to such representations and warranties, subject to the limitations and restrictions contained in this Agreement.

Section 4.3.    <u>Warranties Exclusive</u>.    The parties acknowledge that the representations and warranties contained in <u>Article 4</u> are the only representations and/or warranties given by the parties and that all other express or implied warranties are disclaimed. Without limiting the foregoing, Buyer acknowledges that, excepted as provided herein, the Acquired Assets are conveyed "AS IS", "WHERE IS" and "WITH ALL FAULTS" and that ALL WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR

21

PURPOSE ARE DISCLAIMED. WITHOUT LIMITING THE FOREGOING, EXCEPT AS PROVIDED IN SECTION 4.1, BUYER ACKNOWLEDGES THAT SELLER AND SELLER'S AFFILIATES AND THEIR RESPECTIVE RELATED PERSONS, THEIR AGENTS, REPRESENTATIVES, PROFESSIONALS AND RELATED PERSONS, HAVE MADE NO REPRESENTATION OR WARRANTY CONCERNING (I) ANY USE TO WHICH THE ACQUIRED ASSETS MAY BE PUT, (II) ANY FUTURE REVENUES, COSTS, EXPENDITURES, CASH FLOW, RESULTS OF OPERATIONS, FINANCIAL CONDITION OR PROSPECTS THAT MAY RESULT FROM THE OWNERSHIP, USE OR SALE OF THE ACQUIRED ASSETS, (III) ANY OTHER INFORMATION OR DOCUMENTS MADE AVAILABLE TO BUYER OR ITS AFFILIATES OR RELATED PERSONS OR (IV) THE CONDITION OF THE ACQUIRED ASSETS INCLUDING COMPLIANCE WITH ANY FEDERAL TRADE COMMISSION LAWS OR OTHER LAWS.

EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLER MAKES NO REPRESENTATIONS REGARDING THE ENVIRONMENTAL CONDITION OF THE CRESTON PROPERTY OR THE LORIMOR PROPERTY AND SELLER PROVIDES NO WARRANTIES OR OTHER ASSURANCES REGARDING THE ENVIRONMENTAL OR OTHER CONDITIONS OF THE CRESTON PROPERTY OR THE LORIMOR PROPERTY. THE ACQUIRED ASSETS ARE SOLD SUBJECT TO ALL EXISTING CONDITIONS, INCLUDING ANY ENVIRONMENTAL CONDITIONS.

Section 4.4.    Survival of Representations and Warranties.    None of the representations or warranties of Seller or Buyer set forth in this Agreement or in any certificate delivered pursuant to Section 7.1(a) or Section 7.2(a) shall survive the Closing.

ARTICLE 5.    COVENANTS AND OTHER AGREEMENTS.

Section 5.1.    Covenants of Seller.

(a)    Seller agrees that, prior to the Closing Date, Buyer shall be entitled, through its officers, employees, consultants and representatives (including legal advisors and accountants), to make such investigation of the properties, businesses and operations of the Business, including the conduct of environmental assessments of the real property and title reports, and such examination of the books and records of the Business, the Acquired Assets and the Assumed Liabilities as it reasonably requests and to make extracts and copies of such books and records. Seller shall direct and use its commercially reasonable efforts to cause its officers, employees, consultants, agents, accountants, attorneys and other representatives to cooperate with Buyer and Buyer's representatives in connection with such investigation and examination.

(b)    Upon execution of this Agreement, Buyer agrees to be the Stalking Horse Bidder.

(c)    At the request of Buyer, at any time after the Closing Date, Seller shall promptly as reasonably practicable execute and deliver such documents, and take other acts, as Buyer or its counsel may reasonably request to effectuate the purposes of this Agreement.

(d)     Seller shall use its best efforts, and Buyer shall cooperate with Seller, to obtain at the earliest practicable date all consents and approvals required to consummate the transactions contemplated by this Agreement.

(e)     Seller shall cooperate and provide such documents as Buyer or its counsel may request in connection with obtaining the consent of any counterparty to any Government Contract to the assignment of such Contracts.

(f)     Seller shall cooperate and provide such documents as Buyer or its counsel may request in connection with obtaining the consent of the Defense Security Service or such other cognizant security authority to effectuate the continued performance post-closing of the Government Contracts requiring access to classified information.

Section 5.2.     <u>Covenants of Buyer</u>.  At the request of Seller, at any time after the Closing Date, Buyer shall promptly execute and deliver such documents as Seller or its counsel may reasonably request to effectuate the purposes of this Agreement.

Section 5.3.     <u>Conduct of the Business Pending Closing</u>.

(a)     Prior to the Closing, Seller shall:

(i)     conduct the Business only in the Ordinary Course of Business;

(ii)     use its best efforts to (A) preserve its present business operations, organization (including management and the sales force) and goodwill of Seller and (B) preserve the present relationships with Persons having business dealings with Seller (including customers and suppliers);

(iii)     maintain (A) all of the assets and properties of Seller in their current condition, ordinary wear and tear excepted and (B) insurance upon all of the assets and properties of Seller in such amounts and of such kinds comparable to that in effect on the date of this Agreement;

(iv)     (A) maintain the books, accounts and records of Seller in the Ordinary Course of Business, (B) continue to collect accounts receivable and pay accounts payable utilizing normal procedures and without discounting or accelerating payment of such accounts, and (C) comply with all contractual and other obligations applicable to the operation of Seller;

(v)     not take any action which would adversely affect the ability of the parties to consummate the transactions contemplated by this Agreement;

(vi)     use commercially reasonable efforts to make, or cause to be made, all necessary repairs, replacements and improvements to the Acquired Assets in the Ordinary Course of Business and use commercially reasonable efforts to defend and protect the Acquired Assets from infringement or deterioration; and

(vii)     comply with applicable Laws.

23

(b)      except as required by applicable Law or by order of the Bankruptcy Court, or as otherwise expressly contemplated by this Agreement, or with the prior written consent of Buyer, Seller shall not, solely as it relates to the Business:

(i)      permit, offer, agree, or commit (in writing or otherwise), to permit any of the Acquired Assets to become subject, directly or indirectly, to any Lien, except for any Lien securing a debtor-in-possession loan facility;

(ii)      other than pursuant to an order of the Bankruptcy Court authorizing the sale of the Acquired Assets in a Competing Transaction, enter into any Contract for the direct or indirect sale (whether by merger, sale of assets or stock, or otherwise) transfer, financing, assignment, conveyance, lease recapitalization or other disposition of any portion of the Business or any Acquired Asset;

(iii)      (A) increase the annual level of compensation payable or to become payable by Seller to any of their respective executive officers, (B) grant any unusual or extraordinary bonus, benefit or other direct or indirect compensation to any employee, director or consultant, (C) increase the coverage or benefits available under any (or create any new) severance pay, termination pay, vacation pay, company awards, salary continuation for disability, sick leave, deferred compensation, bonus or other incentive compensation, insurance, pension or other employee benefit plan or arrangement made to, for, or with any of the directors, officers, employees, agents or representatives of Seller or otherwise modify or amend or terminate any such plan or arrangement or (D) enter into any employment, deferred compensation, severance, consulting, non-competition or similar agreement (or amend any such agreement) to which Seller is a party or involving a director, officer or employee of Seller in his or her capacity as a director, officer or employee of Seller;

(iv)      make any loan or advance to any Person;

(v)      incur or assume any Indebtedness;

(vi)      sell, license, sublicense, assign, transfer, abandon, allow to lapse, mortgage, encumber or otherwise dispose of any Purchased Intellectual Property or license any Intellectual Property Rights relating to the Products from a third party, except for (A) the grant of non-exclusive licenses to third parties in the Ordinary Course of Business which do not give such third parties the right to manufacture, market or sell any Product or (B) exclusive or non-exclusive licenses from third parties entered into in the Ordinary Course of Business which are fully paid-up as of the date of grant and do not impose any on-going milestone, royalty or other payment obligations;

(vii)      make or rescind any election relating to Taxes, settle or compromise any claim, action, suit, litigation, proceeding, arbitration, investigation, audit or controversy relating to Taxes, or except as may be required by applicable Law or GAAP, make any material change to any of its methods of accounting or methods of reporting income or deductions for Tax or accounting practice or policy from those employed in the preparation of its most recent Tax Returns;

24

(viii)   acquire any material properties or assets (except for fair consideration in the Ordinary Course of Business; provided that this exception shall not apply to real property) or sell, assign, license, transfer, convey, lease or otherwise dispose of any of the Acquired Assets of Seller;

(ix)   (i) enter into or agree to enter into any merger or consolidation with, any corporation or other entity or (ii) invest in, make a loan, advance or capital contribution to, or otherwise acquire (whether by formation of a Person, transfer or otherwise) the securities of any other Person;

(x)   cancel or compromise any debt or claim or waive or release any material right of Seller except in the Ordinary Course of Business;

(xi)   enter into any commitment for capital expenditures in excess of $10,000 for any individual commitment and $50,000 for all commitments in the aggregate;

(xii)   enter into, modify or terminate any labor or collective bargaining agreement or, through negotiation or otherwise, make any commitment or incur any liability to any labor organization;

(xiii)   introduce any material change with respect to the operation of the Business, including any material change in the types, nature, composition or quality of products or services, or, other than in the Ordinary Course of Business, make any change in product specifications or prices or terms of distributions of such products;

(xiv)   enter into any transaction or enter into, modify or renew any Contract which by reason of its size or otherwise is not in the Ordinary Course of Business;

(xv)   enter into any Contract, understanding or commitment that restrains, restricts, limits or impedes the ability of the Business, or the ability of Buyer, to compete with or conduct any business or line of business in any geographic area;

(xvi)   amend the certificate of incorporation or by-laws of Seller; or

(xvii)   agree to do anything prohibited by this Section 5.3 or anything which would make any of the representations and warranties of Seller in this Agreement untrue or incorrect in any material respect.

Section 5.4.   Bankruptcy Matters.   Seller and Buyer shall use commercially reasonable efforts to cooperate, assist and consult with each other to secure the entry of the Sale Order following the date hereof, and to consummate the transactions contemplated by this Agreement, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and furnishing any testimony regarding the transactions contemplated hereby.

Section 5.5.   Further Assurances.   Each of Seller and Buyer shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate

25

the transactions contemplated by this Agreement and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement.

Section 5.6.    <u>Public Announcements</u>.    Except for any description of the transactions contemplated hereunder in any motion filed with the Bankruptcy Court, no party shall make any press release or public announcement, other than as required in the chapter 11 case, concerning this Agreement or the transactions contemplated hereby without the prior written approval of the other party hereto, which approval will not be unreasonably withheld or delayed.    The parties hereto acknowledge that Seller shall file this Agreement with the Bankruptcy Court in connection with obtaining the Sale Order and may file and serve other related notices regarding this Agreement as Seller deems appropriate and must so file and serve any notices required to be filed or served under applicable bankruptcy Law.

Section 5.7.    <u>Use of Name</u>.

(a)    Seller hereby agrees that: (a) upon the consummation of the transactions contemplated hereby, Buyer shall have the sole right to the use of the name "Wellman Dynamics" or similar names or Marks containing or comprising the foregoing, including any name or Mark confusingly similar thereto (collectively, the "<u>Seller Marks</u>") and Seller shall not, and shall not permit any Affiliate to, use such name or any variation or simulation thereof; and (b) as promptly as practicable but in no event more than three (3) Business Days after the Closing Date, Seller shall cause an amendment to its and, as applicable, its Affiliates', certificate of incorporation to be filed with the appropriate Governmental Body and shall take all other action necessary to change Seller's and, as applicable, its Affiliates', legal, registered, assumed, trade and/or "doing business as" name to a name or names not containing the Seller Marks and will cause to be filed as promptly as practicable after the Closing Date, in all jurisdictions in which Seller or its Affiliates are qualified to do business, any documents necessary to reflect such change in its legal, registered, assumed, trade and/or "doing business as" name  or to terminate its qualification therein. In furtherance thereof, as promptly as practicable but in no event later than sixty (60) days following the Closing Date, Seller shall remove, strike over or otherwise obliterate all Seller Marks from all materials owned by Seller and used or displayed publicly including any sales and marketing materials, displays, signs, promotional materials and other materials.

(b)    Seller hereby agrees that, if the assets of WDMA are sold to a Person other than Buyer (such Person, the "<u>WDMA Purchaser</u>"): (a) Seller shall ensure that the WDMA Purchaser does not acquire any right to the use of the name "Wellman Dynamics" or similar names or any other Seller Marks and Seller shall not permit the WDMA Purchaser to use such name or any variation or simulation thereof; and (b) as promptly as practicable but in no event more than three (3) Business Days following the closing of the sale of WDMA's assets to the WDMA Purchaser, Seller shall cause an amendment to WDMA's certificate of incorporation to be filed with the appropriate Governmental Body and shall cause WDMA to take all other action necessary to change WDMA's legal, registered, assumed, trade and/or "doing business as" name to a name or names not containing the Seller Marks and will cause to be filed as promptly as practicable after the closing of the sale of WDMA's assets to the WDMA Purchaser, in all jurisdictions in which WDMA is qualified to do business, any documents necessary to reflect

26

such change in its legal, registered, assumed, trade and/or "doing business as" name  or to terminate its qualification therein. In furtherance thereof, as promptly as practicable but in no event later than sixty (60) days following the closing of the sale of WDMA's assets to the WDMA Purchaser, Seller shall cause the WDMA Purchaser to remove, strike over or otherwise obliterate all Seller Marks from all materials owned by the WDMA Purchaser and used or displayed publicly including any sales and marketing materials, displays, signs, promotional materials and other materials.

Section 5.8.    Confidentiality.  Except as required and permitted under the Bid Procedures, from and after the date hereof (including after the Closing), Seller shall not and shall cause its Affiliates and their respective officers, and directors not to, directly or indirectly, disclose, reveal, divulge or communicate to any Person other than authorized officers, directors and employees of Buyer or use or otherwise exploit for its own benefit or for the benefit of anyone other than Buyer, any Confidential Information (as defined below).  Seller and its officers, directors and Affiliates shall not have any obligation to keep confidential any Confidential Information if and to the extent disclosure thereof is specifically required by Law; provided, however, that in the event disclosure is required by applicable Law, Seller shall, to the extent reasonably possible, provide Buyer with prompt notice of such requirement prior to making any disclosure so that Buyer may seek an appropriate protective order.  For purposes of this Section 5.8, "Confidential Information" shall mean any confidential information with respect to the Business, including, methods of operation, customers, customer lists, Products, prices, fees, costs, Technology, inventions, Trade Secrets, know-how, Software, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters. "Confidential Information" does not include, and there shall be no obligation hereunder with respect to, information that (i) is generally available to the public on the date of this Agreement or (ii) becomes generally available to the public other than as a result of a disclosure not otherwise permissible thereunder.

Section 5.9.    Casualty and Insurance.  Seller shall maintain until Closing all existing insurance policies (or policies substantially comparable to the existing policies) relating to the Business or the Acquired Assets, at its sole cost and expense.  If, between the date hereof and the Closing, any material Acquired Assets shall be damaged or destroyed by fire, theft, vandalism or other casualty event, or become subject to any condemnation or eminent domain proceeding, Seller shall promptly notify Buyer in writing of such fact and Buyer shall have the option to (i) acquire such Acquired Assets on an "as is" basis and take an assignment from Seller of any and all insurance proceeds payable to Seller in respect of such event or (ii) elect to exclude such Acquired Asset from this Agreement.

Section 5.10.    Contact with Customers and Suppliers.  Seller acknowledges and agrees that Buyer and its representatives have the right to contact and communicate with any customers, suppliers, distributors and licensors of the Business ("Interested Parties") in connection with the transactions contemplated hereby (including operations of Seller and other matters customarily included in due diligence investigations); provided that (i) prior to any initial contact or communication with an Interested Party, Buyer shall notify Seller and (ii) to the extent reasonably requested by Seller within one (1) Business Day after the receipt of such notice, Seller shall have the right to participate in communications between Buyer and the applicable Interest Party with respect to the transactions contemplated hereby.  To the extent requested by

Buyer, Seller agrees to use its reasonable best efforts to facilitate, engage in planning, executing and taking other actions reasonably necessary in connection with contacting, communicating and managing the relationship with the Interested Parties.

Section 5.11.  Environmental Matters.  Prior to the Closing Date, Buyer shall attempt to engage in negotiations with each Governmental Body with jurisdiction concerning environmental conditions at the Creston Property and the Lorimor Property to resolve all Environmental Costs and Liabilities associated with the presence of any Hazardous Material at, on, under or migrating to or from the Creston Property or the Lorimor Property, as applicable.  In furtherance of the foregoing and notwithstanding anything else to the contrary in this Agreement, Seller acknowledges and agrees that Buyer shall have the right to engage in negotiations with each such Governmental Body without participation by Seller; provided, however, that Buyer shall have no authority to make any commitment on behalf of Seller without Seller's prior written approval.  In connection with such negotiations, Seller shall cooperate with Buyer, including providing Buyer with access to relevant documents, data and personnel, as may be reasonably necessary to facilitate Buyer's negotiations with such Governmental Bodies.  Buyer shall provide Seller with periodic updates concerning the status such negotiations, including copies of any non-confidential correspondence with any Governmental Body regarding such negotiations.  For the avoidance of doubt, nothing in this Agreement shall obligate Buyer to make any payment or otherwise incur any obligation with respect to any Environmental Costs and Liabilities.

Section 5.12.  No Disparagement.  From the date of this Agreement until the second anniversary of the Closing Date, Seller agrees that it will not (i) engage in any conduct disparaging to, (ii) induce or encourage others to disparage or (iii) make or cause to be made any statement that disparages or otherwise maligns the goodwill, reputation or business relationships of Buyer, any of its Affiliates or any of their respective directors, employees, investors or other business partners.

Section 5.13.  Lorimor Property.  If, as of the date of this Agreement, Seller does not have good, valid and marketable fee simple title to the Lorimor Property, free and clear of all Liens, Seller shall, prior to the Closing, either (i) acquire good, valid and marketable fee simple title to the Lorimor Property, free and clear of all Liens or (ii) cause Fansteel, Inc. to be become a party to this Agreement for the purpose of Fansteel, Inc. transferring the Lorimor Property to Buyer, Free and Clear of all Liens, at the Closing.

Section 5.14.  Schedules to be Filed.  With respect to any schedule to be filed with the Bankruptcy Court pursuant to the terms hereof (including the Disclosure Schedules), Seller (i) shall provide to Buyer a draft of such schedule at least 5 Business Days prior to filing such schedule with the Bankruptcy Court, (ii) shall not file such schedule with the Bankruptcy Court without the prior written consent of Buyer and (iii) shall file such schedule on the Schedule Filing Date (or, if expressly provided in this Agreement, such other date on which such schedule is to be filed).

Section 5.15.  TCTM Contingent Claim.  Prior to the purchase by Buyer of the assets of WDMA pursuant to a motion, pursuant to section 363 of the Bankruptcy Code, filed on

or about the date hereof, Seller shall enter into definitive documents with respect to the TCTM Contingent Claim in form and substance satisfactory to Buyer in its sole discretion.

Section 5.16.  Use of Cash Consideration.  Seller shall not use (or agree to use) all or any portion of the Restricted Cash Consideration without the prior written consent of Buyer, which consent may be withheld in Buyer's sole discretion.

## ARTICLE 6.  TAXES.

Section 6.1.  Taxes Related to Purchase of Assets.  All federal, state and local sales, transfer, gains, excise, value-added or other similar Taxes, if any, including, all state and local Taxes in connection with the transfer of the Acquired Assets, and all recording and filing fees (collectively, "Transaction Taxes"), that may be imposed by reason of the sale, transfer, assignment and delivery of the Acquired Assets, and are not exempt under section 1146(a) of the Bankruptcy Code, shall be paid by Buyer up to an aggregate amount equal to $10,000, and Seller shall pay any Transaction Taxes not paid by Buyer pursuant to the preceding clause.  Buyer and Seller agree to cooperate to determine the amount of Transaction Taxes payable in connection with the transactions contemplated under this Agreement.  The party hereto that is required by applicable Law to file any Tax Returns in connection with Transaction Taxes shall prepare and timely file such Tax Returns (unless Buyer informs Seller that it will prepare all such Tax Returns as relates to the transfer of the Acquired Assets, in which event Buyer shall prepare such Tax Returns for signing by Seller, Seller shall sign and remit the tax amounts to Buyer, and Buyer shall thereafter file such Tax Returns with the tax).  To the extent Buyer is required, by applicable Law, to pay any Tax for which Seller is responsible pursuant to this Section 6.1, Seller shall pay Buyer, no later than five (5) days prior to the payment due date, the tax amount.  Buyer shall be entitled to receive any Tax Returns to be prepared and filed by Seller and other documentation which relates to the Acquired Assets not less than ten (10) Business Days prior to the anticipated date of filing of such Tax Returns, and such Tax Returns and other documentation shall be subject to Buyer's approval, which shall not be unreasonably withheld, delayed, or conditioned.  The parties hereto shall cooperate to permit the filing party to prepare and timely file any such Tax Returns and shall provide each other with any applicable exemption certificates.

Section 6.2.  Cooperation on Tax Matters.

(a)  Buyer and Seller agree to furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance relating to the Acquired Assets and the Assumed Liabilities as is reasonably necessary for the preparation and filing of any Tax Return, claim for refund or other required or optional filings relating to Tax matters, for the preparation for and proof of facts during any Tax audit, for the preparation for any Tax protest, for the prosecution or defense of any suit or other proceeding relating to Tax matters and for the answer to any governmental or regulatory inquiry relating to Tax matters.  All tax refunds due or which may be claimed relative to the Acquired Assets or otherwise shall belong to the Estate and are not part of the Acquired Assets.

(b)  Buyer agrees to retain possession, at its own expense, of all accounting, business, financial and Tax records and information (i) relating to the Acquired Assets that are in

29

existence on the Closing Date and transferred to Buyer hereunder and (ii) coming into existence after the Closing Date that relate to the Acquired Assets, for a period of at least three years from the Closing Date.  In addition, from and after the Closing Date, Buyer agrees that it will provide reasonable access to Seller and its attorneys, accountants and other representatives (after reasonable notice and during normal business hours and without charge) to the books, records, documents and other information relating to the Acquired Assets as Seller may reasonably deem necessary to (x) properly prepare for, file, prove, answer, prosecute and/or defend any such Tax Return, claim, filing, Tax audit, Tax protest, suit, proceeding or answer or (y) administer or complete the administration of the Debtor's case under chapter 11 of the Bankruptcy Code.  Such access shall include access to any computerized information retrieval systems relating to the Acquired Assets.

   Section 6.3. <u>Allocation of Consideration and Consideration Allocation Forms</u>. Buyer shall allocate the TCTM Credit Bid, the Cash Consideration, and the Assumed Liabilities among the Acquired Assets as reasonably determined by Buyer (the "<u>Allocation</u>").  No later than ninety (90) days, after the Closing Date Buyer shall prepare and deliver to Seller Buyer's determination of the allocation (the "<u>Asset Acquisition Statement</u>").  The Asset Acquisition Statement shall be conclusive and binding on the parties.  Seller and Buyer will cooperate in filing with the Internal Revenue Service their respective Forms 8594 as provided for in Section 1060 of the Code on a basis consistent with the Allocation, and the Allocation shall be reflected on any Tax Returns required to be filed as a result of the transactions contemplated hereby.

  ARTICLE 7. <u>CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES</u>.

   Section 7.1. <u>Conditions Precedent to Performance by Seller</u>.  The obligation of Seller to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or before the Closing Date, of the following conditions; any one or more of which (other than the condition contained in <u>Section 7.1(c)</u>) may be waived by Seller in its sole discretion:

   (a) <u>Representations and Warranties of Buyer</u>.  All representations and warranties made by Buyer in <u>Section 4.2</u>, disregarding all qualifications and exceptions contained therein relating to materiality or material adverse effect, shall be accurate in all respects on and as of the date hereof and on and as of the Closing Date, in each case, as if again made by Buyer on and as of such date, except for inaccuracies that do not result in a material adverse effect on Buyer's ability to perform its obligations hereunder, and Seller shall have received a certificate, dated the Closing Date and signed by an authorized signatory of Buyer, to that effect.

   (b) <u>Performance of the Obligations of Buyer</u>.  Buyer shall have performed in all material respects all obligations required under this Agreement to be performed by it on or before the Closing Date, and Seller shall have received a certificate, dated the Closing Date and signed by an authorized signatory of Buyer, to that effect.

   (c) <u>Consents and Approvals</u>.  The Bankruptcy Court shall have entered the Sale Order and no order staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date.

30

(d)    <u>No Violation of Orders</u>.  No preliminary or permanent injunction or other order that declares this Agreement invalid or unenforceable in any respect or which prevents the consummation of the transactions contemplated hereby shall be in effect.

Section 7.2.    <u>Conditions Precedent to the Performance by Buyer</u>.  The obligation of Buyer to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or before the Closing Date, of the following conditions, any one or more of which (other than the condition contained in <u>Section 7.2(c)(i)</u>) may be waived by Buyer in its sole discretion:

(a)    <u>Representations and Warranties of Seller</u>.    All representations and warranties made by Seller in <u>Section 4.1,</u> disregarding all qualifications and exceptions contained therein solely relating to materiality or Material Adverse Effect (and, with respect to the Closing Date, also disregarding <u>Section 10.10(k)</u>), shall be accurate in all respects on and as of the date hereof, and on and as of the Closing Date, in each case, as if again made by Seller on and as of each such date, except for inaccuracies that have not resulted in, or would not be reasonably expected to result in, a Material Adverse Effect, and Buyer shall have received a certificate, dated the Closing Date and signed by an authorized officer of Seller, to that effect.

(b)    <u>Performance of the Obligations of Seller</u>.  Seller shall have performed in all material respects all obligations required under this Agreement to be performed by it on or before the Closing Date, and Buyer shall have received a certificate, dated the Closing Date and signed by an authorized officer of Seller, to that effect.

(c)    <u>Consents and Approvals</u>. (i) Buyer shall have received, in a form and substance to the satisfaction of Buyer in its sole discretion (A) the consent of the relevant counterparty to assign or novate, as applicable, to Buyer effective as of the Closing Date, each Government Contract and, to the extent applicable, the consent of the Defense Security Service or such other cognizant security authority to effectuate the continued performance post-closing of the Government Contracts requiring access to classified information and (B) an assignment or novation, as applicable, for each Contract set forth in a written notice delivered by Buyer to Seller on or before the Closing Date and (ii) the waiting period shall have expired or early termination shall have been granted under any applicable antitrust or competition Law and each party hereto shall have obtained or made any consent, approval, order or authorization of, or registration, declaration or filing with, any Governmental Body required to be obtained or made by it in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

(d)    <u>No Violation of Orders</u>.  No preliminary or permanent injunction or other order that declares this Agreement invalid in any respect or prevents the consummation of the transactions contemplated hereby shall be in effect.

(e)    <u>Seller Deliverables</u>.  Seller shall have delivered, or caused to be delivered, to Buyer all of the items set forth in <u>Section 3.2</u>.

31

(f)    <u>No Material Adverse Effect</u>.  There shall not have been or occurred any event, change, occurrence or circumstance that has had or which could reasonably be expected to have a Material Adverse Effect since the Balance Sheet Date.

(g)    <u>Financing</u>.  Seller shall have a capital structure (including entering into (i) definitive documents consistent with the terms set forth on <u>Schedule 7.2(g)</u> with respect to refinanced first lien debt (the "<u>Refinanced First Lien Debt</u>") and (ii) definitive documents with respect to the TCTM Contingent Claim) satisfactory to Buyer, in its sole discretion.  Buyer shall also have received the funds of any third party financing. (For the avoidance of doubt, Buyer shall have the right to enter into binding Contracts with third parties with respect to transfers of any or all of the Refinanced First Lien Debt, and the consummation of such transfers may occur concurrently with, or after, the Closing.)

(h)    <u>Financial Performance</u>.

(i)    For each calendar month that ends on or after June 30, 2017 and before the Closing Date (each, a "<u>Complete Month</u>"), the EBITDA for such calendar month shall be at least the Target Monthly EBITDA for such calendar month, and if the Closing is to occur on a day that is not the first day of a calendar month (such calendar month, a "<u>Truncated Month</u>"), the EBITDA for such Truncated Month through (and including) the day before the Closing Date shall be at least the Target Monthly EBITDA for such Truncated Month prorated through (and including) the day before the Closing Date.

(ii)    The Acquired Assets shall include at least $100,000 in cash.

(i)    <u>Permits</u>.  Seller shall have obtained the issuance, reissuance or transfer to Buyer of all Permits required for Buyer to conduct the operations of the Business as of, and following, the Closing Date.

(j)    <u>Sale Order</u>.  The Sale Order shall have been entered and not stayed, vacated or modified without Buyer's consent.

(k)    <u>Environmental Costs and Liabilities</u>.  Buyer either (i) shall have entered into definitive agreements (in form and substance satisfactory to Buyer, in its sole discretion) with each relevant Governmental Body with jurisdiction concerning environmental conditions at the Creston Property and the Lorimor Property resolving all Environmental Costs and Liabilities associated with the presence of any Hazardous Material at, on, under or migrating to or from the Creston Property or the Lorimor Property, as applicable or (ii) shall, in the event that one or more settlements cannot be agreed, be satisfied, in Buyer's sole discretion, with the environmental condition of the Creston Property, the Lorimor Property and, in each case, any Environmental Costs and Liabilities associated therewith.

(l)    <u>Other Indebtedness</u>.  Seller has not, directly or indirectly, created, incurred, assumed, permitted to exist or otherwise has become or remains liable with respect to any Indebtedness that is secured by Liens that are pari passu or senior to the Liens securing any Indebtedness of Seller owed to Buyer.

32

(m)     Audit.  The audit of Seller for the year ended December 31, 2016 shall have been completed, and the results of such audit are satisfactory to Buyer, in its sole discretion.

(n)     Cash Collateral.

(i)     Seller shall not have violated any terms or conditions of (A) the order governing the Debtor's use of cash collateral through July 28, 2017 (Case No. 16-011823-als11) (ECF No. 227) (the "Cash Collateral Order") or (B) any order(s) governing Seller's use of cash collateral beyond July 28, 2017 (each a, "Subsequent Cash Collateral Order").

(ii)     Each Subsequent Cash Collateral Order is in form and substance satisfactory to Buyer in its sole discretion.

Section 7.3.     Frustration of Closing Conditions.  No party hereto may rely on the failure of any condition set forth in Section 7.1 or Section 7.2, as the case may be, if such failure was caused by such party's failure to comply with or breach of any provision of this Agreement.

ARTICLE 8.     TERMINATION.

Section 8.1.     Termination.  This Agreement may be terminated at any time prior to the Closing Date:

(a)     By either Seller or Buyer, if the Closing shall not have occurred by October 31, 2017 (the "Outside Date"); provided, however, that the Outside Date may be extended by Seller and Buyer upon mutual agreement; provided, further, that, if the Closing shall not have occurred on or before the Outside Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Buyer or Seller, then the breaching party may not terminate this Agreement pursuant to this Section 8.1(a);

(b)     By either Seller or Buyer, upon the entry of an order of the Bankruptcy Court authorizing the sale of the Acquired Assets in a Competing Transaction; provided, however, that Buyer shall not be permitted to terminate this Agreement upon the entry of such an order if Buyer previously had been determined at the Auction to be the second highest bidder ("Backup Bidder") for the Acquired Assets, in which case Buyer is required to remain bound by the terms of this Agreement pursuant until the earlier of (1) closing of the Competing Transaction or (2) fourteen (14) days after the date of the Auction;

(c)     By Seller, if Buyer shall have breached any of its obligations, representations, warranties, covenants or agreements contained in this Agreement, which breach would cause the failure of any condition in Section 7.1 to be satisfied and cannot be or has not been cured by the Outside Date;

(d)     By Buyer, if Seller shall have breached any of its obligations, representations, warranties, covenants or agreements contained in this Agreement, which breach would cause the failure of any condition in Section 7.2 to be satisfied and cannot be or has not been cured by the Outside Date;

(e)     By the mutual written consent of Seller and Buyer;

33

(f)     By Buyer, if any of the terms or conditions in any Subsequent Cash Collateral Order are not satisfactory to Buyer in its sole discretion;

(g)     By Buyer, if the Bankruptcy Court does not enter the Bid Procedures Order by August 11, 2017.

(h)     By Buyer, if the order retaining an investment banker shall not have been approved by the Bankruptcy Court by the close of business on August 21, 2017;

(i)     By Buyer, if (i) the Sale Order shall not have been entered by the Bankruptcy Court by the close of business on September 30, 2017 or (ii) following its entry the Sale Order (y) shall fail to be in full force and effect or shall have been vacated, stayed or reversed and the Sale Order is not reinstated or such stay has not been lifted prior to the Closing Date or (z) shall have been modified or amended in any respect without the prior written consent of Buyer;

(j)     By either Buyer or Seller, if there shall be any Law that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited, or there shall be in effect a final non-appealable order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; it being agreed that Seller shall promptly appeal any adverse determination which is appealable (and pursue such appeal with reasonable diligence);

(k)     By Buyer, if the Bankruptcy Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, or if an examiner with expanded powers or a trustee is appointed for Seller;

(l)     By Buyer, if at any time during the Bankruptcy Case, Buyer, in its sole discretion, requests additional adequate protection, relief from the automatic stay, or any other relief Buyer determines to be necessary or appropriate to protect its rights or enforce remedies in any manner to the extent permitted by law.

(m)     By Buyer, if Seller has sought, or otherwise attempted, to, directly or indirectly, create, incur, assume, permit to exist or otherwise become or remain liable with respect to any Indebtedness that is secured by Liens that are pari passu or senior to the Liens securing any Indebtedness of Seller owed to Buyer;

(n)     By Buyer,

(i)     if Seller shall have violated any terms or conditions of (A) the Cash Collateral Order or (B) any Subsequent Cash Collateral Order; or

(ii)     any Subsequent Cash Collateral Order is not satisfactory in form or substance to Buyer in its sole discretion;

(o)     Automatically, without any action of either Buyer or Seller if a Competing Transaction is consummated; or

34

(p)    By Buyer, if Buyer is neither the winning bidder at the Auction nor named the Backup Bidder.

Section 8.2.    Effect of Termination.

(a)    In the event that this Agreement is validly terminated as provided in Section 8.1, then each of the parties hereto shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to any of the parties hereto; provided, however, this Section 8.2, Article 10, Article 11 (to the extent relevant to this Section 8.2 and Article 10) shall survive any such termination and shall be enforceable hereunder.

(b)    Nothing in this Agreement shall relieve Buyer or Seller of any liability for a breach of this Agreement prior to the date of termination or for fraudulent or criminal acts, the remedies for which shall not be limited by the provisions of this Agreement.

Section 8.3.    Procedure Upon Termination.    In the event of termination by Buyer or Seller, or both, pursuant to Section 8.1, notice thereof shall forthwith be given to the other party.    If this Agreement is terminated as provided herein, each party shall redeliver all documents, work papers and other material of any other party relating to the transactions contemplated by this Agreement, whether so obtained before or after the execution hereof, to the party furnishing the same as soon as reasonably practicable following termination.

## ARTICLE 9.    EMPLOYEES AND EMPLOYEE BENEFITS.

Section 9.1.    Employment.

(a)    Transferred Employees.    Prior to the Closing, Buyer shall deliver, in writing, an offer of employment (on an "at will" basis) to commence immediately upon the day following the Closing (subject to Buyer's standard conditions for new employees) to those Employees identified by Buyer on a schedule to be delivered to Seller no later than five (5) Business Days prior to the Closing.    Each such offer of employment shall be at the same salary or hourly wage rate and position in effect immediately prior to the Closing Date.    Such individuals who accept such offer by the Closing Date are hereinafter referred to as the "Transferred Employees."    Subject to applicable Laws, on and after the Closing Date, Buyer shall have the right to dismiss any or all Transferred Employees at any time, with or without cause, and to change the terms and conditions of their employment (including compensation and employee benefits provided to them).

(b)    Excluded Employees.    Any Employee who is not offered employment by Buyer prior to Closing or who does not accept an offer of employment by Buyer, in each case pursuant to Section 9.1(a), is hereinafter referred to as an "Excluded Employee."

## ARTICLE 10. MISCELLANEOUS.

Section 10.1.    Successors and Assigns.    Except as otherwise provided in this Agreement, neither Buyer nor Seller shall assign this Agreement or any rights or obligations hereunder without the prior written consent of Seller (in the case of an assignment by Buyer) or

Buyer (in the case of an assignment by Seller), and, in each case, any such attempted assignment without such prior written consent shall be void and of no force and effect; provided, however, that Buyer may assign this Agreement and any or all rights or obligations hereunder (including Buyer's rights to purchase the Acquired Assets and assume the Assumed Liabilities) to any Affiliate of Buyer, which shall not relieve Buyer of its obligations hereunder.  Upon any such permitted assignment, the references in this Agreement to Buyer shall also apply to any such assignee unless the context otherwise requires.  This Agreement shall inure to the benefit of and shall be binding upon the successors and permitted assigns of the parties hereto.

Section 10.2.   <u>Governing Law; Jurisdiction</u>.  This Agreement shall be construed, performed and enforced in accordance with, and governed by, the laws of the United States of America and the State of Delaware (without giving effect to the principles of conflicts of laws thereof), except to the extent that the laws of such State are superseded by the Bankruptcy Code. The parties hereto irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court.

Section 10.3.   <u>Expenses</u>.  Except as otherwise provided herein, each of the parties hereto shall pay its own expenses in connection with this Agreement and the transactions contemplated hereby, including any legal and accounting fees, whether or not the transactions contemplated hereby are consummated.

Section 10.4.   <u>Broker's and Finder's Fees</u>.  Each of the parties represents and warrants that it has dealt with no broker or finder in connection with any of the transactions contemplated by this Agreement and, insofar as such party knows, no other broker or other Person is entitled to any commission or finder's fee in connection with any of these transactions.

Section 10.5.   <u>Severability</u>.  In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and effect only if, after excluding the portion deemed to be unenforceable, the remaining terms shall provide for the consummation of the transactions contemplated hereby in substantially the same manner as originally set forth at the later of the date this Agreement was executed or last amended.

Section 10.6.   <u>Notices</u>.

(a)     All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given: (i) on the date of service, if served personally on the party to whom notice is to be given; (ii) on the date of delivery to the party to whom notice is to be given if sent by Federal Express or similar overnight courier or the next day Express Mail service maintained by the United States Postal Service; or (iii) on the of transmission, if sent by facsimile (so long as confirmation of transmission is electronically or mechanically generated and kept on file by the sending party), to the party as follows:

If to Seller:

Wellman Dynamics Corporation
1746 Commerce Rd
Creston, IA 50801
Attn: Robert Compernolle
Phone:  (641) 782-0265
Email: bob.compernolle@wellmandynamics.com

With a copy to:

Jeffrey Goetz
Bradshaw Fowler Proctor & Fairgrave P.C.
801 Grand Ave,
Des Moines, IA 50309
Phone: (515) 243-5817
Fax: (515) 246-5808
Email: goetz.jeffrey@bradshawlaw.com

If to Buyer:

TCTM Financial FS LLC
2021 McKinney Avenue, Suite 1200
Dallas, TX 75201
Attn: General Counsel
Fax: (469) 310-9961

With a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn:   Jill Frizzley
        Peter Feist
Phone: (212) 310-8823
        (212) 310-8939
Fax:    (212) 310-8007
Email: jill.frizzley@weil.com
        peter.feist@weil.com

(b)     Any party may change its address for the purpose of this Section 10.6 by giving the other parties written notice of its new address in the manner set forth above.

Section 10.7.   Amendments; Waivers.   This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by Buyer and Seller, or in the case of a waiver, by the party waiving compliance.  Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any

37

one or more instances, shall not be deemed to be or construed as a furthering or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

Section 10.8.  <u>Entire Agreement</u>.   This Agreement contains the entire understanding between the parties hereto with respect to the transactions contemplated hereby and supersedes and replaces all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions.  All schedules hereto and any documents and instruments delivered pursuant to any provision hereof are expressly made a part of this Agreement as fully as though completely set forth herein.

Section 10.9.  <u>No Third-Party Beneficiaries / Parties in Interest</u>.  Nothing in this Agreement is intended to or shall confer any rights or remedies under or by reason of this Agreement on any Persons other than Seller and Buyer and their respective successors and permitted assigns.  Nothing in this Agreement is intended to or shall relieve or discharge the obligations or liability of any third Persons to Seller or Buyer.  This Agreement is not intended to nor shall give any third Persons any right of subrogation or action over or against Seller or Buyer.

Section 10.10. <u>Headings, Interpretation, Gender</u>.

(a)     Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine, or neuter, as the context requires.

(b)     Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed followed by the words "without limitation".

(c)     Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Buyer or Seller, whether under any rule of construction or otherwise.  No party to this Agreement shall be considered the draftsman.  On the contrary, this Agreement has been reviewed, negotiated and accepted by all parties and their attorneys and shall be construed and interpreted according to the ordinary meaning of the words so as fairly to accomplish the purposes and intentions of all the parties.

(d)     The table of contents and the captions and section headings contained in this Agreement are for convenience of reference only, do not form a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement.

(e)     All references in this Agreement to "Section" or "Article" shall be deemed to be references to a Section or Article of this Agreement.

(f)     All references to "herein" or "hereof" or "hereunder" and similar phrases shall be broadly construed to refer to the entire Agreement and not merely to the specific clause, section, or article.

(g)     When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is

the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day. References herein to "as of the date hereof," "as of the date of this Agreement" or words of similar import will be deemed to mean "as of the date of the execution and delivery of this Agreement."

(h)     Any reference in this Agreement to $ shall mean U.S. dollars.

(i)     References herein to any law shall be deemed to refer to such law as amended, modified, codified, reenacted, replaced, supplemented or superseded in whole or in part and in effect from time to time, including any successor legislation thereto, and also to all rules and regulations promulgated thereunder, and references to any section or other provision of a law means that section or provision of such law in effect from time to time and constituting the substantive amendment, modification, codification, reenactment, replacement or supplement of such section or other provision.

(j)     Whenever the words "made available" are used in this Agreement, they shall be deemed followed by the words "prior to the date of this Agreement".

(k)     To the extent not qualified by Knowledge of Seller, each representation and warranty of Seller in Section 4.1 shall be deemed to be qualified by the Knowledge of Seller.

Section 10.11. <u>Injunctive Relief</u>.  The parties hereto agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, and that damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, any party hereto shall be entitled to injunctive relief to prevent any such breach, and to specifically enforce the terms and provisions of this Agreement, including specific performance of such covenants, promises or agreements or an order enjoining a party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement.  The rights set forth in this <u>Section 10.11</u> shall be in addition to any other rights which a party may have at law or in equity pursuant to this Agreement.

Section 10.12. <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute the same instrument. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original executed counterpart of this Agreement.

ARTICLE 11. <u>DEFINITIONS</u>.

Section 11.1.   <u>Certain Terms Defined</u>.  As used in this Agreement, the following terms have the following meanings:

"<u>Acquired Assets</u>" shall have the meaning ascribed to it in <u>Section 1.1</u> of this Agreement.

39

"Affiliate" means, with respect to any Person, any Person directly or indirectly controlling, controlled by or under direct or indirect common control with such other Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" shall have the meaning ascribed to it in the preamble of this Agreement.

"Allocation" shall have the meaning ascribed to it in Section 6.3 of this Agreement.

"Asset Acquisition Statement" shall have the meaning ascribed to it in Section 6.3 of this Agreement.

"Assumed Benefit Plans" shall have the meaning ascribed to it in Section 1.5(c) of this Agreement.

"Assumed Collective Bargaining Agreements" shall have the meaning ascribed to it in Section 1.5(c) of this Agreement.

"Assumed Contracts" shall have the meaning ascribed to it in Section 1.3 of this Agreement.

"Assumed Liabilities" shall have the meaning ascribed to it in Section 1.4 of this Agreement.

"Auction" means the auction undertaken pursuant to the Bid Procedures Order.

"Backup Bidder" shall have the meaning ascribed to it in Section 8.1(b) of this Agreement.

"Balance Sheet" shall have the meaning ascribed to it in Section 4.1(k) of this Agreement.

"Balance Sheet Date" shall have the meaning ascribed to it in Section 4.1(k) of this Agreement.

"Bankruptcy Code" shall have the meaning ascribed to it in the preamble of this Agreement.

"Bankruptcy Court" shall have the meaning ascribed to it in the preamble of this Agreement.

"Bankruptcy Estate" means the estate of the Debtor created under section 541 of the Bankruptcy Code.

"Bid Procedures" means the bidding and auction procedures for the sale of substantially all of the assets of WDC.

"Bid Deadline" means the deadline for submission of any and all bids set forth in the Bid Procedures Order.

"Bid Procedures Order" means that certain order of the Bankruptcy Court in form and substance reasonably acceptable to Buyer, that among other things, establishes a date by which Competing Bids must be submitted by bidders and establishes procedures for the auction process.

"Business" shall have the meaning ascribed to it in the preamble of this Agreement.

"Business Day" means any day that is not a Saturday, Sunday or legal holiday as identified in Bankruptcy Rule 9006.

"Buyer" shall have the meaning ascribed to it in the preamble of this Agreement.

"Cash Collateral Order" shall have the meaning ascribed to it in Section 7.2(n) of this Agreement.

"Cash Consideration" shall have the meaning ascribed to it in Section 2.1 of this Agreement.

"Causes of Action" means any and all claims, rights, actions, choses in action, suits, causes of action, liens, judgments and damages belonging to the Debtor or its Bankruptcy Estate, and any and all liabilities, obligations, covenants, undertakings and debts owing to the Bankruptcy Estate, including actions under Chapter 5 of the Bankruptcy Code whether arising prior to, or after, the Petition Date and in each case whether known or unknown, in law, equity or otherwise, including receivables and those claims and actions to avoid or recover pre-petition or post-petition transfers of money or property pursuant to applicable bankruptcy and non-bankruptcy law; provided that, for the avoidance of doubt, Causes of Action shall not include any Excluded Causes of Action.

"Closing" shall have the meaning ascribed to it in Section 3.1 of this Agreement.

"Closing Date" shall have the meaning ascribed to it in Section 3.1 of this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collective Bargaining Agreements" shall have the meaning ascribed to it in Section 4.1(v) of this Agreement.

"Competing Bid" shall have the meaning ascribed to it in Section 2.2(b) of this Agreement.

"Competing Transaction" means a competing offer to that of Buyer for the Acquired Assets and as set forth in the Bid Procedures.

"Complete Month" shall have the meaning ascribed to it in Section 7.2(h)(i) of this Agreement.

41

"Confidential Information" shall have the meaning ascribed to it in Section 5.8 of this Agreement.

"Contract" means any contract, agreement, indenture, note, bond, mortgage, loan, instrument, lease, license, commitment or other arrangement or understanding, commitment or obligation, whether written or oral.

"Copyrights" shall have the meaning ascribed to it in the definition of "Intellectual Property Rights"

"Creston Property" shall have the meaning ascribed to it in Section 1.1(a) of this Agreement.

"Cure Amount" means the amount fixed by the Bankruptcy Court as being the amount necessary to cure all defaults under an executory contract or unexpired lease designated by Buyer to become an Assumed Contract.

"Cure Notice" shall have the meaning ascribed to it in Section 1.3(b) of this Agreement.

"Cure Objection Deadline" shall have the meaning ascribed to it Section 1.3(d) of this Agreement.

"Debtor" shall have the meaning ascribed to it in the preamble of this Agreement.

"Designated Contracts" shall have the meaning ascribed to it in Section 1.3 of this Agreement.

"Disclosure Schedules" means the disclosure schedules regarding this Agreement, as filed with the Bankruptcy Court on or prior to the Schedule Filing Date in form and substance satisfactory to Buyer, in its sole discretion; provided that the Disclosure Schedules shall not set forth any matter with respect to the representations and warranties made by Seller in Section 4.1 unless such matter was disclosed by Seller to Buyer prior to the date of this Agreement.

"EBITDA" means, for any period, without duplication, (i) net income (calculated in accordance with GAAP) *plus* (ii) depreciation, amortization (including deferred financing costs amortization expense), interest expense and income taxes *minus* (iii) interest income *minus* (iv) any non-cash or extraordinary income, in each case, (a) of Seller and (b) for such period; provided that, for the avoidance of doubt, EBITDA is net of corporate allocation.

"Employee Benefit Plan" shall have the meaning ascribed to it in Section 4.1(h) of this Agreement.

"Environmental Costs and Liabilities" means, with respect to any Person, all liabilities, obligations, responsibilities, losses, damages, punitive damages, consequential damages, treble damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts and consultants and costs of investigation and feasibility studies), fines, penalties, sanctions and interest incurred as a result of any claim or demand by any other Person or in response to any violation of Environmental Law, whether known or unknown, accrued or

42

contingent, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute, or to the extent based upon, related to, or arising under or pursuant to any Environmental Law, order or agreement with any Governmental Body or other Person, which relates to any environmental, health or safety condition, violation of Environmental Law or a Release of Hazardous Materials.

"Environmental Law" means any Law as now or hereafter in effect in any way relating to the protection of human health and safety, the environment or natural resources, including the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. App. § 1801 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.), the Clean Water Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.) the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. § 136 et seq.), and the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.), as each has been or may be amended and the regulations promulgated pursuant thereto.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any Affiliate of Seller and any other entity that, together with any Seller, may be treated as a single employer under section 4001 of ERISA or section 414 of the Code.

"Estate" shall have the meaning ascribed to it in the preamble of this Agreement.

"Excluded Asset" shall have the meaning ascribed to it in Section 1.2 of this Agreement.

"Excluded Causes of Action" shall have the meaning ascribed to it in Section 1.1(l) of this Agreement.

"Excluded Employee" shall have the meaning ascribed to it in Section 9.1(b) of this Agreement.

"Excluded Liabilities" shall have the meaning ascribed to it in Section 1.5 of this Agreement.

"Final Designated Contract" shall have the meaning ascribed to it in Section 1.3(f) of this Agreement.

"Financial Statements" shall have the meaning ascribed to it in Section 4.1(k) of this Agreement.

"Free and Clear of all Liens" means a transfer pursuant to the Sale Order authorizing conveyance of the Acquired Assets to Buyer free and clear of Liens.

"GAAP" means generally accepted accounting principles in the United States as of the date hereof.

43

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private) (including the Bankruptcy Court).

"Government Contracts" shall have the meaning ascribed to it in Section 4.1(t).

"Government Official" means any officer or employee of any Governmental Body, or of a public international organization, or any Person acting in an official capacity for or on behalf of any Governmental Body, or for or on behalf of any such public international organization, or any political party, party official, or candidate thereof.

"Hardware" means any and all computer and computer-related hardware, including computers, file servers, facsimile servers, scanners, color printers, laser printers and networks.

"Hazardous Material" means any substance, material or waste that is regulated, classified, or otherwise characterized under or pursuant to any Environmental Law as "hazardous," "toxic," "pollutant," "contaminant," "radioactive," or words of similar meaning or effect, including petroleum and its by-products, asbestos, polychlorinated biphenyls, radon, mold or other fungi, and urea formaldehyde insulation.

"Inbound Intellectual Property Licenses" shall have the meaning ascribed to it in the definition of "Intellectual Property Licenses".

"Indebtedness" of any Person means, without duplication, (i) the principal of and premium (if any) in respect of (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement; (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) the liquidation value of all redeemable preferred stock of such Person; (vi) all obligations of the type referred to in clauses (i) through (v) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations; and (vii) all obligations of the type referred to in clauses (i) through (vi) of other Persons secured by any Lien (for the purposes of this clause (vii), disregarding any words after "or other similar restrictions" in the definition of Lien) on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"Intellectual Property Licenses" means (i) any grant by Seller to another Person of any right to use any of the Purchased Intellectual Property ("Outbound Intellectual Property Licenses") and (ii) any grant by another Person to Seller of a right to use or distribute Technology and/or the Intellectual Property Rights therein used in the conduct of the Business ("Inbound Intellectual Property Licenses").

"Intellectual Property Rights" means any and all intellectual property rights of whatever nature and in whatever form, whether protected, created or arising under the Laws of the United States or any other jurisdiction, including: (i) all patents and applications therefor, including continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon (collectively, "Patents"); (ii) all trademarks, service marks, trade names, service names, brand names, trade dress rights, logos, Internet domain names and corporate names and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof, (collectively, "Marks"); (iii) copyrights and registrations and applications therefor, works of authorship and mask work rights (collectively, "Copyrights"); (iv) discoveries, concepts, ideas, research and development, know-how, formulae, inventions, compositions, manufacturing and production processes and techniques, technical data, procedures, designs, drawings, specifications, databases, and other proprietary and confidential information, including customer lists, supplier lists, pricing and cost information, and business and marketing plans and proposals, in each case excluding any rights in respect of any of the foregoing that comprise or are protected by Copyrights or Patents (collectively, "Trade Secrets"); (v) all rights in Software and Technology; and (vi) all rights to sue and recover for any past, present, and future infringement, misappropriation or other violation of any of the foregoing.

"Interested Parties" shall have the meaning ascribed to it in Section 5.10 of this Agreement.

"IRS" means the Internal Revenue Service.

"Knowledge of Seller" means the knowledge, after due inquiry, of James Mahoney, Robert Compernolle, Danette Grim, Matt Thelen, Kandi Yrigoyen and S.L. Downing.

"Law" means any foreign, federal, state or local law (including common law), statute, code, ordinance, rule, regulation, Order or other requirement.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, proceedings (public or private) or claims or any proceedings by or before a Governmental Body.

"Liability" means any debt, loss, damage, adverse claim, liability or obligation (whether direct or indirect, known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and whether in contract, tort, strict liability or otherwise), and including all costs and expenses relating thereto.

"Lien" means any mortgage, pledge, security interest, encumbrance, lien (statutory or other) or conditional sale agreement, deed of trust, claim, lease, charge, right to purchase, option, right of first refusal, easement, license, right of way, restriction, covenant, condition, encroachment or other survey defect, servitude, encumbrance or other similar restrictions other than (a) a lessor's interest in, and any mortgage, pledge, security interest, encumbrance, lien (statutory or other) or conditional sale agreement on or affecting a lessor's interest in, property underlying any leases; (b) easements, encroachments, covenants, conditions, restrictions and similar imperfections of title and state of facts with respect to any assets that do not, individually or in the aggregate, materially interfere with the present and continued occupancy, use, operation

45

or marketability of such asset and, in each case, are not created pursuant to (i) mortgages, pledges, deeds of trust or other financing or security documents, (ii) claims, leases, charges, rights to purchase, rights of first refusal, licenses, servitudes, or other similar restrictions, or (iii) monetary judgments, mechanic's liens or other statutory liens; (c) zoning, entitlement and other land use and environmental regulations by any Governmental Body having jurisdiction over the real property which are not violated by the current use, occupancy, or operation of the real property; and (d) Liens for Taxes, assessments or other governmental charges not yet due and payable or the amount or validity of which are being contested in good faith by appropriate proceedings (promptly instated and conducted).

"Lorimor Property" shall have the meaning ascribed to it in Section 1.1(a) of this Agreement.

"Marks" shall have the meaning ascribed to it in the definition of "Intellectual Property Rights".

"Material Adverse Effect" means a state of facts, event, change or effect on the Acquired Assets that results in or would be reasonably expected to result in a material adverse effect on (i) the Acquired Assets taken as a whole or the results of operation or financial condition of the Business or (ii) the ability of Seller to consummate the transactions contemplated by this Agreement, but excludes any state of facts, event, change or effect caused by events, changes or developments arising from (A) any action of Seller pursuant to any order of the Bankruptcy Court entered prior to the date hereof, including orders entered in connection with the sale of Seller's other assets or the liquidation of Seller's inventory, the implementation of this Agreement, the transactions contemplated by this Agreement or the announcement thereof; (B) changes or conditions generally affecting the industry in which the Business operates; (C) changes in economic, regulatory or political conditions generally in the United States or those other countries in which Seller operates; or (D) any act(s) of war or of terrorism; provided, that, with respect to any matter described in clauses (B), (C) or (D), such matter shall only be excluded to the extent that such matter does not have a disproportionate effect on the Business relative to other comparable businesses operating in the same industry.

"Material Contracts" shall have the meaning ascribed to it in Section 4.1(g) of this Agreement.

"Multiemployer Plan" shall have the meaning ascribed to it in Section 4.1(h) of this Agreement.

"Necessary Consent" shall have the meaning ascribed to it in Section 1.6 of this Agreement.

"OFAC" shall have the meaning ascribed to it in Section 4.1(w) of this Agreement.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body.

46

"<u>Ordinary Course of Business</u>" means the ordinary and usual course of normal day-to-day operations of the Business through the date hereof consistent with past practice.

"<u>Outbound Intellectual Property Licenses</u>" shall have the meaning ascribed to it in the definition of "Intellectual Property Licenses".

"<u>Outside Date</u>" shall have the meaning ascribed to it in <u>Section 8.1(a)</u> of this Agreement.

"<u>Patents</u>" shall have the meaning ascribed to it in the definition of "Intellectual Property Rights".

"<u>Permit</u>" means any approvals, authorizations, consents, licenses, permits or certificates of a Governmental Body.

"<u>Petition Date</u>" shall have the meaning ascribed to it in the preamble of this Agreement.

"<u>Person</u>" means any individual, corporation, or partnerships defined in Bankruptcy Code Section 101(41).

"<u>Personal Property Leases</u>" shall have the meaning ascribed to it in <u>Section 1.1(b)</u> of this Agreement.

"<u>Preliminary Designated Contract</u>" shall have the meaning ascribed to it in <u>Section 1.3(a)</u> of this Agreement.

"<u>Products</u>" means any and all products developed, manufactured, marketed or sold by Seller, whether work in progress or in final form.

"<u>Purchased Intellectual Property</u>" shall have the meaning ascribed to it in <u>Section 1.1(h)</u> of this Agreement.

"<u>Real Property Leases</u>" shall have the meaning ascribed to it in <u>Section 4.1(i)(viii)</u> of this Agreement.

"<u>Refinanced First Lien Debt</u>" shall have the meaning ascribed to it in Section 7.2(g) of this Agreement.

"<u>Registered Intellectual Property</u>" shall have the meaning ascribed to it in <u>Section 4.1(f)</u>.

"<u>Related Person</u>" means, with respect to any Person, all past, present and future directors, officers, members, managers, stockholders, employees, controlling persons, agents, professionals, attorneys, accountants, investment bankers or representatives of any such Person.

"<u>Release</u>" means any release, spill, emission, leaking, pumping, pouring, injection, deposit, dumping, emptying, disposal, discharge, dispersal, leaching or migration into the indoor or outdoor environment, or into or out of any property.

47

"Required Governmental Body" shall mean any Governmental Body disclosed in Schedule 4.1(c) for which consents or permits need to be filed.

"Restricted Cash Consideration" means $4,000,000 of the Cash Consideration.

"Sale Hearing" means hearing for the approval of, among other things, this Agreement, the Sale Motion, and the Bid Procedures.

"Sale Order" shall be an order or orders of the Bankruptcy Court in form and substance satisfactory to Buyer and Seller, approving this Agreement and all of the terms and conditions hereof, and approving and authorizing Sellers to consummate the transactions contemplated herein.

"Sale Motion" means the motion or motions of Sellers, in form and substance reasonably acceptable to Buyer, seeking approval and entry of the Bid Procedures Order and Sale Order.

"Schedule Filing Date" means August 4, 2017.

"Seller" shall have the meaning ascribed to it in the preamble of this Agreement.

"Seller Marks" shall have the meaning ascribed to it in Section 5.7 of this Agreement.

"Seller Documents" shall have the meaning ascribed to it in Section 4.1(b) of this Agreement.

"Service Provider" means any consultant or independent contractor who has been performing services for Seller.

"Stalking Horse Bidder" means TCTM Financial FS, LLC.

"Software" means any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons and (iv) all documentation, including user manuals and other training documentation related to any of the foregoing.

"Subsequent Cash Collateral Order" shall have the meaning ascribed to it in Section 7.2(n) of this Agreement.

"Subsequent WDMA Proceeds" means the amount of proceeds actually received by Buyer for the assets of WDMA in a subsequent sale by Buyer of substantially all the assets of WDMA as they then exist (whether (i) by merger, purchase of stock or assets or otherwise or (ii) in a single transaction or a series of transactions).

"Target Monthly EBITDA" means, with respect to a calendar month, the amount under the column "Target EBITDA" with respect to such calendar month on Schedule 7.2(h).

48

"Tax" or "Taxes" means (i) any United States federal, state, local or foreign taxes, charges, levies, fees, imposts, assessments or similar governmental charges, including income, gross receipts, license, payroll, employment, excise, stamp, occupation, premium, windfall profits, environmental (including taxes under section 59A of the Code), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated or escheat, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether disputed or not and (ii) any item described in clause (i) for which a taxpayer is liable as a transferee or successor, by reason of the regulations under section 1502 of the Code or any similar law, or by contract, indemnity or otherwise.

"Tax Return" means any report, return, information return, filing or other information, including any schedules, exhibits or attachments thereto, and any amendments to any of the foregoing required to be filed or maintained in connection with the calculation, determination, assessment or collection of any Taxes (including estimated Taxes).

"TCTM" shall have the meaning ascribed to it in the preamble of this Agreement.

"TCTM Bid" shall have the meaning ascribed to it in Section 2.1 of this Agreement.

"TCTM Contingent Claim" means a secured claim against Seller (which shall be (a) cash collateralized by Seller (or any buyer of the assets of Seller) in an amount equal to $2 million by a cash deposit or letter of credit issued by or on behalf of Seller (or any buyer of the assets of Seller) for the benefit of Buyer and (b) otherwise secured by collateral satisfactory to Buyer in its sole discretion) in an amount equal to the difference between $8 million and the Subsequent WDMA Proceeds (up to a maximum of $5 million); provided that such secured claim shall be contingent upon (i) Buyer being the purchaser of the assets of WDMA pursuant to a motion, pursuant to section 363 of the Bankruptcy Code, filed on or about the date hereof and (ii) the Subsequent WDMA Proceeds is less than $8 million.

"TCTM Credit Bid" means the credit bid component of the TCTM Bid on account of TCTM's prepetition secured debt pursuant to section 363(k) of the Bankruptcy Code, which will be in the form of the Refinanced First Lien Debt in an amount equal to the TCTM Credit Bid Amount.

"TCTM Credit Bid Amount" shall have the meaning ascribed to it in Section 2.1 of this Agreement.

"Technology" means, collectively, all Software, information, designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology.

49

"Trade Secrets" shall have the meaning ascribed to it in the definition of "Intellectual Property Rights".

"Transaction Taxes" shall have the meaning ascribed to it in Section 6.1 of this Agreement.

"Transferred Employee' shall have the meaning ascribed to it in Section 9.1(a) of this Agreement.

"Truncated Month" shall have the meaning ascribed to it in Section 7.2(h)(i) of this Agreement.

"WDC" shall have the meaning ascribed to it in the preamble of this Agreement.

"WDMA" means Wellman Dynamics Machining & Assembly, Inc.

"WDMA Purchaser" shall have the meaning ascribed to it in Section 5.7 of this Agreement.

[*signatures appearing on following page*]

50

IN WITNESS WHEREOF, the parties have executed this Agreement (or are deemed to have so executed this Agreement) as of the day and year written above.

**WELLMAN DYNAMICS**                    **TCTM FINANCIAL FS LLC**
**CORPORATION**

By: _____        By: _____
   Name:                                Name:
   Title:                               Title:

## Exhibit B

**Proposed Bid Procedures Order**

Exhibit B

# UNITED STATES BANKRUPTCY COURT

# SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In Re: | ) | Case No.: 16-01825-als11 |
| | ) | |
| **WELLMAN DYNAMICS CORP.** | ) | Chapter 11 |
| | ) | |
| Debtor and Debtor in Possession. | ) | Honorable Anita L. Shodeen |
| | ) | |
| 1746 Commerce Rd. | ) | **ORDER (A) APPROVING THE BID** |
| Creston, IA  50801 | ) | **PROCEDURES IN CONNECTION** |
| | ) | **WITH THE AUCTION AND** |
| | ) | **SALE OF ASSETS AND** |
| EIN:  36-3198501 | ) | **SCHEDULING AN AUCTION AND** |
| | ) | **SALE HEARING; (B) APPROVING** |
| | ) | **ASSUMPTION OF ASSET PURCHASE** |
| | ) | **AGREEMENT; (C) APPROVING** |
| | ) | **PROCEDURES FOR DETERMINING** |
| | ) | **CURE AMOUNTS; AND (D)** |
| | ) | **GRANTING OTHER RELATED** |
| | ) | **RELIEF** |
| | ) | |
| | ) | Entered On Docket: _____ |
| _____ | ) | |

THIS MATTER having come before the Court[1] on the motion (the "Motion") [Docket No. ____] dated _____, of the Debtor for entry of an order (this "Order") approving, among other things: (a) the Bid Procedures (substantially in the form attached hereto as **Exhibit 1**) and scheduling an Auction and the Sale Hearing for the sale of substantially all the Debtor's assets; (b) the form of the APA (attached as Exhibit A to the Motion); and (c) the Assumption and Assignment Procedures. After due deliberation, and having reviewed the Motion, any objections thereto, and materials submitted by the parties, and having considered the statements of counsel on the record, and the evidence adduced with respect to the Motion at a

---

[1] Unless otherwise stated, capitalized terms not defined herein shall have the meanings set forth in the APA and the Bid Procedures.

hearing to consider same, and having considered the agreements announced by the parties, and having determined that the relief requested in the Motion is in the best interests of the Debtors and their estates, in light of the circumstances described by counsel and reflected in the evidence,

**THE COURT HEREBY FINDS THAT:[2]**

A.    This court has jurisdiction over the Motion pursuant to 28 U.S.C. § 1334. This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O). Venue is proper in this district and in this court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    The statutory predicates for the relief requested herein are sections 105(a), 363(b) and (f), and 365 of title 11 of the United States Code (the "Bankruptcy Code") and Fed. R. Bankr. P. 2002(a)(2), 6004(a), (b), (c), (e) and (f), 6006(a) and (c), 9006, 9007, and 9014.

C.    Notice of the Motion having been given to the Notice Parties (as defined below) is sufficient in light of the circumstances and the nature of the relief requested in the Motion.

D.    The Debtor has articulated good and sufficient reasons for this court to grant the relief requested in the Motion regarding the sale process, which is reasonable and appropriate and represents the best method for maximizing value for the benefit of the Debtor's estate, including, without limitation: (i) approval of the Bid Procedures; (ii) approval of the form of the APA and; (ii) approval of the Assumption and Assignment Procedures.

E.    Pursuit of the Stalking Horse Bidder as a "stalking-horse" bidder and its APA as a "stalking-horse" sale agreement is in the best interests of the Debtor and the Debtor's estate and creditors, and it reflects a sound exercise of the Debtor's business judgment. The APA provides the Debtor with the opportunity to sell the Acquired Assets in order to preserve and realize their

---

[2] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Fed. R .Bankr. P. 7052, made applicable to this proceeding pursuant to Fed. R. Bankr. P. 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

going concern value. The Stalking Horse Bidder has provided a material benefit to the Debtor and its creditors by increasing the likelihood that the best possible price for the Acquired Assets will be received.

F. The Bid Procedures were negotiated in good faith and at arms' length and are reasonably designed to promote participation and active bidding and ensure that the highest or best value is generated for the Acquired Assets. Accordingly, the Bid Procedures are reasonable and appropriate and represent the best method for maximizing value for the benefit of the Debtor's estate.

G. TCTM Financial FS, LLC ("TCTM") submitted a bid, which bid includes a credit bid component on account of a portion of TCTM's prepetition debt, for the Acquired Assets as reflected in the APA, which bid represents a fair and reasonable price in the Debtor's business judgment, subject to higher or better offers.

H. The Stalking Horse Bidder is not an "insider" or "affiliate" of the Debtor, as those terms are defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders exists between the Stalking Horse Bidder and the Debtor. The Stalking Horse Bidder and its advisors have acted in "good faith" within the meaning of section 363(m) of the Bankruptcy Code in connection with the negotiation of the sale transactions contemplated in the APA and the Bid Procedures.

I. The Assumption and Assignment Procedures, including notice of proposed cure costs, are reasonable and appropriate and consistent with section 365 of the Bankruptcy Code and Bankruptcy Rule 6006. The Assumption and Assignment Procedures have been tailored to provide an adequate opportunity for all non-Debtor parties to the Preliminary Designated Contracts to raise any objections to the proposed assumption and assignment or to the cure costs.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED EFFECTIVE IMMEDIATELY THAT:**

1.      The Motion is granted to the extent set forth herein.

2.      The Bid Procedures are hereby approved in their entirety.   The Debtor is authorized to take any and all actions necessary or appropriate to implement the Bid Procedures.

3.      All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled (and all reservations of rights included therein) as announced to the Court at the hearing on the Motion or by stipulation filed with the Court, are overruled on the merits except as otherwise set forth herein.

4.      All bidders submitting a Qualified Bid are deemed to have submitted to the exclusive jurisdiction of this Court with respect to all matters related to the Auction and the terms and conditions of the sale or transfer of the Acquired Assets.

5.      The form of the APA is hereby approved.   All of the Debtor's pre-closing obligations under the APA are authorized as set forth therein; *provided that*, for the avoidance of doubt, consummation of the sale transactions contemplated by the APA shall be subject to entry of the Sale Order and the satisfaction or waiver of the other conditions to closing on the terms set forth in the APA.

6.      The Assumption and Assignment Procedures are reasonable and appropriate under the circumstances, fair to all non-Debtor parties, comply with the Bankruptcy Code, and are approved in their entirety.

7.      All Cure Objections must: (i) be in writing; (ii) comply with the Bankruptcy Rules and the Local Rules; (iii) with respect to a Cure Objection, state with specificity what Cure

Amounts the objections party believes are required; and (iv) be filed with this Court and served on the Debtor.

8.      If a timely Cure Objection is received and such objection cannot otherwise be resolved by the parties, such objection shall be heard at the Sale Hearing or such other date as the Court may determine.

9.      Within two (2) business days of entry of this Order, the Debtor (or its agent) shall serve by first class mail, postage prepaid, copies of: (i) this Order and (ii) the Bid Procedures upon the following entities (collectively, the "Notice Parties"):[3]

    (a)      the United States Trustee;

    (b)      counsel to the Creditors' Committee;

    (c)      the Internal Revenue Service and the Iowa Department of Revenue

    (d)      the United States Department of Justice;

    (e)      state, county, and municipal governments having jurisdiction over any of the Assets;

    (f)      all parties that have requested special notice pursuant to Fed. R. Bankr. P. 2002;

    (g)      all persons or entities known to the Debtor that have or have asserted a lien on, or security interest in, all or any portion of the Assets;

    (h)      all Contract parties;

    (i)      counsel to the Stalking Horse Bidder;

    (j)      all potential bidders previously identified by or otherwise known to the Debtor; and

    (k)      all of the Debtor's employees.

---

[3] The Bid Procedures will direct parties to contact Gordian Group, Investment Banker for Debtor, for more information and will provide that any party that wishes to obtain a copy of any related document (subject to any necessary confidentiality agreement) may make such a request in writing to Gordian Group, attention David Herman, 950 Third Avenue, 17th Floor, New York, NY 10022, dh@gordiangroup.com.

10.     No person or entity shall be entitled to any expense reimbursement, breakup fee, "topping," termination, or other similar fee or payment.

11.     If the Stalking Horse Bidder objects to the manner in which the Debtor has conducted the Auction or the Debtor's determination of a Qualified Bid as the highest or best bid, it shall have standing at the Sale Hearing to contest the Debtor's determination or conduct of the Auction, and shall be permitted to make a further bid at the Sale Hearing for consideration by the Bankruptcy Court as the highest or best bid.

12.     As further described in the Bid Procedures, the Sale Hearing will commence on _____ at _____ **prevailing Central time** or at such other hour on that date as the Court shall announce.  The Sale Hearing may be adjourned by the Bankruptcy Court from time to time without further notice to creditors or parties-in-interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing.

13.     Objections, if any, to the remainder of the relief requested in the Motion must: (a) be in writing and filed with this court **no later than** _____ **at** _____ **prevailing Central time** (the "Objection Deadline"); (b) comply with the Federal Rules of Bankruptcy Procedure; and (c) be served upon the Debtor, counsel for the Committee, and counsel for the Stalking Horse Bidder so as to be **actually received** on or before the Objection Deadline.

14.     The Auction to conduct bidding with respect to the sale of the Acquired Assets, if necessary, shall have commenced by no later than August 21, 2017 at _____ and shall have been completed no later than August 21, 2017.

15.     All persons or entities (whether or not Qualified Bidders) that participate in the bidding process shall be deemed to have knowingly and voluntarily (i) consented to the entry of

a final order by this Court in connection with the Motion to the extent that it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgment in connection herewith consistent with Article III of the United States Constitution and (ii) waived any right to jury trial in connection with any disputes relating to any of the foregoing matters.

16.     Notwithstanding the possible applicability of Fed. R. Bankr. P. 6004(h), 7062, 9014, or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

17.     All time periods set forth in this order shall be calculated in accordance with Fed. R. Bankr. P. 9006(a).

18.     The Debtor is authorized and empowered to take all actions necessary to implement the relief granted herein.

19.     To the extent that this Order is inconsistent with any prior order or pleading with respect to the Motion, the terms of this Order shall govern.

20.     This court shall retain jurisdiction to resolve any dispute relating to the interpretation of the terms and conditions of the APA and this order.

IT IS SO ORDERED.

_____
United States Bankruptcy Judge

Submitted by:


*/s/*
Jeffrey D. Goetz, Esq., IS #9999366
Thomas J. Joensen, Esq. IS#9997576
Krystal R. Mikkilineni, Esq. IS#9997703
Bradshaw Fowler Proctor & Fairgrave, P.C.
801 Grand Avenue, Suite 3700
Des Moines, IA 50309-8004
515/246-5817
515/246-5808 FAX

*General Reorganization Counsel for Debtor*




Approved as to Form and Content:


*/s/*
Julie Johnson McLean, Esq.
Mark D. Walz, Esq.
Davis, Brown, Koehn, Shors & Roberts, P.C.
215 10th Street, Suite 1300
Des Moines, IA 50309

Jill Frizzley, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

*Attorneys for TCTM Financial FS, LLC*

## **EXHIBIT 1**

### **AUCTION AND BIDDING PROCEDURES**

**EXHIBIT 1**

## **WDC BID PROCEDURES**

On September 13, 2016, Wellman Dynamics Corporation ("WDC"), as debtor and debtor in possession (the "Debtor"), filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Iowa (the "Bankruptcy Court").

The Debtor is seeking to sell all or substantially all of its assets for the highest or best offer.  On [__], 2017, the Bankruptcy Court entered an order [Docket No. [__]] (the "Bid Procedures Order"), which, among other things, authorized the Debtor to solicit bids and approved these procedures (these "Bid Procedures") for the consideration of the highest or otherwise best price for all or substantially all of the Debtor's assets, on the terms and conditions set forth herein.

TCTM Financial FS, LLC (the "Stalking Horse Bidder") submitted the TCTM Bid, which includes a credit bid component on account of a portion of TCTM's prepetition secured debt.  TCTM has executed that certain Asset Purchase Agreement (together with the exhibits thereto, and as may be amended, modified, or supplemented from time to time in accordance with the terms thereof, the "Stalking Horse APA"),[1] dated as of July [14], 2017.  The Stalking Horse APA contemplates, pursuant to the terms and subject to the conditions contained therein, the sale of the Acquired Assets to the Stalking Horse Bidder in exchange for consideration including (i) the TCTM Credit Bid in an amount of $[15,500,000], (ii) an amount in cash equal to $[5,000,000], subject to certain adjustments, and (iii) the assumption of the Assumed Liabilities (clauses (i) through (iii) collectively, the "TCTM Bid").

The TCTM Bid is subject to higher or better offers submitted in accordance with the terms and conditions of these Bid Procedures.  These Bid Procedures describe, among other things: (i) the procedures for bidders to submit bids for the Acquired Assets; (ii) the manner in which bidders and bids become Qualified Bidders and Qualified Bids, respectively (each as defined below); (iii) the negotiation of bids received; (iv) the conduct of the auction with respect to the Acquired Assets; and (v) the ultimate selection of the Accepted Bid (as defined below).

---

[1] Capitalized terms used but not otherwise defined herein will have the meanings ascribed to them in the Stalking Horse APA

## Access to Diligence Materials

To participate in the bidding process and to receive access to due diligence (the "Diligence Materials"), a party must submit to the Debtor (i) an executed confidentiality agreement ("Confidentiality Agreement") in form and substance reasonably satisfactory to the Debtor and (ii) reasonable evidence demonstrating the party's financial capability to consummate a sale transaction for the Acquired Assets (a "Sale Transaction") as determined by the Debtor, in consultation with its professionals.

The Diligence Materials shall be made available to interested bidders in a "Data Room" created and administered by the Debtor.  Parties interested in receiving access to the Data Room and Diligence Materials may contact [Robert Compernolle, Vice President, Corporate Comptroller, Fansteel Inc., Phone: 847.525.2772, Email: bob.compernolle@fansteel.com] [investment banker contact]; and will be provided with a form of Confidentiality Agreement.

A party who qualifies for access to Diligence Materials shall be a "Preliminary Bidder". The Debtor will afford any Preliminary Bidder the time and opportunity to conduct reasonable due diligence under the time constraints provided herein; provided, however, that the Debtor shall not be obligated to furnish any due diligence information after the Preliminary Bid Deadline.  The Debtor reserves the right to withhold any Diligence Materials that it, in consultation with its professionals, determines are business-sensitive or otherwise not appropriate for disclosure to a Preliminary Bidder.  Neither the Debtor nor its representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be a Preliminary Bidder.

Each Preliminary Bidder shall comply with all reasonable requests for made by the Debtor and its advisors regarding such Preliminary Bidder and its contemplated Sale Transaction.

The Debtor shall keep the Consultation Parties (as defined below) reasonably informed of all interested parties that become Preliminary Bidders and the status of their due diligence at all times.

## Assets to Be Sold

The Debtor is offering for sale all of the Acquired Assets as set forth in the Stalking Horse APA, and such other Excluded Assets, if any, as may be designated by a Preliminary Bidder.  The Debtor has no obligation to sell the Acquired Assets in lots.

Except as otherwise provided in the asset purchase agreement submitted by a Preliminary Bidder setting forth its Preliminary Bid (a "Bid APA"), all of the Debtor's right, title and interest in and to the Acquired Assets shall be sold free and clear of any pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon (collectively, the "Encumbrances") to the maximum extent permitted by the Sale Order and the Bankruptcy Code, with such Encumbrances to attach to the net proceeds of the sale of the Acquired Assets under the terms and provisions of the Sale Order.

**Bidding Process**

The TCTM Bid, in accordance with the Stalking Horse APA, is deemed a Qualified Bid as set forth herein and in the Stalking Horse APA submitted to the Debtor as part of the Bid Procedures Order.  The Stalking Horse APA is being made available to Preliminary Bidders so that they may formulate their Preliminary Bid.  The Debtor and its advisors, in consultation with the Consultation Parties, shall (i) determine whether any person in addition to the Stalking Horse Bidder is a Qualified Bidder as set forth herein; (ii) coordinate the efforts of Preliminary Bidders in conducting their due diligence investigations; (iii) receive offers from Preliminary Bidders, (iv) negotiate any offers made to purchase the Acquired Assets; (iv) determine any Qualified Bids in addition to the TCTM Bid, including any non-cash consideration or other value offered by any Preliminary Bidder; (v) conduct an Auction of the Acquired Assets; (vi) select the Accepted Bid and a Backup Bid, if any; (vii) seek approval by the Bankruptcy Court of the Accepted Bid and Backup Bid at the hearing set for approval of the Sale Transaction (the "Sale Hearing"); and consummate the Sale Transaction at a closing ("Closing") thereon as set forth herein and in the asset purchase agreement governing the Accepted Bid.

**Key Dates For Potential Preliminary Bidders**

| | |
|---|---|
| **Preliminary Bid Deadline:** | **August [17], 2017** |
| **Qualified Bid Deadline:** | **August [20], 2017** |
| **Auction:** | **August [21], 2017** |
| **Sale Hearing:** | **[●], 2017** |

Preliminary Bids shall include an offer price for all the Acquired Assets (including non-cash or other value) as required herein.  Each Preliminary Bidder must provide to the Debtor, by the Preliminary Bid Deadline, a redline of the Stalking Horse APA against their Preliminary Bid and a clean, signed Bid APA, their Bid Deposit and acceptable Proof of Performance as set forth herein.

The Debtor in consultation with its advisors and the Consultation Parties will evaluate the Preliminary Bids and Proof of Performance to determine Preliminary Bidders who may, in addition to the Stalking Horse Bidder, be Qualified Bidders at the Auction.

The Debtor may enter into verbal discussions with any or all of the Preliminary Bidders to determine clarifications of the Preliminary Bids per the submitted Bid APAs and to negotiate terms of sale.  The Debtor may offer pricing guidance to the Preliminary Bidders if he determines that such guidance will provide the best value to the Estate.  Such pricing guidance and other discussions, if undertaken, are totally at the discretion of the Debtor and shall not be binding on the Debtor or the Estate or otherwise.

The Debtor shall accept Preliminary Bids  until **August [17], 2017 at 5 p.m. (Central Time)**, which shall be the "Preliminary Bid Deadline".  Any party that does not submit a bid by the Bid Deadline will not be allowed to (i) submit any offer after the Bid Deadline or

(ii) participate in the Auction.  The Debtor shall promptly inform the Consultation Parties, including the Stalking Horse Bidder, of all bids received and shall provide copies of all such bids to counsel to each of the Consultation Parties except for counsel to the Stalking Horse Bidder, who shall receive summaries of the material terms of all such bids.

Thereafter, the Debtor shall evaluate and select by **August [20], 2017 at [5 p.m.] (Central Time)** (the "Qualified Bid Deadline"), those Preliminary Bids which, in its discretion, after consultation with its professionals and the Consultation Parties, are deemed Qualified Bids entitled to bid at the Auction.

After determining the highest and best Qualified Bid submitted (the "Opening Auction Bid"), the Debtor shall conduct a live Auction for the sale of the Acquired Assets on **August [21]], 2017 at [9 a.m.**] **(Central Time)** (the "Auction Date").

Following the Auction, the Debtor shall determine, after consultation with its advisors and professionals, and the Consultation Parties, the Accepted Bid and the Backup Bid.  The Debtor shall seek Bankruptcy Court approval of the Accepted Bid and Backup Bid, if any, at the Sale Hearing scheduled for [●]**, 2017 at [●] (Central Time)**.

## Bid Submission Process

A bid is a signed document from a Preliminary Bidder received by the Bid Deadline that identifies the purchaser by its legal name (including any equity holders or other financial backers, if the Preliminary Bidder is an entity formed for the purpose of submitting bids or consummating a Sale Transaction), and any other party that will be participating in connection with the bid or the Sale Transaction, and includes, at a minimum, the following (a "Bid").  To be eligible to be considered by the Debtor as a Qualified Bidder, each Preliminary Bidder must satisfy, to the satisfaction of the Debtor, the following conditions:

(a)     Good Faith Deposit:  Each Preliminary Bidder must submit to the Debtor, by the Preliminary Bid Deadline, a good faith deposit (a "Bid Deposit") with its redline of the Stalking Horse APA in the amount of $[●], which Bid Deposit shall be held by the Debtor in an escrow account to be maintained by the Debtor until it determines whether or not such Preliminary Bid is a Qualified Bid.  The Bid Deposit shall be held in escrow (without interest) and refunded, or applied to the Purchase Price, as set forth herein.  To the extent a Qualified Bid is modified before, during, or after the Auction, the Debtor reserves the right to require that such Qualified Bidder adjust its Bid Deposit so that it equals ten percent (10%) of the proposed purchase price.  The requirements set forth in this paragraph shall not apply to the TCTM Bid or the Stalking Horse Bidder.

(b)     Redline APA:  Each Preliminary Bid must be submitted with a redline of the Stalking Horse APA (the "Redline APA") setting forth all proposed revisions by the Preliminary Bidder to the terms of the Stalking Horse APA.

(c)     Signed APA: Each Preliminary Bid must be submitted with a clean version of the Bid APA, incorporating any proposed revisions, and signed by an authorized representative of the Preliminary Bidder.

4

(d)    <u>Same or Better Terms</u>:  A statement that the applicable Preliminary Bidder offers to purchase the Acquired Assets, pursuant to a Sale Transaction that is no less favorable to the Debtor's estate, as the Debtor may reasonably determine, in consultation with the Consultation Parties, than the transactions contemplated in the Stalking Horse APA.

(e)    <u>Purchase Price; Minimum Bid</u>:  Each Bid submitted must (i) be a Bid for the Acquired Assets, (ii) exceed the TCTM Bid (as set forth in the Stalking Horse APA) by the Minimum Overbid Amount (as defined below), and (iii) propose an alternative transaction that provides substantially similar or better terms than the TCTM Bid.

(f)    <u>Designation of Assigned Contracts and Leases</u>:  A Preliminary Bid must identify with particularity each and every executory contract and lease with respect to which the Preliminary Bidder seeks assignment from the Debtor, if different than the TCTM Bid terms in this regard.

(g)    <u>Excluded Assets</u>: A Preliminary Bid must identify with particularity each and every Acquired Asset which the Preliminary Bidder does not wish to include in its offer.

(h)    <u>TCTM Contingent Claim</u>:  A Preliminary Bid must provide in the Bid APA that the Preliminary Bidder will assume the TCTM Contingent Claim (as defined in the Stalking Horse APA) as a liability.

(i)    <u>Corporate Authority</u>:  A Preliminary Bid must include written evidence reasonably acceptable to the Debtor demonstrating appropriate corporate authorization of the Preliminary Bidder to consummate the proposed Sale Transaction; <u>provided</u> that, if the Preliminary Bidder is an entity specially formed for the purpose of effectuating the Sale Transaction, then the Preliminary Bidder must furnish written evidence reasonably acceptable to the Debtor of the approval of the Sale Transaction by the equity holder(s) of such Preliminary Bidder.

(j)    <u>Disclosure of Identity of Preliminary Bidder</u>:  A Preliminary Bid must fully disclose the identity of each entity that will be bidding for or purchasing the Acquired Assets, including any equity holders, in the case of a Preliminary Bidder which is an entity specially formed for the purpose of effectuating the contemplated transaction, or otherwise participating in connection with such Preliminary Bid, and the complete terms of any such participation, including any agreements, arrangements or understandings concerning a collaborative or joint bid or any other combination concerning the proposed Preliminary Bid.  A Preliminary Bid must also fully disclose any connections or agreements with the Debtor, or any other known, potential or prospective Preliminary Bidder, and/or any officer, director or equity holder of the Debtor.

(k)    <u>Proof of Financial Ability to Perform</u>:  A Preliminary Bid must include written evidence that the Debtor may conclude, in consultation with its advisors and the

Consultation Parties, demonstrates that the Preliminary Bidder has the necessary financial ability to close the Sale Transaction and comply with section 365 of the Bankruptcy Code, including providing adequate assurance of future performance under all contracts and/or leases to be assumed and assigned in such Sale Transaction (such written evidence, the "<u>Proof of Performance</u>").

(l)    <u>Contact Information and Affiliates</u>:    The Preliminary Bid must provide the identity and contact information for the Preliminary Bidder and full disclosure of any affiliates of the Preliminary Bidder.

(m)    <u>Contingencies</u>:    Each Preliminary Bid **<u>shall not</u>** be conditioned on obtaining financing, any internal approvals or credit committee approvals, or on the outcome or review of unperformed due diligence.

(n)    <u>Irrevocable</u>:    Each Preliminary Bid, which the Debtor deems a Qualified Bid, must be irrevocable in accordance with the Bid Procedures until five (5) business days after the Sale Hearing, <u>provided</u> that if such Preliminary Bid is determined by the Debtor to be the Accepted Bid or the Backup Bid, such Preliminary Bid shall continue to remain irrevocable, subject to the terms and conditions of these Bid Procedures.

(o)    <u>Compliance with Diligence Requests</u>:  A Preliminary Bidder must have complied with reasonable requests for additional information and due diligence access from the Debtor to its satisfaction.

(p)    <u>Confidentiality Agreement</u>:    To the extent not already executed, the Preliminary Bid must include an executed Confidentiality Agreement in form and substance reasonably satisfactory to the Debtor.

(q)    <u>Termination Fees</u>:  The Preliminary Bid must not entitle the Preliminary Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment or reimbursement and, by submitting the Preliminary Bid, the Preliminary Bidder waives the right to pursue a substantial contribution claim under 11 U.S.C. § 503 related in any way to the submission of its Preliminary Bid.

(r)    <u>Closing Date</u>:  The Preliminary Bid must include a commitment to close and fully consummate the transactions contemplated by the Bid APA by **October 31, 2017.**

(s)    <u>Bid Deadline</u>:  The following parties must receive a Preliminary Bid in writing (in both PDF and Word format), on or before the Preliminary Bid Deadline: (i) counsel to the Debtor, 801 Grand Avenue, Suite 3700, Des Moines, IA 50309 Attn: Thomas J. Joensen (joensen.thomas@bradshalaw.com); (ii) counsel for the Official Committee of Unsecured Creditors, Archer & Greiner, P.C., 300 Three Logan Square, Suite 3500, 1717 Arch St., Philadelphia, PA, 19103, Attn: Stephen Packman (spackman@archerlaw.com) and Alan Root (aroot@archerlaw.com); and (iii) counsel for the Stalking Horse Bidder, Weil, Gotshal & Manges LLP 767 Fifth Avenue New York, New York 10153 (Attn: Jill Frizzley

(jill.frizzley@weil.com), Billy Kwon (.u-hyeon.kwon@weil.com), and John Conte (john.conte@weil.com)).

A Preliminary Bidder must also accompany its Bid with (i) the contact information of the specific person(s) whom the Debtor or its advisors should contact in the event that he have any questions or wish to discuss the Bid submitted by the Preliminary Bidder; (ii) written evidence of available cash, a commitment for financing (not subject to any conditions other than those expressly set forth in the Bid APA) and such other evidence of ability to consummate the transaction contemplated by the Bid APA, as acceptable in the Debtor's business judgment; (iv) a copy of a board resolution or similar document demonstrating the authority of the Preliminary Bidder to make a binding and irrevocable bid on the terms proposed and to consummate the transaction contemplated by the Bid APA; (v) a covenant to cooperate with the Debtor to provide pertinent factual information regarding the Preliminary Bidder's operations reasonably required to analyze issues arising with respect to any applicable anti-trust laws and other applicable regulatory requirements; and (vi) if the value of the Bid relative to the Stalking Horse APA including additional non-cash components (such as fewer contingencies than are in the Stalking Horse APA), a detailed analysis of the value of any additional non-cash component of the APA Bid and back-up documentation to support such value.

A Preliminary Bid received from a Preliminary Bidder on or before the Preliminary Bid Deadline that meets the above requirements shall constitute a "Qualified Bid", and such Preliminary Bidder shall constitute a "Qualified Bidder"; provided that if the Debtor receives a Preliminary Bid prior to the Bid Deadline that is not determined by the Debtor, in accordance with these Bid Procedures, to constitute a Qualified Bid, the Debtor may provide the Preliminary Bidder with the opportunity to remedy any deficiencies prior to the Qualified Bid Deadline (or, as he deems appropriate, after the Qualified Bid Deadline); provided, further, that, for the avoidance of doubt, if any Qualified Bidder fails to comply with reasonable requests for additional information and due diligence access from the Debtor to its satisfaction, the Debtor may, after consulting with its professionals and the Consultation Parties, disqualify any Qualified Bidder and reject a Qualified Bid.

If one or more Qualified Bids are received by the Qualified Bid Deadline, the Debtor will notify such Qualified Bidders that they shall be entitled to attend and Bid at the Auction. The Debtor will determine prior to the Auction which Qualified Bid shall be the Opening Auction Bid. This determination shall take into account any factors the Debtor reasonably deems relevant to the value of the Qualified Bids received to the Estate and may include, but are not limited to, the following: (a) Acquired Assets to be purchased, the amount and type(s) of the consideration, and the resulting recovery to holders of claims; (b) the number, type and nature of any changes to the Bid APA requested by such Qualified Bidder; (c) the extent to which such modifications are likely to delay closing of the sale of the Acquired Assets and the cost to the Estate of such modifications or delay; (d) the total consideration and value thereof to be received by the Estate; (e) the Qualified Bidder's ability to close a transaction and the timing thereof; and (f) the net benefit to the Estate (collectively, the "Bid Assessment Criteria").

**If no Qualified Bids other than the TCTM Bid are received by the Qualified Bid Deadline, the TCTM Bid shall be the Accepted Bid and no Auction shall be conducted.**

### Determination and Announcement of Baseline Bids

In evaluating the Bids, the Debtor, in consultation with the Consultation Parties, shall also make a determination regarding which Qualified Bid is the highest or best Qualified Bid for the Acquired Assets and will therefore serve as the starting point at the Auction (the "Baseline Bid"). On or before, **August [20], 2017 at [5 p.m.](Central Time)** (the "Designation Deadline"), the Debtor shall file a notice designating the Baseline Bid and publish such notice on the website of the Debtors' claims and noticing agent and in the Data Room and/or distribute the same at the Auction. The Debtor shall also provide copies of such Baseline Bid to all of the Qualified Bidders (including the Stalking Horse Bidder) and each of the Consultation Parties.

### Conduct of the Auction and Bidding Terms and Conditions

If there are two or more Qualified Bids, the Debtor will conduct the Auction on **August [21], 2017**, **beginning at [9] a.m. (Central Time)**. Only a Qualified Bidder will be eligible to participate at the Auction, subject to such limitations as the Debtor may impose in good faith. In addition, professionals and/or other representatives of (i) the Debtor, (ii) the Official Committee of Unsecured Creditors for the unsecured creditors of WDC (the "Committee"); and (iii) the Stalking Horse Bidder will be permitted to attend and observe the Auction.

At the Auction, Qualified Bidders (including the Stalking Horse Bidder) will be permitted to increase their bids. Bidding will start at the purchase price and terms proposed in the Baseline Bid, and will proceed thereafter in minimum increments of at least $[50,000] (a "Minimum Overbid Amount") and all subsequent overbids shall be by $[50,000] (e.g. $[100,000; $150,000]; etc.). The Debtor reserves the right to and may, after consultation with the Consultation Parties, increase or decrease the Minimum Overbid Amount at any time during the Auction. The Stalking Horse Bidder is authorized to increase its bid at the Auction, including with cash, cash equivalents, or other forms of consideration, including additional credit bid amounts.

The Debtor may adopt rules for the Auction at any time that the Debtor, in consultation with the Consultation Parties, reasonably determines to be appropriate to promote a spirited and robust auction. At the start of the Auction, the Debtor shall describe the terms of the Baseline Bid. Any rules adopted by the Debtor will not unilaterally modify any of the terms of the Stalking Horse APA (as may be consensually modified at the Auction) without the consent of the Stalking Horse Bidder. Any rules developed by the Debtor will provide that all bids in the Auction will be made and received on an open basis, and all other bidders participating in the Auction will be entitled to be present for all bidding with the understanding that the true identity of each bidder placing a bid at the Auction will be fully disclosed to all other bidders participating in the Auction and that all material terms of each Qualified Bid submitted in response to the Baseline Bid or to any successive bids made at the Auction will be disclosed to all other bidders. Each Qualified Bidder will be permitted what the Debtor, in consultation with the Consultation Parties, reasonably determines to be an appropriate amount of time to respond

to the previous bid at the Auction. The Auction will be conducted openly and shall be transcribed or recorded, and the Qualifying Bidders will be informed of the material terms of the previous bid.

In evaluating a Qualified Bid submitted at the Auction, the Debtor may consider, among other things and without limitation, the amount of cash to be paid or delivered, the speed and certainty of consummating a transaction, and any other relevant factor. Prior to the conclusion of the Auction, the Debtor, after consultation with the Consultation Parties, shall announce on the record that it has determined in its business judgment that it has received the highest or otherwise best Qualified Bid, and the Qualified Bidder that had submitted such Qualified Bid (the "Accepted Bid") shall be declared the winning bidder (the "Successful Bidder"). The Debtor, after consultation with the Consultation Parties, shall also identify the Qualified Bidder that submitted the next highest or otherwise best Qualified Bid (the "Backup Bid") shall be declared the "Backup Bidder".

The Backup Bidder shall be required to keep its Backup Bid open and irrevocable until earlier of (i) the Closing of the Sale Transaction on the Accepted Bid; or (ii) fourteen (14) days after the date of the Auction. Promptly following the Debtor's selection of the Accepted Bid, he shall file with the Bankruptcy Court notice of the Accepted Bid and Backup Bid, if any ("Sale Report"), accompanied by such Successful Bidder's and Backup Bidder's APAs.

Following the Sale Hearing, if the Successful Bidder fails to consummate its purchase of the Acquired Assets, the Debtor may deem the Backup Bidder to have the new prevailing bid, and the Debtor will be authorized, without further order of the Bankruptcy Court, to consummate the Sale Transaction with the Backup Bidder. In such case of a failure to consummate the purchase of the Acquired Assets on the part of the Successful Bidder, the defaulting Successful Bidder's Bid Deposit shall be forfeited to the Debtor for the benefit of the Estate. In addition, the Debtor, on behalf of the Estate, specifically reserves the right to seek all available damages, including specific performance, from any defaulting Successful Bidder (including any Backup Bidder designated as the new Successful Bidder).

Each Qualified Bidder, by submitting its bid, shall be deemed to acknowledge and agree that it is not relying upon any written or oral statements, representations, promises, warranties or guarantees of any kind whether expressed or implied, by operation of law or otherwise, made by any person or party, including the Debtor and its agents and representatives (other than as may be set forth in a definitive agreement executed by the Debtor), regarding the Debtor, the Acquired Assets, these Bid Procedures or any information provided in connection therewith.

**Sale Is As Is/Where Is**

The sale of the Acquired Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Debtor, its agents or the Estate other than as set forth in the Stalking Horse APA. By submitting a bid, each Preliminary and Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Acquired Assets prior to making its offer, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Acquired Assets in making its bid, and that it did not rely

9

upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Acquired Assets, or the completeness of any information provided in connection therewith or with the Auction, except as expressly stated in these Bid Procedures.

## Sale Hearing

The Accepted Bid and the Backup Bid will be subject to approval by the Bankruptcy Court at the Sale Hearing on the date set forth above, or such other date as the Court may set. The Sale Hearing may be adjourned by the Debtor from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing, or by filing a notice on the docket of the Debtor's chapter 11 case.

## Return of Deposits

The Bid Deposits of all Preliminary Bidders whose Preliminary Bid is not deemed by the Debtor as a Qualified Bid shall be returned to such Preliminary Bidder, without interest, within 72 hours of such determination but no later than 72 hours after the Qualified Bid Deadline. The Bid Deposit of any Qualified Bidder that is neither the Successful Bidder nor the Backup Bidder shall be returned to such Qualified Bidder not later than five (5) business days after the Sale Hearing. The Bid Deposit of the Backup Bidder, if any, shall be returned to the Backup Bidder 72 hours after the Closing of the Sale Transaction with the Successful Bidder. If the Successful Bidder timely and fully closes the Sale Transaction, its Bid Deposit shall be credited towards the Purchase Price. The Stalking Horse Bidder's Deposit (as the term "Deposit" is defined in the Stalking Horse APA) shall be returned in accordance with the terms and conditions of the Stalking Horse APA.

## Closing of the Sale Transaction

The Successful Bidder shall fully consummate the Sale Transaction at a Closing to be scheduled and conducted by the Debtor and its professionals within five (5) business days of the Sale Hearing but no later than October 31, 2017. At the Closing, the Successful Bidder shall be required to pay to the Debtor the balance of the Purchase Price in immediately available funds as set forth in the Successful Bidder's asset purchase agreement; execute such documents as the Debtor deems reasonably necessary to consummate the Sale Transaction; and otherwise fully consummate the Sale Transaction under the Accepted Bid APA and in accordance with the Accepted Bid. The Debtor may elect to conduct and consummate the Closing electronically and shall not be required to close the Sale Transaction in person if he deems it advisable.

## Consultation Parties

The term "Consultation Parties" as used in these Bid Procedures shall mean (i) the Committee; and (ii) the Stalking Horse Bidder.

The Debtor shall use its reasonable best efforts to consult and confer with the Consultation Parties in respect of all material aspects of the bidding and Auction process in order

to maximize value for all parties in interest.  For the avoidance of doubt, however, the consultation rights provided to the Consultation Parties by these Bid Procedures shall not limit the Debtor's discretion in any way and shall not include the right to veto any decision made by the Debtor in the exercise of its business judgment.

The Debtor may not modify the consultation or consent rights of any of the Consultation Parties set forth herein without the consent of such affected party; provided, however, that the Debtor may, in the exercise of its business judgment, take such steps as are necessary to ensure a competitive and transparent bidding and Auction process, including, but not limited to, limiting (but not eliminating) the consultation rights of a Consultation Party that is or becomes a Qualified Bidder.

Promptly upon receipt of any Competing Bid (as defined in the Stalking Horse APA) or proposal or indication of interest in respect thereof, the Debtor shall provide the Stalking Horse Bidder with a summary of such Competing Bid.  The Debtor shall regularly update the Stalking Horse Bidder as to the status of the marketing process, including any negotiations in connection with a Competing Bid.  The Debtor shall promptly furnish the Stalking Horse Bidder with all information, documents and data concerning Seller that is provided to any prospective purchaser that has not previously been furnished to the Stalking Horse Bidder.

## Reservation of Rights of the Debtor

Except as otherwise provided in the Bid Procedures or the Bid Procedures Order, the Debtor further reserves the right as it may reasonably determine to be in the best interest of the Estate, to: (a) determine which Preliminary Bidders are Qualified Bidders; (b) determine which Preliminary Bids are Qualified Bids; (c) determine which Qualified Bid is the Accepted Bid or Backup Bid; (d) reject any Preliminary Bid that is (1) inadequate or insufficient, (2) not in conformity with the requirements of the Bid Procedures or the requirements of the Bankruptcy Code or (3) contrary to the best interests of the Debtor and its Estate; (e) waive non-compliance with any of the terms and conditions set forth herein as he determines to be in the best interests of the Estate, its creditors, and other parties in interest; (f) impose additional terms and conditions with respect to all potential bidders; (g) extend the deadlines set forth herein; (h) continue or cancel the Sale Hearing in open court, or by filing a notice on the docket of the Debtor's chapter 11 case, without further notice to creditors or other parties in interest; and (i) modify the Bid Procedures and implement additional procedural rules that the Debtor determines, in its business judgment, will better promote the goals of the bidding process and discharge its duties; provided, however, that any modification or additions to the Bid Procedures shall not be materially inconsistent with the Sale Order or any other order of the Court.

## Consent to Jurisdiction and Authority as Condition to Bidding

All bidders (including the Stalking Horse Bidder) that participate in the bidding process shall be deemed to have (i) consented to the core jurisdiction of the Bankruptcy Court to enter any order or orders, which shall be binding in all respects, in any way related to these Bid Procedures, the bid process, the Auction, or the construction and enforcement of any agreement or any other document relating to the Sale Transaction, (ii) waived any right to a jury trial in

11

connection with any disputes relating to these Bid Procedures, the bid process, the Auction, or the construction and enforcement of any agreement or any other document relating to the Sale Transaction, and (iii) consented to the entry of a final order or judgment in any way related to these Bid Procedures, the bid process, the Auction, or the construction and enforcement of any agreement or any other document relating to the Sale Transaction if it is determined that the Bankruptcy Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.