IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF IOWA

In the Matter of:

**Fansteel Foundry Corporation**                                Case No. **16-01825-als11**

Debtor

**MEMORANDUM OF DECISION**

**(date entered on docket: October 26, 2018)**

On July 27, 2018 the Court held a hearing on the Debtor's combined Disclosure Statement and Plan that was jointly proposed by Fansteel Foundry Corporation and the Official Committee of Unsecured Creditors (OCC) (docket numbers 758, 759, 766, 804) (hereinafter "Plan"). The Court has jurisdiction pursuant to 11 U.S.C. sections 157 and 1334. For the reasons that follow 510's objections to the Disclosure Statement and Plan are overruled and the Plan is confirmed.

**BACKGROUND**

Fansteel Foundry Corporation, and its related companies, engaged in specialized work involving the casting and fabrication of parts for the aerospace and defense industries. The genesis of the disputes before the Court are rooted in transactions that occurred prior to the voluntary chapter 11 petitions filed in the Southern District of Iowa. A timeline of events[1] is useful in framing the issues surrounding Plan confirmation.

---

[1] This information is not disputed by the parties in the pending objections. The detail is based upon filed documents and evidence admitted at multiple hearings.

1

In 2002 Fansteel Foundry Corporation (Fansteel 1) filed a petition under Chapter 11 in Delaware which was jointly administered with other of its affiliates. A Second Amended Consolidated Plan was confirmed in mid-November 2003. Based upon agreed plan treatment the reorganized entity, Fansteel, Inc. (Fansteel 2) issued a $9.5 million Note in favor of the Pension Benefit Guaranty Corp. (PBGC) payable in a series of installments. The assets of Fansteel de Mexico provided collateral for that Note.

The Fansteel 1 bankruptcy also included claims held by the Nuclear Regulatory Commission (NRC) involving real estate located in the State of Oklahoma. Fansteel 2 was released from any environmental liability in Oklahoma by the transfer of its ownership in the Muskogee real estate to FMRI, Inc. which would then be responsible for remediation costs.[2] Wellman Dynamics Corporation (WDC) also provided additional financial assurance for FMRI's obligation by way of an irrevocable standby letter of credit.

Fifth Third Bank (Bank) began extending credit to Fansteel 2 and its affiliates in July 2005.

In December 2009, when Fansteel 2 was in default on its obligation to PBGC, 510 Ocean Drive Debt Acquisition LLC (510) purchased PBGC's interest in the note and collateral pledge for an amount far less than the outstanding balance.

In January 2014 Fansteel 2 and 510 entered into a forbearance agreement related to the former PBGC Note. At that same time WDC and Wellman Dynamics Machinery & Assembly (WDMA) provided guaranties and pledged collateral to 510. Approximately two months later 510 obtained a security interest in Fansteel 2's collateral and a mortgage against WDC's real estate in Creston, Iowa. The way in which these transfers were facilitated placed an insider on all sides of the transactions.[3]

In September 2015 the Bank and 510 executed a subordination agreement. At that same time WDC had a $1 million delinquency owing to its retirement plan. Because of that obligation PBGC held a 430(k) lien that the Bank also wanted subordinated to its debt which resulted in 510 transferring its interest in the Note back to the PBGC pursuant to a Collateral Assignment of Note, Mortgage and Pledge Agreement.

By July 2016 the Bank was owed approximately $30 million under its credit facilities which were in default. The following month the Bank sold its notes, as well as any interests it held under the loans, to TCTM Financial LLC (TCTM).

---

[2] FMRI was funded by Fansteel 2.
[3] 510 Confirmation Exhibit A pages 37-43

2

On September 13, 2016 Fansteel 2, WDC and WDMA[4] filed voluntary chapter 11 petitions (collectively "Debtors").[5]

Post-filing the Debtors and TCTM, their then current senior secured lender, became immediately entrenched on issues involving the use of cash collateral and adequate protection. After multiple hearings a final order for use of cash collateral was approved and TCTM's claim was determined to be over-secured entitling it to augment its claim under 11 U.S.C. §506(b).

In January 2017 the Debtors filed a joint plan of reorganization. Implementation of that plan was dependent upon establishing a lending relationship with a bank and 510's contribution of new value in the amount of $7 million. The plan also included an assignment to 510 of any potential claims held by the Debtors against Terra Mar, Inc., an entity affiliated with TCTM. Numerous objections were filed. 510 was given a period of time to demonstrate its commitment to funding. For a variety of reasons, 510 declined to deposit any funds to be held in escrow. Following this, the ability to obtain bank financing grew more uncertain because the collateral value was insufficient to support the requested loan amount. Lacking feasibility this plan was abandoned.

Work toward a 363 sale of WDMA assets then began. TCTM served as the stalking horse bidder. An auction was held, and the sale was approved to a third-party bidder.[6]

Over the course of the Debtors' bankruptcy cases there were multiple filings, disputes and stipulations among the parties involving the claims made by NRC. Two additional discoveries involving environmental liabilities further complicated the ability to move the Fansteel 2 and WDC cases forward: 1) the deed transferring the Muskogee site did not include the legal description for the contaminated portion of the real estate which remained in Fansteel's name; and 2) the Creston site owned by WDC was also the subject of extensive environmental issues which had not previously been addressed.

In July 2017, the OCC asked the Court to appoint a mediator. This request was prompted in part by promises between the parties that were not honored and was undertaken to facilitate resolution with major stakeholders. All parties were supportive of this process. Due to the diligent efforts of many constituencies the mediation was successful and a negotiated resolution was crafted for treatment of the NRC claims which would provide potential buyers with certainty about these obligations. The time frame for the mediation process was extended on several occasions to promote negotiation on other

---

[4] WDC and WDMA were wholly owned by Fansteel.
[5] These cases were jointly administered for a time, but that procedural consolidation was later vacated.
[6] That buyer has not performed its payment of the purchase price and a pending motion to dismiss WDMA's chapter 11 case, to which 510 objects, is currently in abeyance.

issues as the case progressed. Although 510 initially supported mediation it did not actively participate in the process.

TCTM submitted an Asset Purchase Agreement (APA) to serve as the stalking horse bid for the sale of WDC's assets which was attached to a sale motion filed in July 2017. Several months later, before the bidding procedures and APA were finally approved, an unexecuted Memorandum of Understanding of Key Terms of Settlement Agreement (MOU)[7] was filed with the Court under seal. The contents of the MOU included specific terms that would govern the parties' intentions involving the terms of the APA, bid procedures, sale order, the plan and any order confirming it.[8] Other than the request to seal, this document was never the subject of a motion requiring any Court action. The filing was unsealed by the Court after 510 raised questions about the contents of the MOU at the time of the confirmation hearing.

TCTM was the successful bidder at the auction of WDC's assets. As reflected on the docket, and in the caption here, that Debtor is now known as Fansteel Foundry Corporation (FCC).

The instant Disclosure Statement and Plan were jointly filed by FCC and the OCC. The ballot report reflected that the votes received unanimously accepted the Plan and cram down was not requested. Gordian Group, LLC[9] objected to the Plan's treatment of its potential administrative claim. At the conclusion of the confirmation hearing this objection was sustained. 510 objected to the Disclosure Statement and to the treatment of its claim under the Plan. Pending the submission of written closing arguments and additional briefing the objections filed on behalf of 510 were placed under advisement.

While considering confirmation of the Plan, the objections and relevant underlying documents the Court found that clarification was required on the status of 510's claim. Specifically, the Court was concerned as to whether 510 had standing as a claimholder or whether a debt existed to support its secured claim after the transfer of the Note to PBGC. The responses filed to the Court's inquiry all agreed that 510 holds a claim.

## DISCUSSION

**1.    THE DISCLOSURE STATEMENT**

---

[7] Signature lines appear for James Mahoney, WDC CEO; the individual members of the OCC for WDC and WDMA; and TCTM's President (filed 12/17/17 at docket number 444).
[8] Signature lines appear for James Mahoney, WDC CEO; members of the OCC and TCTM (docket number 444).
[9] Debtor(s) duly employed Investment Banker.

Because the objections to the disclosure statement were not specifically addressed by the parties at the hearing the Court relies on the filed documents to determine whether the disclosure statement meets the standard for adequate information.

"The primary purpose of a disclosure statement is to give creditors the information they need to decide whether to accept the plan." *In re Monnier Bros.*, 755 F.2d 1336, 1342 (8th Cir. 1985). To this end, the Bankruptcy Code defines adequate information to guide the contents of a disclosure statement:

> "[A]equate information" means information of a kind, and in sufficient detail as far as is reasonably practicable in light of the nature an history of the debtor and the conditions of the debtor's books and records, including a discussion of potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interest in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan . . . the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information.

11 U.S.C.A. § 1125(a)(1). Adequate information is not a static or rigid term. Instead, the concept is intended to be tailored to suit individual cases.

> Precisely what constitutes adequate information in any particular instance will develop on a case by case basis. Courts will take a practical approach as to what is necessary under the circumstances of each case, such as the costs of preparation of the statements, the need for relative speed in solicitation and confirmation, and, of course, the need for investor protection . . . . In reorganization cases, there is frequently great uncertainty. Therefore the need for flexibility is greatest.

*In re Monnier Bros.*, 755 F.2d at 1342 (quoting H.R.Rep. No. 595, 95th Cong., 1st Sess. 409, *reprinted in* 1978 U.S. Code Cong. & Ad.News 5963, 6365).

510 asserts that the Disclosure Statement is deficient in the following respects: it is filed in support of an unconfirmable plan, the MOU is not fully described, there is a lack of detail regarding 510's secured claim, and it does not describe the effect that a rejection of TCTM's subordination rights would have under the Plan.

It is unclear why a disclosure statement should be rejected simply because the plan may not be confirmed. 510 provides no rationale or legal authority for this proposition. The MOU is identified in the disclosure statement and provides a description of the purpose and contents of that document. 510 makes unsubstantiated allegations that the MOU was used to subvert its claim rights but provides no

5

evidence that this in fact occurred. Many terms of the MOU were contained in the APA, discussed during the sale process and included in the proposed Plan. Nothing suggests that 510, or any other creditor, was unaware of these documents or their contents. 510 does not elaborate as to why or how the subordination agreement between it and the Bank would in any way be relevant to a hypothetical investor or to any other creditors. Further 510's suggestion that the Disclosure Statement include a range of outcomes or alternatives is not supported by the statutory language which states: "*adequate information need not include such information about any other possible or proposed plan.*" 11 U.S.C. §1125(a)(1).

Having reviewed the contents of the Disclosure Statement and its purpose the Court concludes that adequate information has been provided. 510's objections are overruled.

## 2. THE PLAN

510 objects to confirmation of the Plan for following reasons: the terms of the subordination agreement are improperly applied to 510's claim; treatment of 510's claim is not fair and equitable; the third-party releases contained in the Plan are inappropriately broad; and the treatment of 510's claim is the result of collusion and bad faith.

### a. The Subordination Agreement (Agreement)

11 U.S.C. §510(a) states: "A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law."[10] The basic question presented here is whether the terms of the Agreement are being applied and enforced in the same way manner as they would outside of a bankruptcy proceeding. The parties disagree on these points which raises an issue of contract interpretation.

"A contract does not exist in a vacuum; its terms must be understood in light of the commercial context within which it was drawn." *Fleet Bus. Credit, LLC v. Enterasys Networks, Inc.*, 352 Ill. App. 3d 456, 469 (2004) (citations omitted). The objective is to give meaning and effect to the parties' intent at the time they entered into the Agreement. *Id.*

> Illinois courts follow the 'four corners' rule when interpreting contracts, which requires:
> An agreement, when reduced to writing, must be presumed to speak the intentions of the parties who signed it. It speaks for itself, and the intention

---

[10] Illinois law governs the parties' Agreement.

6

> with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence. [11]

*Bright Horizons Children's Ctrs., LLC v. Riverway Midwest II, LLC*, 403 Ill. App. 3d 234, 247, 931 N.E.2d 780, 792 (2010) (citations omitted). "When a dispute exists between the parties as to the meaning of a contract provision, the threshold issue is whether the contract is ambiguous." *Fleet Bus. Credit LLC*, 352 Ill. App. 3d at 469. An ambiguity does not automatically arise just because the parties disagree about the application of a contract's terms. *Id*. An ambiguity is present when the language used is "susceptible to more than one meaning [citation] or is obscure in meaning through indefiniteness of expression." *Id*. 510 identifies no ambiguities in the contract language and the Court finds none in its review of the Agreement. Accordingly, in this case, the plain language of the Agreement controls the treatment of TCTM and 510's claims under the Plan.

Pursuant to the Agreement dated September 8, 2015, 510 subordinated the Debtors' obligations owing to the Senior Debt, which is defined as:

> all debts, claims, obligations and liabilities of Borrower to Senior Lender, whether primary, secondary, direct, contingent, fixed or otherwise, heretofore, no and/or from time to time hereafter owing, due or payable, however evidenced, created, incurred, acquired or owing, and however arising including, without limitation, all notes made by Borrower in favor of Senior Lender and all renewals, extensions, replacement or modifications thereof.

The Agreement clearly permits the Senior Lender to take any action it deems proper related to its debt and collateral. Specifically, it may extend "the time of payment or renewing or otherwise altering the terms of any of the Senior Debt or affecting any security underlying any or all of the Senior Debt." Broad discretion was given to the Senior Lender related to the Senior Debt and related collateral, which includes its actions during this chapter 11 proceeding.

No distinction is made between secured and unsecured Senior Debt: "in the event of a dissolution, winding-up, liquidation (sic) reorganization or similar proceeding relating to the Borrower, the Senior Debt shall be paid first in full before any portion of the Subordinated Debt shall be entitled to receive any payment." Under the Agreement 510 is precluded from taking any action to collect its obligation before the Senior Debt is repaid, a contract term which, arguably, 510 has ignored. So long as the Senior Debt has an outstanding balance and remains unpaid, even if 510 is successful in its efforts to obtain payment on its claim, including under the Plan, any proceeds would be required to be turned

---

[11] At the hearing, the Court asked 510 if it intended to present evidence on this point. Counsel responded that no evidence was required because 510's position was not relying upon parole evidence.

7

over to TCTM as the assignee of the Agreement. The language of the Agreement is unequivocal in its requirement that the Senior Debt must be paid *in full* before 510 receives any payment on its subordinated debt and the Plan recognizes this contract term in the classification of TCTM and 510's claims.

510 also argues that the assignment of its voting rights to TCTM under the Agreement is unenforceable. 11 USC §1126(a) allows the holder of a claim of interest to accept or reject a proposed plan. Absent the subordination agreement, 510 would be correct in its assertion that it would have a right to vote its claim. However, the plain language of the subordination agreement entered into by 510 at paragraph 7 indicates "[t]he Senior Lender is hereby authorized, as attorney-in-fact for the Subordinated Lender (510) to vote and prove the indebtedness of the Borrower (WDC) to the Subordinated Lender. . . ." In spite of its voluntary grant to this right, 510 argues that courts are loathe to recognize such an assignment. *In re SW Bos. Hotel Venture, LLC*, 460 B.R. 38, 47 (Bankr. D. Mass. 2011); *Bank of Am. v. N. LaSalle St. Ltd. P'ship (In re 203 N. Lasalle St. P'shp.)*, 246 B.R. 325, 331 (Bankr. N.D. Ill. 2000). Other courts have allowed voting rights to be the subject of assignment under subordination agreements. See, e.g., *Rosenfeld v. Coastal Broad. Sys., Inc. (In re Coastal Broad. Sys., Inc.)*, No. 12-5682-RMB, 2013 WL 3285936, at *5–6 (D.N.J. June 28, 2013), aff'd, 570 Fed. Appx. 188 (3d Cir. 2014); *Blue Ridge Investors, II, LP v. Wachovia Bank, N.A. (In re Aerosol Packaging, Ltd. Liab. Co.)*, 362 B.R. 43, 47 (Bankr. N.D. Ga. 2006). It is unnecessary for the Court to resolve or reconcile this split of authority in this case.

Under Illinois law a contract can effectively waive a statutory right. *Smith v. Freeman*, 232 Ill. 2d 218, 228 (2009). Enforceability of the waiver "arises from an affirmative act, is consensual, and consists of an intentional relinquishment of a known right." *Gallagher v. Lenhart*, 847 NE.2d 43, 56 (S.Ct. IL 2007). That is, "[a] party may waive a statutory right as long as there was an intentional relinquishment of a known right." *Northbrook Bank and Tr. Co. v. O'Malley*, 2017 IL App (1st) 16043-U, ¶ 37 (citations omitted); *In re Estate of Ferguson*, 313 Ill. App. 3d 931, 937 (2000) (waiver of statutory rights must be "knowing, voluntary, and intentional"). Accordingly, courts have required contractual waivers of statutory rights to be explicit. *Northbrook Bank & Tr. Co.*, 2017 IL App (1st) at ¶ 37. The assignment (or waiver) of 510's right to vote in a bankruptcy case is explicitly stated in the Agreement. No evidence was supplied to establish any of the exceptions to enforcement of that assignment.

Although 510 is now unhappy with the results arising from its Agreement with the Bank, the language contained in the document is unambiguous, explicit and its intent clear. For the reasons stated, 510's objections related to the enforcement and application of the Agreement are overruled.

### b. Treatment of 510's Claim

510 alleges that the Plan "artificially and illegally suppresses" its status as a secured creditor and that the treatment of its claim under the Plan is "unjustified and unfair." It frames and addresses these issues in three areas: 510's claim status, its claim classification, and fair and equitable treatment involving cram down.

Both TCTM and 510 filed proofs of claim that identified their respective debts as secured. TCTM's proof of claim states that it holds a secured claim in the amount of $30,569,860. 510's proof of claim states that it holds a secured claim in the amount of $6,153,485. There is no dispute that each of these entities held liens against the Debtors' assets and that guaranties were also provided. These facts, however, do not establish the allowed amount of each of these respective secured claims. A secured claim under the Bankruptcy Code "means something different" from its meaning outside of bankruptcy. *In re Caesars Entm't Operating Co.,* 562 B.R. 168, 177 (Bankr. N.D. IL 2016), citing In *re Okosisi, 451 B.R. 90, 93 (Bankr. D. Nev. 2011).* In bankruptcy, 11 U.S.C. §506(a) governs the valuation of secured claims:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property. . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim.

Simply put the amount of a creditor's allowed secured claim is restricted to the value of any underlying collateral. *Minn. Hous. Fin. Agency v. Schmidt (In re Schmidt)*, 765 F.3d 877, 880 (8th Cir. 2014). "[B]y its terms, section 506(a) requires the bifurcation of an ostensibly secured claim into 'secured' and 'unsecured' portions if the value of the creditor's collateral is less than the amount of its claim." *In re Riverbend Leasing LLC*, 458 B.R. 520, 533 (Bankr. S.D. Iowa 2011) (citation omitted). There is insufficient collateral to fully secure TCTM's stated claim. Consequently, by definition, 510's allowed claim is unsecured.[12]

510 complains that it does not understand how TCTM's claim has been calculated and that this information is relevant to how their respective claims are treated under the Plan. Applying TCTM's credit bid to its proof of claim reduces its secured claim to $6,569,860. That total does not include any post-petition amounts that may be added to its claim under 11 U.S.C. §506(b). At the hearing, the testimony provided estimates of how the claim was calculated but no details were provided to reach an

---

[12] 510 states that there has been no objection to its secured claim. This circumstance does not supplant the application of 11 U.S.C. §506(b).

9

exact figure. This should not be surprising as TCTM's claim is not static. In this case, as in many others, it is not unusual for claims to be adjusted post confirmation for a variety of reasons. For example, the sale of WDMA's assets may result in a further reduction of TCTM's claim, but the purchase price has not yet been paid. The Court has previously entered an order that permits TCTM to "seek allowance of its fees and expenses as provided for under 11 U.S.C. § 506(b)" which may also increase the overall amount of its claim. 510's questions related to the calculation of TCTM's deficiency claim do not pose an obstacle to Plan confirmation.

Plan treatment of 510's claim is also affected by voluntary actions it took prior to the bankruptcy filing involving the PBGC. 510 assigned its interest in the Note (it previously purchased from PBCG) as collateral for the outstanding contributions owed by WDC to its retirement fund. The document executed by the parties to accomplish this transaction is labeled a Collateral Assignment of Note, Mortgage and Pledge Agreement. It states in relevant part:

> 1. Assignment. Subject to the terms and conditions hereof, Assignor hereby collaterally assigns and transfers to Assignee, and Assignee hereby accepts, the PBGC Note; the Mexican Mortgage; and the Pledge Agreement with respect to the land, buildings and equipment owned, used or later acquired by Fansteel, Inc., Fansteel de Mexico and/or FDM Holdings, Inc. ("Assigned Interest"), provided, however, that the value of the Assigned Interests shall in no circumstance be greater than the value remaining unpaid in the PBGC Note after the Bank's exercise of its interest in the PBGC Note provided, however that (a) the Assigned Interest shall decrease dollar for dollar by each Contractual Contribution made by Wellman or any other source; (b) upon payment in full of the Contractual Arrearage Contributions, the Assigned Interest shall automatically decrease to $3.5 million and shall thereafter decrease dollar for dollar by the cumulative amount of each Contractual Excess Contribution made by Wellman or any other source; and (c) upon payment in full of the $1 million in Contractual Excess Contributions, the Assigned Interest shall automatically decrease to $1.5 million.
>
> 2. Termination of Assignment. Upon payment in full of (a) the Contractual Arrearage Contributions and (b) the Contractual Excess Contributions, this Agreement shall automatically terminate and become void on the earlier of (i) 2 years after the Assigned Interest is reduced to $1.5 million or (ii) the Plan underfunding, calculated on a termination basis, is estimated to be $3 million or less. Upon termination, all rights of Assignee hereunder and created hereby shall be deemed canceled and terminated, and all rights in the Assigned Interest shall revert to Assignor, at which time Assignee shall execute and deliver such

10

>instruments as Assignor shall reasonably request to cancel the lien assigned hereby.

The language of the document clearly contemplates that the PBGC Note will revert to 510 upon certain events.[13] The record lacks any evidence to establish the stipulated conditions agreed to by the parties for the Termination of the Assignment had been accomplished either before or after the Debtor's bankruptcy filing. It is uncertain the extent to which the Plan payments made to PBGC could reduce the balance owing under the Note. The practical effect of this collateral assignment is that 510 must await the return of its Note under the termination clause to be entitled to any payments. The Plan recognizes this fact by classifying payment to the PBGC ahead of payment on 510's claim.

510 states "the Plan also clearly violates the absolute priority rule in providing for distributions to administrative claimants and unsecured creditors without first satisfying 510 Ocean's secured claim." At the time of the hearing 510 also seemed to argue that it should be included as a general unsecured creditor in Class 9.[14] This position conflicts with its insistence that it is secured creditor. Because 510 does hold an unsecured claim it has no authority to demand payment of its claim ahead of any claimant with a higher priority under the bankruptcy code or the Agreement.

Additional allegations by 510 state that the Plan expands the scope of the subordination granted to the Bank because it improperly proposes to pay other creditors ahead of 510 in violation of Illinois law. *Caterpillar Fin. Servs. Corp. v. Peoples Nat. Bank, N.A.,* 710 F.3d 691, 693 (7th Cir. 2013) (a subordination agreement only applies to the payment relationship between the senior and subordinated lender and it cannot operate to the benefit of a non-party). 510 is presumably taking issue with the $2.4 million Creditor Note given for the benefit of the bankruptcy estate as part of the approved sale (the back-up bidder's package also included a similar payment vehicle). The Creditor Note does not result in 510's claim being improperly subordinated to the Class 9 general unsecured creditors. The funds under the Creditor Note are not estate funds and are not part of any collateral to which 510 would be entitled. Further, because these funds are a gift and are unrelated to property of the estate there is no requirement that the bankruptcy priority payment scheme to be imposed on their distribution. *In re ICL Holding Co.*, 802 F.3d 547, 555 (3d Cir. 2015).

11 U.S.C. 1122(a) provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." *Comput. Task Grp., Inc. v. Brotby (In re Brotby)*, 303 B.R. 177, 186 (B.A.P. 9th Cir. 2003). 510's debt is

---

[13] The Court makes no finding as to the value or amount of 510's claim as a result of this Collateral Assignment.
[14] Trial Tr., 77: 2-5 (July 27, 2018) ("Okay. So you don't have any understanding as to why 510 Ocean was placed in a separate classification, namely, Class 13, as opposed to being grouped in Class 9 with other unsecured creditors?")

inherently different from the creditors treated under the Plan based upon the nature of its debt and the manner in which it was obtained. Specifically, no credit was extended to FCC and the creation of the debt and underlying security were created solely by insiders. Due to these distinctions the placement of the claim in a separate class is justified. See *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters. (In re Briscoe Enters.)*, 994 F.2d 1160, 1167 (5th Cir. 1993).

In its filed documents 510 argues that the cram down provisions are applicable in this case. Cram down allows a court to confirm a plan in spite of a class of claims or interests that has voted to reject it. *In re Breitburn Energy Partners, LP*, 582 B.R. 321, 349 (Bankr. S.D.N.Y. 2018). The statute states:

> *Notwithstanding section 510(a) of this title,* if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan. (emphasis added).

11 U.S.C. §1129(b)(1). Notably, subordination agreements remain enforceable under the discrimination and fair and equitable concepts of the statute. *In re Consul Rest. Corp.*, 146 B.R. 979, 988 (Bankr. D. Minn. 1992). Due to the determination that the assignment of voting rights under the Agreement is valid, TCTM's vote of 510's claim in support of the Plan renders this argument moot. Having met the requirements of 11 U.S.C. §1129(b)(8), and as indicated by the ballot report filed with the Court, cram down is not triggered.

For the reasons stated 510's objections based on plan treatment are overruled.

### c. Third Party Release(s)

The Plan defines "Released Parties" broadly to include the Debtors along with its officers, directors and management, members of the OCC, TCTM and its affiliates, and the professional representing these identified parties. The following language appears at Section VI(J) of the Plan:

> Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released from any and all claims, obligations, rights, suits, damages, causes of action, choses in action, remedies, disputes, issues, and liabilities whatsoever, including any derivative claims, whether known or unknown, foreseen or unforeseen, listed on the WDC Debtor's Schedules or not, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise,

12

based on or relating to, or in any manner arising from, in whole or in part, the Bankruptcy Case or the subject matter thereof, any Claim or Interest that is treated under the Plan, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, the Sale Process, the Sale Order, the APA or related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence relating to the WDC Debtor or in connection with the Bankruptcy Case, provided, however, that the Released Parties did not engage in fraud, willful misconduct, or gross negligence, taking place on or before the Effective Date. For the avoidance of doubt, none of the Released Parties is being released in connection with any of the claims, objections, issues, disputes or Causes of Action that are otherwise expressly preserved by the Plan.

For the avoidance of doubt, the WDC Debtor, the Estate, the WDC Debtor's successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the WDC Debtor, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of the WDC Debtor, or similar responsible person or similar designee or litigation trust hereinafter appointed or elected for the Estate of the WDC Debtor), and the Committee hereby agree that: (i) to the extent not already waived by the Cash Collateral Order entered on November 4, 2016 (Fansteel Docket Item 251) or any other stipulation or order, the right to bring the causes of action identified in Fansteel's schedule of assets against TCTM or any of its affiliates, including a "potential cause of action against TerraMar Capital LLC for breach of Non-Disclosure Agreement," is irrevocably waived; and (ii) any existing right to investigate and/or pursue a Challenge (as that term is defined in Docket Item 238 paragraph 19)[15] is hereby terminated.

510 argues this language is impermissible and precludes confirmation of the Plan. Countering this position the Plan proponents argue that TCTM is providing the only funding available to propose a viable Plan through the Plan Carve-Out and the Creditor Note, which justifies the release.

A bankruptcy court has the authority to consider and order implementation of third party releases as part of its core jurisdiction. *Lynch v. Lapidem Ltd. (In re Kirwan Offices S.A.R.L.),* 2018 U.S. Dist.

---

[15] A "Challenge" means (i) a contested matter, adversary proceeding, or other action or "claim" (as defined in the Bankruptcy Code) filed by the Committee on behalf of the Debtors and their estates or the creditors of the Debtors with this Court challenging or otherwise objecting to the findings included in this Order or (ii) a contested matter, adversary proceeding, or other action filed with this Court against TCTM or Fifth Third in connection with or related to the Loan Agreement, or the actions or inactions of TCTM or Fifth Third arising out of or related to the Loan Agreement, or otherwise, including, but not limited to, any claim against TCTM or Fifth Third in the nature of a "lender liability" cause of action, setoff, counterclaim or defense to any obligations under the Loan Agreement (including, but not limited to, those under sections 506, 544, 547, 548, 549, 550 and/or 552 of the Bankruptcy Code) and any claims or causes of action identified in the Debtors' schedule of assets. Proposed Consent Order filed in Fansteel, Inc., Case No. 16-1823, docket number 238, ¶ 19.

LEXIS 176898, *24 (S.D.N.Y. Oct. 10, 2018). Approving a third-party release "does not address the merits of the claims being released; those of course, are governed by non-bankruptcy law." *Id.* Non-debtor protections are rare and only permitted in extraordinary cases and under unique circumstances. See *Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 143 (2d Cir. 2005); *Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 657 (6th Cir. 2002).

Third party releases are not forbidden in the context of a plan, but such releases are subject to careful review to ensure that the purpose does not lead to an abuse of the bankruptcy process or extend protections that would otherwise not be afforded. In the Eighth Circuit non-consensual third-party releases in a chapter 11 plan of reorganization may be permissible but only where certain stringent requirements are met. To this extent 510 has raised a colorable objection. A five-factor analysis has developed to weigh whether a third-party release is legitimate in the context of a reorganization plan.

> (1) There is an identity of interest between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate.
> (2) The non-debtor has contributed substantial assets to the reorganization.
> (3) The injunction is essential to reorganization. Without the (sic) it, there is little likelihood of success.
> (4) A substantial majority of the creditors agree to such injunction, specifically, the impacted class, or classes, has "overwhelmingly" voted to accept the proposed plan treatment.
> (5) The plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction.[16]

*In re Master Mortgage Inv. Fund, Inc.,* 168 B.R. 930, 934–35 (Bankr. W.D. Mo. 1994). Courts may also examine non-debtor releases outside of the boundaries of rigid factors and may take into account the circumstances of a specific case when making a determination of whether non-party releases are appropriate. *Id.* at 935. In this Circuit at least one court has considered the fairness of the releases in general. *In re U.S. Fidelis, Inc.,* 481 B.R. 503, 520 (Bankr. E.D. Mo. 2012) (finding that it would be a "truly unfair result" if an objection to releases in plan was sustained because plan would fall apart, no other plan would be presented, and the case would be dismissed or converted to chapter 7).

The relevant release clauses are not an effort to expand a discharge permitted under 11 U.S.C. §524. Further, because the Plan liquidates, a discharge is not at issue. 11 U.S.C. §1141(d)(3). The

---

[16] This factor is not entirely applicable to 510's claim under the circumstances of this case. The right to pursue a claim against Terra Mar arguably arises from 510's interests as an insider of the Debtor(s) and its potential ability to bring a private right of action which is unrelated to payment on its claim under the Plan.

14

release is also not an attempt to avoid a non-party's joint liability for a debtor's obligation. Instead, the Plan tailors the release to the Debtor's rights in a specific asset that can only be described as potential contingent claim for breach of contract involving Terra Mar. The release does not broadly extend to any other causes of action and is restricted in its application to claims that involving *fraud, willful misconduct, or gross negligence*. For these reasons, balancing the various and the purpose of the release balancing the various factors provides the best method to evaluate whether the release contained in the Plan is permissible. See *In re Nat'l Heritage Found., Inc.*, 478 B.R. 216, 232 (Bankr. E.D. Va. 2012) (weighing factors "on balance" for and against release); see also *In re Neogenix Oncology, Inc.,* 508 B.R. 345, 360 (Bankr. D. Md. 2014).

Having observed this progress of this case for almost two years the Court concludes that substantial facts exist to support the third-party release as an appropriate and legitimate component of the Plan. Specifically, the Court concludes that:

(1) TCTM, an affiliate of Terra Mar, is providing a substantial contribution and is the only funding available to propose a viable Plan.
(2) The professionals included in the release have worked tirelessly over the past two years to reach a consensual exit from chapter 11.
(3) An overwhelming majority of the creditors voted in favor of the Plan
(4) The plan provides a mechanism that realizes recovery for creditors who would receive no distribution in under chapter,
(5) The plan cannot move forward if the release and exculpation are not permitted.
(6) The purpose for the release contained in the Plan is measured and limited in scope.

For these reasons 510's objection to the Plan based upon the third-party release is overruled.

### d. Bad Faith and Collusion

510's final objection to the Plan broadly raises theories of collusion and bad faith. The focus of these accusations is against FCC and TCTM but there is an undercurrent that vaguely references that the OCC was aware of such conduct or tacitly promoted it.

TCTM was the successful bidder at auction for the sale of WDC's assets. Its offer included a credit bid of $24 million in addition to other funds contributed for the benefit of creditors, including professionals, the NRC and assumed contracts for a total bid package valued at $56.69 million. In its brief 510 maintains that:

> TCTM could have credit bid the full amount of its claim and then paid as further proceeds whatever amount its and the Debtor and Committee agreed (in the top-secret Memorandum of Understanding or otherwise) was necessary to confirm a plan, satisfy the 510 Ocean secured claim, and pay professionals. TCTM's purpose in not credit bidding the full amount of its claim is revealed in the Plan's alleged "contractual subordination of

15

> 510 Ocean's secured claim. By credit biding low and paying cash proceeds in the WDC Sale, TCTM artificially crafted a deficiency claim where none existed economically.

510 presents no evidence to substantiate its theory. The grounds underlying this objection appear to be an attempt to untimely challenge the outcome and terms of the sale to TCTM. The APA and procedures governing the sale process were available to 510. At the sale hearing evidence involving the specifics of the auction process, its results and proposed use of proceeds was supplied. Based upon that evidence, the Court has previously determined that the sale was at arm's length and no collusion was evident. 510 failed to object to the sale and did not appear at the hearing. The order approving the sale is final and 510 cannot resurrect these issues at this stage of the proceeding. See *In re Veg Liquidation, Inc.*, 583 B.R. 203, 210 (B.A.P. 8th Cir. 2018).

The confirmation standard at 11 U.S.C. 1129(a)(3) requires that a "plan has been proposed in good faith and not by any means forbidden by law." The term "good faith" is not defined in the Bankruptcy Code. The court must determine "whether the plan constitutes an abuse of the provisions, purpose or spirit of the Code." *In re Riverbend Leasing LLC*, 458 B.R. at 529. (citations omitted).

"The court should judge each case on its own facts after considering the totality of the circumstances surrounding the plan and the bankruptcy filing." *Id.* Several factors are evaluated to make a finding of good faith. For example, good faith exists when "there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code." *Hanson v. First Bank*, 828 F.2d 1310, 1315 (8th Cir. 1987) (citations omitted); *In re Egan*, 458 B.R. 836, 850 (Bankr. E.D. Pa. 2011) ("Generally speaking, bad faith cannot be inferred from conduct permitted by the Bankruptcy Code"). Such results include "maximizing value . . . and reaching compromise among disparate constituencies." *In re Charles Street African Methodist Episcopal Church of Bos.*, 578 B.R. 56, 97 (Bankr. D. Mass 2017). The Court is convinced that these results have been achieved in this case. A court may also consider "whether [the debtor] has unfairly manipulated the Bankruptcy Code." *Molitor v. Eidson (In re Molitor)*, 76 F.3d 218, 220 (8th Cir. 1996); *In re LeMaire*, 898 F.2d 1346, 1349 (8th Cir. 1990). Based upon the record the Court is not aware that any such efforts were undertaken by the plan proponents.

Liquidation in a chapter 11 proceeding is permitted to maximize the benefits afforded creditors under the Plan. 510 focuses on the MOU and complains that failure to disclose the contents of that document prevents confirmation of the Plan. It is unclear to the Court why this document was filed at all and acknowledges that filing it under seal reflects a lack of transparency. Notwithstanding these

16

observations, if the document had been executed and never been filed, 510 would not have been privy or entitled to its contents. 510 identifies no specific information in the MOU to support its claim of bad faith. Standing alone, the Court finds that the MOU does not demonstrate bad faith or collusion.

Finally, 510 asserts that TCTM, the OCC and FCC colluded to manipulate TCTM's claim in order to preclude any distribution to 510. A plan proponent bears the burden of establishing the plan's compliance with each of the requirements set forth in § 1129(a), while the objecting parties bear the burden of producing evidence to support their objections. *In re Genesis Health Ventures, Inc.,* 266 B.R. 591, 598-99 (Bankr. D.Del. 2001); *Matter of Greate Bay Hotel & Casino, Inc.,* 251 B.R. 213, 221 (Bankr. D.N.J. 2000). No evidence was presented to substantiate this theory.

510 failed to meet its burden to establish either collusion or lack of good faith and its objections on these grounds are overruled.

**IT IS HEREBY ORDERED:**

1. 510's objections to the Disclosure Statement and Plan are overruled.

2. By entry of this ruling the Disclosure Statement is approved.

3. The Plan will be confirmed by separate Order.

/s/ Anita L. Shodeen
Anita L. Shodeen
U.S. Bankruptcy Judge

Parties receiving this Memorandum of Decision from the Clerk of Court:
Electronic Filers in this Chapter Case